UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUNG MIN LEE,<br><br>    Plaintiff,<br><br>    v.<br><br>FORIS DAX, INC., et al.,<br><br>    Defendants. | Case No. 24-cv-06194-WHO<br><br>**ORDER DENYING MOTION TO REMAND, STAYING CLAIMS IN PART, AND GRANTING MOTIONS TO DISMISS**<br><br>Re: Dkt. Nos. 7, 9, 13, 22, 53 |

Plaintiff Jung Min Lee ("Lee") alleges that defendants First Republic Bank (receiver, Federal Deposit Insurance Corporation) ("FDIC-R"), Foris DAX (d/b/a Crypto.com), and former First Republic Bank employee Catherine Evans (collectively, the "defendants"), enabled unknown internet cryptocurrency scammers to take advantage of her elderly husband by enticing him to withdraw fiat currency from various accounts that he held at First Republic Bank and invest those funds in fraudulent cryptocurrency ventures. Lee wants me to remand the case to the Superior Court of California, County of San Francisco. But FDIC-R's removal pursuant to 12 U.S.C. § 1819(b)(2)(B) and 28 U.S.C. § 1441(a) was proper, and Lee's motion to remand is DENIED.

The defendants move to dismiss the Complaint for several reasons. Lee has not satisfied administrative exhaustion procedures for claims against FDIC-R, and for that reason her claims against it and Evans cannot proceed. And she has not plausibly alleged that she has standing; the facts as pleaded do not demonstrate that she is the real party in interest. The defendants' motions are granted. The claims against FDIC-R and Evans are stayed pending exhaustion; Lee may amend the claims against Foris DAX within 20 days.

## BACKGROUND

### A. Factual Background

Lee is married to Donald Patz, who is not a plaintiff in this case. Complaint ("Compl.") [Dkt. No. 1-1] ¶¶ 18-19. Patz is 69 years old, qualifying as an "elder" under Cal. Welf. & Inst.

Code § 15610.27. Lee is not elderly. Lee and Patz were longtime First Republic Bank ("First Republic") customers before First Republic was shut down in May 2023. They maintained "multiple accounts for their business," "personal checking, retirement, and wealth management." *Id.* ¶ 95.

According to the Complaint, in January 2023, "scammers" contacted Patz via Instagram and began chatting with him on the online messaging app "WhatsApp" to discuss what they described as an "investment opportunity." Compl. ¶¶ 87-89.[1] The scammers "targeted and exploited Mr. Patz's age and inherent vulnerability," *id.* ¶ 90, and told him that the investment would be managed through the cryptocurrency application "Changelly," *id.* ¶ 91.

Patz researched Changelly and determined that it was a reputable cryptocurrency site. *Id.* ¶ 92. But the scammers "mirror[ed] the legitimate Changelly website with an illegitimate, high-quality application," and told Patz that "he would need to invest in the fund via Crypto.com and provided him with detailed instructions on creating and funding the account." *Id.* ¶ 93. Patz then created an account on Crypto.com. *Id.* ¶ 93, n. 34.[2]

At that point, Patz "turned to his family's bank accounts at First Republic" for funds to invest at the scammers' instruction. *Id.* ¶ 94. Defendant Christine Evans was the financial planner and investment manager for Lee and Patz at First Republic. She was "aware that Plaintiff's family investment strategy was conservative." *Id.* ¶ 97. Up until January 2023, neither Lee nor Patz had ever made a transaction at First Republic related to cryptocurrency. *Id.* ¶ 98. But "[w]ithin a matter of days, and without making . . . a single inquiry for due diligence . . . First Republic wired almost a million dollars from Plaintiff's checking account to Crypto.com, where it was eventually

---

[1] The Complaint inconsistently refers to "scammers" plural, and "scammer," when explaining what happened to Patz. It is unclear how many individuals may have been a part of this scheme. None have been identified by name or any other identifying information. I will use the plural.

[2] Lee states in a footnote in the Complaint that "*Plaintiff* created an account on the Crypto.com app but did not consent to any terms and conditions as part of the signup. Crypto.com's terms and conditions are both procedurally and substantively unconscionable." Compl. ¶ 93, n.34. This suggests that Lee made the Crytpo.com account, not Patz, which does not match any of the other allegations in the Complaint but does illustrate a serious issue with the pleadings: Lee is attempting to assert claims that may not be hers to assert. *See* discussion *infra* Section III.

2

transferred on to fraudsters." *See id.* ¶ 100 (see chart breaking down the wire transfer amounts from First Republic to Crypto.com).³

Patz told Evans and First Republic that he was making the transfers to "invest" in cryptocurrency. *Id.* ¶ 101. Patz "swept funds from his retirement and investment accounts," which was money that "had been aside with the help of . . . Evans to help protect [Lee] and Patz's financial future." *Id.* ¶ 103. First Republic "authorized the transactions without any delay or inquiry." *Id.*

When First Republic "transferred Plaintiff's funds out of the banking system and onto a cryptocurrency exchange, the next phase of the fraud was underway: converting the fraud proceeds into cryptocurrency, laundering the funds once more, and transferring the funds to the custody of criminals." *Id.* ¶ 107. Defendant Foris DAX (d/b/a Crypto.com) allegedly "assisted the fraudsters by converted [sic] Plaintiff's fiat currency into Tether, a cryptocurrency known by Crypto.com to be a favored vehicle for fraud." *Id.* ¶ 111.

On February 20, 2023, apparently at the direction of the scammers, Patz registered a new wallet as a "whitelisted" wallet on his Crypto.com account.⁴ During the "whitelisting" process, which refers to the process by which an entity "identifies trustworthy agents, applications, or sources that are then pre-approved for access to a system," Foris DAX contacted Patz and asked him questions about his account activity. Compl. ¶¶ 129, 130. Patz answered that he was taking part in an investment opportunity. *Id.* ¶ 130. Later the same day, at 12:21 PM, Crypto.com confirmed a withdrawal to the "newly whitelisted" wallet for an amount of 10,759.74 USDT (the symbol for Tether), which has approximately the same value in USD. Two hours later, at 2:21 PM, Crypto.com confirmed a deposit of 35,916.34 USDT.

After the fiat currency was converted into Tether, Patz "saw his account balance begin to

---

³ The Complaint contains numerous inconsistencies as to where the money that Patz transferred to the purported scammers came from; whether it came from accounts that he shared with the plaintiff, or whether it came from his own private accounts. *See* discussion *infra* Section III.

⁴ Here, Lee refers to *Patz* as the individual who holds the Crypto.com account. *See* discussion *infra* Section III(A)(1).

grow at an exciting rate, prompting more and more investments," but when he tried to withdraw funds, "he was told he had to pay 'fees' to access them, totaling hundreds of thousands of dollars." *Id.* ¶¶ 115-117. At that point, the "scammer began suggesting that Mr. Patz liquidate other assets and approach friends and family for more money." *Id.* ¶ 118.

According to the pleadings, when Foris DAX made these conversions, "it knew that Patz was in fact a victim of fraud." *Id.* ¶ 112; *see also id.* ¶¶ 153-160 (alleging that Crypto.com knew that the "scam wallet" interacted with the "destination wallet" to which Patz was sending fiat currency when it enabled his transactions).[5] In total, Patz spent approximately $1.25 million USD. But it "was not until after his final transaction . . . that [he] noticed that the mirror site was not . . . associated with Changelly," and realized that he had been defrauded. *Id.* ¶ 121. Because Crypto.com collects fees for its transactions, Foris DAX "obtained hundreds of dollars in fees for transactions it allowed to go forward despite obvious red flag indicators." *Id.* ¶ 136.

**B.    Procedural Background**

On May 1, 2023, the California Department of Financial Protection and Innovation closed First Republic Bank and appointed the FDIC as the receiver. *See* Declaration of Jeremy Stamelman ("Stamelman Decl.") [Dkt. No. 7] ¶¶ 2-3; Exs. A, B. On July 1, 2024, Lee filed this lawsuit against First Republic and other defendants in Superior Court; her claims were based on events that occurred in January 2023. Dkt. No. 1-1.

On July 23, 2024, FDIC-R issued a "Notice to Discovered Claimant to Present Proof of Claim" to Lee, stating that the "Claims Bar Date" for actions against the "Failed Institution" (meaning First Republic) was September 5, 2023, and the submission deadline for administrative claims was October 31, 2024. *See* Stamelman Decl. Ex. C (Notice to Discovered Claimant). On August 30, 2024, FDIC-R filed a Notice of Substitution and removed the entire action to the United States District Court for the Northern District of California, pursuant to 12 U.S.C. §

---

[5] Lee qualifies this allegation by stating that "Crypto.com perhaps did not know the entire scheme or its intricacies, or who in fact it was aiding and abetting, but it knew and understood that Mr. Patz was at extreme risk of being a victim, and . . . knew of all the facts and circumstances of the transactions that pointed unequivocally to fraud." Compl. ¶ 112.

4

1819(b)(2)(B) and 28 U.S.C. § 1441(a). *See* Dkt. No. 1 (Notice of Removal). Lee moved to remand. Motion to Remand [Dkt. No. 9]. All defendants have moved to dismiss her claims. Dkt. Nos. 7, 13, 22.

**LEGAL STANDARD**

**I.    REMAND**

Under 28 U.S.C. § 1441(a), a defendant may remove a civil action from state court to federal court so long as original jurisdiction would lie in the court to which the action is removed. *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 163 (1997). According to the Ninth Circuit, courts should "strictly construe the removal statute against removal jurisdiction." *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992). Doubts as to removability should be resolved in favor of remanding the case to the state court. *Id*. This " 'strong presumption' against removal jurisdiction means that the defendant always has the burden of establishing that removal is proper." *Id.* (quoting *Nishimoto v. Federman-Bachrach & Assocs.*, 903 F.2d 709, 712 n.3 (9th Cir. 1990)).

Generally, a defendant must remove an eligible civil action within thirty days of receiving service of the complaint. 28 U.S.C. § 1446(b)(1). If, however, "the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant ... a copy of an amended pleading, motion, order, or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b)(3). "A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal." 28 U.S.C. § 1447(c); *see also Maniar v. FDIC*, 979 F.2d 782, 786 (9th Cir. 1992). A district court lacks power to order a remand in violation of Section 1447(c). *Id.*

**II.   12(B)(1)**

Dismissal is proper when a plaintiff fails to properly plead subject matter jurisdiction in the complaint. Fed. R. Civ. P. 12(b)(1). A "jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). If the challenge is based solely upon the allegations in the complaint (a "facial attack"), the court generally presumes the allegations in the

complaint are true. *Id.*; *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003). If instead the challenge disputes the truth of the allegations that would otherwise invoke federal jurisdiction, the challenger has raised a "factual attack," and the court may review evidence beyond the confines of the complaint without assuming the truth of the plaintiff's allegations. *Safe Air*, 373 F.3d at 1039. The plaintiff bears the burden of establishing subject matter jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

## DISCUSSION

**I.   MOTION TO REMAND**

FDIC-R removed this action from state court pursuant to 12 U.S.C. § 1819(b)(2)(B) and 28 U.S.C. § 1441(a). Dkt. No. 1 (Notice of Removal). Section 1819(b)(2)(B) provides:

> Except as provided [by the state action exception in subparagraph (D)], the [FDIC] may, without bond or security, remove any action, suit, or proceeding from a State court to the appropriate United States district court before the end of the 90-day period beginning on the date the action, suit, or proceeding is filed against the [FDIC] or the [FDIC] is substituted as a party.

12 U.S.C. § 1819(b)(2)(B). The statute's state action exception consists of a three-part test:

> Except as provided in subparagraph (E), any action–
> (i) to which the [FDIC], in the [FDIC's] capacity as receiver of a State insured depository institution by the exclusive appointment by State authorities, is a party other than as a plaintiff;
> (ii) which involves only the preclosing rights against the State insured depository institution, or obligations owing to, depositors, creditors, or stockholders by the State insured depository institution; and
> (iii) in which only the interpretation of the law of such State is necessary, shall not be deemed to arise under the laws of the United States.

12 U.S.C. § 1819(b)(2)(D).

Lee argues that this case belongs in state court for two reasons: (1) FDIC-R improperly filed its Notice of Substitution, establishing itself as Receiver for First Republic Bank and a party in this case; and (2) the Complaint only contains state law causes of action, and thus the state action exception applies. Remand Motion 1-2. FDIC-R responds that it properly filed its Notice of Substitution and argues that § 1819 and § 1441 confer upon it broad removal authority over Lee's claims. Opposition to Remand Motion ("Remand Oppo.") [Dkt. No. 37] 1. FDIC-R also contends that the state law exception does not apply here because its primary substantive

1  defense—that Lee failed to administratively exhaust her claims as is required by the Financial
2  Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA")—requires
3  interpretation of federal law. *Id.* 1, 4; *see also* discussion *infra*, Section II. It is correct on both
4  counts.

### A. Notice of Substitution

Lee argues that FDIC-R, as Receiver for First Republic Bank, cannot remove this action to federal court because it "never filed a notice of substitution in state court." Remand Motion 2:2-5. She says this because the Notice of Substitution that FDIC-R attached to its Notice of Removal does not bear a state court stamp indicating when it was filed on the docket in state court. *See* Dkt. No. 1, Ex. D. FDIC-R responds that the notice of substitution was filed on the same day that it removed the case. Remand Oppo. 1, 4. It explains that it did not provide a court-stamped copy of the notice because it was not available at the time that it filed its Notice of Removal. Remand Oppo. 2, 4; Stamelman Decl. ¶ 2.

The court-stamped copy is now available on the state court website (and was attached as an exhibit to FDIC-R's Opposition), *see* Stamelman Decl. Ex. A. The state court docket also shows that FDIC-R's Notice of Substitution was filed on August 30, 2024. FDIC-R complied with its obligations with respect to notices of substitution.

### B. FDIC-R's Removal Authority

Lee also argues that removal was improper because this case falls under the "state action exception." The first two prongs of the exception are met. FDIC-R is the receiver of First Republic Bank and is a defendant in this action. The action involves the preclosing rights and obligations owed to Lee as a depositor. *See* 12 U.S.C. § 1819(b)(2)(D); Dkt. No. 1, Exs. B, C. But the third prong of § 1819(b)(2)(D), "in which only the interpretation of the law of such State is necessary" is not met.

Lee only asserts state law claims in her Complaint. But as the court observed in *Verdi v. Federal Deposit Insurance Corp.*, 2023 WL 6388225 (C.D. Cal. Sept. 28, 2023), in deciding whether something falls under the state action exception, courts "focus[] on the question of whether *the federal defenses* are colorable," not just on whether the complaint asserts state or

7

federal law causes of action. *See Verdi*, 2023 WL 6388225, at *4 (collecting cases). If a court is presented with a defense arising under federal law, and consideration of that defense is necessary for the disposition of the action, then it cannot be said that "only the interpretation of the law of such State is necessary," as is provided by the third prong of the state action exception, 12 U.S.C. § 1819(b)(2)(D).

One of FDIC-R's defenses against Lee's claims is that they are barred by FIRREA, a federal statute, because Lee has not met the mandatory administrative exhaustion requirements to file a suit like this one against FDIC-R (and its employees). *See* discussion *infra*, Section II; *see generally* FDIC-R's Motion to Dismiss [Dkt. No. 7]. Accordingly, the state action exception does not apply. FDIC-R has removal authority under § 1819(b)(2)(B) and § 1441. The motion to remand is DENIED.

## II.  FDIC-R AND EVANS'S MOTIONS TO DISMISS

FDIC-R moves to dismiss the Complaint on the grounds that this court lacks jurisdiction over Lee's claims because she has failed to exhaust her mandatory administrative remedies in accordance with 12 U.S.C. § 1819(d)(5). Evans moves to dismiss the Complaint on the same grounds, and for failure to state a claim. Evans also has requested to join FDIC-R's motion to dismiss and related briefs in support. *See* Dkt. Nos. 22, 38.[6]

### A.   Claims Under FIRREA Require Exhaustion

After the savings and loan crisis of the 1980s, Congress passed FIRREA to "give the FDIC power to take all actions necessary to resolve the problems posed by a financial institution in default." *Sahni v. Am. Diversified Partners*, 83 F.3d 1054, 1058 (9th Cir. 1996) (quoting H.R. Rep. No. 101-54(I), at 330 (1989)). FIRREA authorizes the FDIC to "act as receiver or conservator of a failed institution for the protection of depositors and creditors." *Sharpe v. FDIC*, 126 F.3d 1147, 1154 (9th Cir. 1997). Once the FDIC has assumed receivership of a bank, FIRREA requires claimants to exhaust administrative remedies before filing certain claims.

---

[6] My analysis of FDIC-R's motion to dismiss applies to Evans because the Complaint does not allege that Evans acted in an individual capacity; Lee's allegations against Evans all concern her role as a financial advisor and investment manager at First Republic prior to its being shut down. *See* Compl. I expand on this later, *see* discussion *infra,* Section II(C).

8

*Benson v. JPMorgan Chase Bank, N.A.*, 673 F.3d 1207, 1211 (9th Cir. 2012). The claims to which this requirement applies include: (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the FDIC has been appointed receiver, including assets which the FDIC may acquire from itself as such receiver; or (ii) any claim relating to any act or omission of such institution or the FDIC as receiver. 12 U.S.C. § 1821(d)(13)(D)

The administrative process requires the FDIC, shortly after a financial institution is placed in receivership, to publish a notice setting a bar date for filing claims against the receivership, which may be not less than 90 days after the publication of such notice. 12 U.S.C. §1821(d)(3)(B). FDIC-R did this, via newspaper publication, shortly after it took over First Republic. *See* Stamelman Decl. Ex. C. The published bar date for First Republic was September 5, 2023. FDIC-R Motion 3:15; *see also* Stamelman Decl. Ex. C.

Once the claimant files a claim, the FDIC, as receiver, has 180 days within which to review and allow or disallow a claim and to notify the claimant of the allowance or disallowance of the claim. 12 U.S.C. § 1821(d)(5)(A). Claims filed after the published bar date must be "disallowed and such disallowance shall be final," unless the late-filed claims exception set forth in 12 U.S.C. §1821(d)(5)(C)(ii) applies. 12 U.S.C. § 1821(d)(5)(C)(i). "If the claim is disallowed, or if [ ] 180 days expire without a determination by the FDIC, then the claimant may request further administrative consideration of the claim, or seek judicial review." *Henderson v. Bank of New England*, 986 F.2d 319, 320 (9th Cir. 1993).

This administrative exhaustion requirement is jurisdictional. Prior to exhaustion, no court has subject-matter jurisdiction over a plaintiff's claims. 12 U.S.C. § 1821(d)(13)(D); *Intercont'l Travel Mktg., Inc. v. FDIC*, 45 F.3d 1278, 1283 (9th Cir. 1994).

**B.    Lee Has Not Exhausted Mandatory Administrative Remedies**

FIRREA clearly applies to Lee's claims. The plain meaning of section 1821(d)(13)(D) limits the court's jurisdiction over "any claim relating to any act or omission" of an institution for which the FDIC has been appointed receiver. 12 U.S.C. § 1821(d)(13)(D)(ii). Lee's allegations challenge First Republic's acts and omissions concerning her husband's assets held in First

9

Republic accounts. *See* Compl. ¶¶ 5, 7, 9, 10, 11, 60-77, 94-106. She alleges that First Republic provided banking services to her husband without performing due diligence or further inquiry into whether he was being "scammed" by third parties. *See id.* ¶¶ 94-106. All of her claims arise from alleged conduct prior to FDIC-R assuming the role of Receiver.

FDIC-R argues that this court does not have subject-matter jurisdiction because Lee has not exhausted administrative remedies under FIRREA. *See* FDIC-R Motion to Dismiss. In seeking remand, Lee does not contest that she has failed to exhaust administrative remedies; she contends that she did not have to exhaust those remedies because she was never given proper notice that FDIC-R was the receiver for First Republic. *See* Plaintiff's Opposition to FDIC-R Motion [Dkt. No. 34]. Nonetheless, she recently filed an administrative claim with FDIC-R on September 18, 2024, two days before she filed her opposition to FDIC-R's Motion to Dismiss, and several weeks before she filed her reply in support of her Motion to Remand. *See* Supplemental Declaration of Jeremy Stamelman ISO FDIC-R's Motion to Dismiss [Dkt. No. 39-1]; *see generally* docket.[7]

Lee's "lack of notice" argument is belied by a letter that FDIC-R attached to its motion to dismiss, showing that FDIC-R notified her on July 23, 2024, of its awareness of her potential claims against First Republic and of her administrative exhaustion obligations with respect to any such potential claims, including how she might show that her failure to file an administrative claim prior to the Claims Bar Date was excused. *See* Stamelman Decl. Ex. C (Notice to Discovered Claimant). FDIC-R presumably sent this letter after it became aware of Lee's claims in this lawsuit. It explained: "Because the Claims Bar Date has passed in this case, you must prove to the Receiver's satisfaction that you did not receive notice of the appointment of the Receiver in time to file a claim before the Claims Bar Date." *See id.* at p. 3 (citing 12 U.S.C. §1821(d)(5)(C)(ii)).

Lee has not alleged why she did not file a claim before the Claims Bar Date or why she did not file an administrative claim until September 18, 2024, even though she certainly knew that the

---

[7] Though Lee did not mention this development in her opposition or reply papers, her counsel confirmed it at oral argument.

10

1  FDIC had seized control of First Republic no later than July 1, 2024, when she filed the
2  underlying action in state court. *See* Compl. ¶ 24 ("[o]n May 1, 2023, [FDIC-R] seized control of
3  First Republic following a collapse of the bank and failed attempts at rescue.").[8]

4  Lee filed this suit prematurely; she must exhaust her administrative remedies first. Until
5  that happens, "no court shall have jurisdiction." 12 U.S.C. § 1821(d)(13)(D). Accordingly, FDIC-
6  R's motion to dismiss is GRANTED, and Lee's claims against it are dismissed without prejudice.
7  Considering the pending statutory window, Lee's claims against FDIC-R are stayed until the 180-
8  day period runs or FDIC-R issues a formal determination with respect to her claims, whichever
9  happens first.

### C. The Same Analysis Applies to Evans' Motion to Dismiss

According to the Complaint, Evans was a "Senior Managing Director and Wealth Manager and employee at First Republic," and Lee and Patz's "financial planner and investment manager." Compl. ¶¶ 26, 97. Lee alleges that after her husband was contacted by scammers in 2023, he requested that First Republic transfer funds out of "his retirement and investment accounts" and told Evans and First Republic that he was "making the transfers to 'invest' in cryptocurrency." Compl. ¶ 101. First Republic and Evans authorized these transfers into a cryptocurrency exchange. *Id.* ¶¶ 104, 107.

Lee is required to exhaust her claims against Evans for the reasons discussed in the preceding section. As Evans points out, "plaintiffs who wish to file suit against former employees of failed financial institutions (who acted in their official capacities) must first pursue the administrative claims process through the FDIC." Evans Motion 11:17-23 (citing *Colenzo v. Federal Deposit Insurance Corporation*, 2010 WL 11507527, at *2 (C.D. Cal. Apr. 28, 2010) for the rule that for complaints against failed banks and those banks' employees, "the administrative claims procedure . . . is a prerequisite to federal jurisdiction.").

---

[8] In her Opposition to FDIC-R's Motion to Dismiss, Lee also reasserts her arguments about the notice of substitution, which I discussed in the context of her remand motion. *See supra* Section I (Motion to Remand). She argues that what she perceives to be FDIC-R's flawed removal process excuses her from administrative exhaustion obligations. *See* Oppo. to FDIC-R Motion 4-5. This argument is not persuasive for the reasons discussed already. *See supra* discussion Section I.

11

Lee argues that Evans is "situated differently" from her former employer, First Republic, because she is an "SEC-registered investment adviser, a certified financial planner, as well as a FINRA-registered broker." Opposition to Evans Motion [Dkt. No. 44] 7-8. This argument reinforces that at all times covered in the Complaint Evans was acting in her capacity as an employee-agent of First Republic. While Lee argues that Evans had a heightened responsibility as a fiduciary with "intimate knowledge" about Patz's and Lee's lives and finances, Evans' role as a fiduciary was a function of her employment with First Republic. Nowhere in the Complaint does Lee allege that Evans acted in her individual capacity when interacting with Patz, separate from her role as a First Republic employee. Quite the opposite—Lee repeatedly groups Evans and First Republic together in the pleadings. *See e.g.*, Compl. ¶¶ 71-74, 101 ("[i]n an email exchange with Defendant Evans, Mr. Patz told Evans and First Republic that he was making the transfers to 'invest' in cryptocurrency,"), ¶¶ 105-107 (referring to "First Republic and Defendant Evans" as simultaneous actors), ¶¶ 125-126.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

There is one more major issue that affects all defendants: Lee has not shown why she has standing to bring the claims that she asserts. I discuss this issue next.

### III. FORIS DAX MOTION TO DISMISS

#### A. Standing

Lee makes four claims, each of which is asserted against every defendant: (1) Violation of the Elder Abuse and Dependent Adult Civil Protection Act Cal. Wel. & Inst. Code §§ 15600 ("Elder Abuse Act"); (2) Violation of California's Unfair Competition Law Cal. Business & Professions Code §§ 17200, et seq. (the "UCL"); (3) Aiding and Abetting; and (4) Negligence and Gross Negligence. But the pleadings do not plausibly allege, at least at this juncture, that she has stated a claim for relief.

#### 1. "Real Party in Interest"

Under Fed. R. Civ. P. Rule 17(a), "[a]n action must be prosecuted in the name of the real party in interest." To identify the real party in interest, the court evaluates the complaint as a whole, rather than claim-by-claim. *See In re New York,* 256 U.S. 490, 500 (1921) (stating that the

1    real party in interest is determined by looking at "the essential nature and effect of the proceeding,
2    as it appears from the entire record"). To evaluate standing, California courts consider whether
3    the plaintiff is a "person aggrieved by the alleged conduct or otherwise 'beneficially interested' in
4    the controversy." *Tepper v. Wilkins*, 10 Cal. App. 1198, 1204 (2017).

5    The Complaint, as pleaded, repeatedly conflates Lee (the plaintiff) with her husband (the
6    subject of the alleged fraud, Crypto.com account holder, and the elder). Throughout the pleadings,
7    Lee attempts to substitute herself for Patz, stating things like, "*Plaintiff* was a victim of . . . an
8    elder financial exploitation and abuse scam, enabled and assisted by [Foris DAX's]
9    cryptocurrency platform," Compl. ¶ 8, and alleging that Foris DAX "knowingly assisted in the
10   fraud against *Plaintiff*," *id.* ¶ 11, even while the Complaint clearly identifies that Lee's *husband*
11   (who is not a plaintiff in this case) was the subject of the alleged fraud and abuse. *See e.g.*, *id.* ¶
12   60 ("[d]efendants knew *Mr. Patz* was a victim but nonetheless . . . shirked their professional
13   responsibilities,") (emphasis added), *id.* ¶¶ 87-93, 107-111 (explaining how *Mr. Patz* was the
14   victim of a scam that encouraged him to invest money in Crypto.com, and how Crypto.com
15   allegedly "assisted the fraudsters"); *compare* Compl. ¶ 93, n.34 (alleging that "Plaintiff created a
16   Crytpo.com account"), *with* Compl. ¶¶ 129-130 (discussing Patz's Crypto.com account in
17   connection with the scammers). Nowhere in the Complaint does Lee allege that she had a
18   Crypto.com account or suggest that she was targeted by the scammers on the platform. *See supra*,
19   n. 2 (discussing misleading allegations about who held a Crypto.com account). Accordingly, it is
20   unclear that Lee has her own claims to bring.[9]

21   Lee responds that she has standing to bring her claims because she was "personally
22   aggrieved" by Crypto.com's "misconduct resulting in a loss of her property." Oppo. to DAX
23   Motion, 2-3. She states that she is Patz's wife, and that she has a "property right and a legally
24   cognizable interest in and claim against the property affected by these proceedings, because the
25   funds at issue are her property." Compl. ¶ 183.

26   Lee analogizes her situation to that of the spouse in a wrongful foreclosure case, *Turner v.*

---

[9] *See* DAX Motion 11-12 for list of allegations in the Complaint involving Patz, not Lee.

*Seterus Inc.*, 27 Cal. App. 5th 516 (2018).  In *Turner*, the spouse's name was not on the deed of trust, but he argued that he had contributed monthly payments to the home loan, thereby converting what was once his wife's separate property from before their marriage into community property and vesting in him an interest in that property.  *Turner*, 27 Cal. App. 5th at 523-25.  The court agreed, holding that under the allegations asserted in the complaint, the community had an interest in the property, so the spouse had standing to pursue tort causes of action "to the extent those causes of action alleged that [defendant's] conduct resulted in the loss of property—and, as a result, the community's interest therein." *Id.* at 525.

There lies the problem for Lee.  The only First Republic accounts that the Complaint specifically identifies are Patz's personal accounts.  The Complaint alleges that Patz "swept funds from *his* retirement and investment accounts," which was money that "had been aside with the help of . . . Evans to help protect [Lee] and Patz's financial future." *Id.* ¶ 103 (emphasis added).  The pleadings do not plausibly allege that the money Patz lost came from joint accounts that he held with Lee such that she might have a property right in them.

The Complaint is, at best, *unclear* regarding whose money was involved and eventually lost throughout the duration of the alleged scam.  Early in the Complaint, Lee alleges that the "[d]efendants . . . [knew] that *Plaintiff*'s," meaning Lee's, "transmittal orders would send *his*," meaning Patz's, "hard-earned savings right into the hands of criminals," Compl. ¶ 9 (emphasis added).  Then, just three paragraphs later, the Complaint states that "Plaintiff brings this lawsuit to recover *her* stolen property", *id.* ¶ 12, and again later alleges that Patz moved "their" money into a cryptocurrency exchange, from "Plaintiff's" checking account, *id.* ¶¶ 96, 99.  This shows that the pleadings conflate Lee, as the plaintiff, and Patz, as her husband and the supposed victim of the scam.

Without more specific pleadings indicating whose property was compromised, the Complaint does not support that Lee is the "real party in interest."[10]  I will grant Lee the opportunity to amend the Complaint to cure this inconsistency if she can.

---

[10] Evans also raises standing issues in her substantive motion.  *See* Evans Motion to Dismiss ("Evans Motion") [Dkt. No. 22] 6-10.  The foregoing analysis applies to Evans's motion as well.

14

### 2. Special Elder Abuse Act Standing

Some statutes carry with them special standing requirements. Lee asserts a claim against all defendants under the Elder Abuse Act, Welf. & Inst. Code, § 15600 et seq. She has not shown how she has standing to do so.

The Elder Abuse Act authorizes an action to be brought not only by the elder, but also by the elder's "personal representative," when the elder is alive but "lacks capacity pursuant to [s]ection 812 of the Probate Code, or is of unsound mind, but not entirely without understanding, pursuant to [section 38] of the Civil Code." *Tepper*, 10. Cal. App. at 1204-05. Lee has alleged that Patz is old enough to qualify, but not that he lacks capacity or has an unsound mind such that she would have standing.

Lee is not herself an elder. To bring this claim, she would need to plausibly allege that she acts as her (still living) husband's "personal representative" in one of the ways outlined by the statute. *See* Elder Abuse Act § 156.30(d) (defining "representative" as (1) conservator, trustee, or other representative of the estate, or (2) an attorney-in-fact acting within the authority of a power of attorney); *see also Tepper*, 10 Cal. App. 5th at 1201 (explaining that special standing rules apply to Elder Abuse Act claims, such that the elder, or their "personal representative" may bring the claims, and outlining when that representative may act on the elder's behalf). At the very least she would need to show that she has been "personally aggrieved" by the defendants' alleged violations of the Elder Abuse Act or otherwise "beneficially interested" in the outcome. *See Tepper*, at 1204.

Lee has not alleged that she is her husband's personal representative in one of the ways outlined via statute; she simply states that she was "personally aggrieved" by Foris DAX's actions because of the alleged loss of money from accounts she shared with her husband. *See* Oppo. to DAX Motion 5-6. At oral argument, and in her opposition papers, counsel for plaintiff insisted that this was sufficient to show standing under the Elder Abuse Act. *See* Dkt. No. 42 at 5-6 (citing *Tepper*, at 1204).

As pointed out above, it is in no way clear from the pleadings that Lee did have a property interest in the money out of which her husband was allegedly defrauded. And more importantly,

15

Lee has offered no case where an individual in her situation has been found to have standing to sue under the Elder Abuse Act.

Lee points to *Covenant Care, Inc. v. Superior Ct.*, 32 Cal. 4th 771 (2004) (which Foris DAX references in support of its argument that Lee's Elder Abuse Act claim fails first because she is not an elder), but she misses the point. *Covenant Care* involved the children of a decedent elder suing the managed care facility where the decedent had stayed up until his death. They could do that because of the provision of the Elder Abuse Act that allows an action to be brought by the elder's personal representative after the elder's death. *See Covenant Care, Inc.*, 32 Cal. 4th at 779-81; Elder Abuse Act § 15657.3, subd. (d)(1)). That Lee is not an elder is not a per se reason why her Elder Abuse Act claim fails as pleaded, it is a contextual reason. She must show that she has some statutorily recognized special relationship to Patz, for example as his conservator, trustee, or representative of his estate. *See Tepper*, 10 Cal. App. 5th at 1201.

Foris DAX's motion to dismiss is GRANTED. For her claims to survive, Lee must plead facts from which I could infer that she is the real party in interest for this claim, and she must show that she has some kind of relationship to either Patz or to the property at issue such that she, as a non-elder, could sustain a claim under the Elder Abuse Act.[11]

## CONCLUSION

For the foregoing reasons, the motions to dismiss are GRANTED. Lee's claims against FDIC-R and Evans are stayed pending the FDIC administrative review process. To the extent that she wishes to amend her claims against Foris DAX, Lee shall file an amended complaint within 20 days of the date below.

**IT IS SO ORDERED.**

Dated: November 25, 2024

William H. Orrick
United States District Judge

---

[11] The parties have also provided briefing on the merits of Lee's claims, and whether they are plausibly alleged. Because Lee has failed to show that she has standing to bring her claims, I will not reach those questions now. On the same note, I will not consider the merits of Lee's objections to the "new reply evidence" filed by Foris DAX. Dkt. No. 53.