UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUNG MIN LEE,<br><br>    Plaintiff,<br><br>    v.<br><br>FORIS DAX, INC., et al.,<br><br>    Defendants. | Case No. 24-cv-06194-WHO<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**<br><br>Re: Dkt. No. 67 |

Plaintiff Jung Min Lee ("Lee") alleges that defendant Foris DAX, Inc. (d/b/a and hereafter, "Crypto.com") enabled unknown internet cryptocurrency scammers to take advantage of her elderly husband by soliciting him to withdraw fiat currency from various accounts that he held with Lee at First Republic Bank, and to invest those funds in fraudulent cryptocurrency schemes. In my prior order, I directed Lee to amend her complaint to include facts from which I could infer that she, and not just her husband, was a proper party to bring this action against Crypto.com. *See* Dkt. No. 59 ("Prior Order"). She has now clarified that the bank accounts from which her husband withdrew funds to facilitate his participation in the purported scam contained community property and claims that she too was injured when he transferred money from those accounts to the purported scammers. This is the only connection she has pleaded to her husband's alleged exploitation.

I will assume without deciding that Lee has general Article III standing because she has lost what she says was community property. But she lacks standing for claims under California's Elder Abuse and Dependent Adult Civil Protection Act (Cal. Welf. & Inst. Code §§ 15600, *et seq*.) ("Elder Abuse Act") and Unfair Competition Law (Cal. Business & Professions Code §§17200, *et seq*.) ("UCL"). Her negligence claim fails because she had no relationship with Crypto.com, and

it had no reason to know of her existence (much less her financial connection to her husband) and therefore she cannot allege that it breached a duty to her. Her aiding and abetting claim falls short; it is unclear *what tort* Lee alleges that Crypto.com aided and abetted. Crypto.com's motion to dismiss is GRANTED.

## BACKGROUND

### A.   Factual Background

Lee is married to Donald Patz ("Patz"), who is not a plaintiff in this case. *See* First Amended Complaint ("FAC.") [Dkt. No. 63] ¶¶ 18-19. Patz is 69 years old, an "elder" under Cal. Welf. & Inst. Code § 15610.27. Lee is not an elder.

Lee and Patz were longtime First Republic Bank ("First Republic")[1] customers before First Republic was shut down in May 2023 and put under a receivership. The couple maintained "multiple accounts for their business," "personal checking, retirement, and wealth management." *Id.* ¶ 111. These accounts held community property, to which Patz and Lee both hold legal interest. *Id.* ¶¶ 117, 121.

In January 2023, "scammers" contacted Patz via Instagram and began chatting with him on the online messaging app "WhatsApp" to discuss what they described as an "investment opportunity." FAC ¶¶ 103-105.[2] The scammers "targeted and exploited Mr. Patz's age and inherent vulnerability," and told him that the investment would be managed through the cryptocurrency application "Changelly." *Id.* ¶¶ 106, 107.

Patz researched Changelly and determined that it was a reputable cryptocurrency site. *Id.* ¶ 108. But the scammers "mirror[ed] the legitimate Changelly website with an illegitimate, high-quality application," and told Patz that "he would need to invest in the fund via Crypto.com and

---

[1] First Republic Bank (receiver, Federal Deposit Insurance Corporation, "FDIC-R") is a defendant in this case. *See* Complaint [Dkt. No. 1]. I stayed Lee's claims against the FDIC-R and First Republic Bank employee individual defendant Catherine Evans pending the FDIC administrative review process, which Lee had not completed prior to filing this action. *See* Dkt. No. 59 (Prior Order). References to First Republic and Evans in this order are included for factual continuity only.

[2] The FAC inconsistently refers to "scammers" plural, and "scammer," when explaining what happened to Patz. It is unclear how many individuals may have been a part of this scheme. None have been identified by name or any other identifying information. I will use the plural.

2

provided him with detailed instructions on creating and funding the account." *Id.* ¶ 109. Patz then created an account on Crypto.com. *Id.* At no point did Lee create an account on Crytpo.com or use Patz's account.

Patz "turned to his family's bank accounts at First Republic" for funds to invest at the scammers' instruction. *Id.* ¶ 110. Up until January 2023, neither Lee nor Patz had ever made a transaction at First Republic related to cryptocurrency. *Id.* ¶ 114. But "[w]ithin a matter of days, and without making . . . a single inquiry for due diligence . . . First Republic wired almost a million dollars of community property from the married couple's checking account to Crypto.com, where it was eventually transferred on to fraudsters." *See id.* ¶ 116 (chart breaking down the wire transfer amounts from First Republic to Crypto.com).

Patz told First Republic that he was making the transfers to "invest" in cryptocurrency. *Id.* ¶ 119. Patz "swept funds from retirement and investment accounts," which were "[a]ll" part of the "married couple's community property." *Id.* ¶ 121. Not "one penny" of the funds at issue was "in any way separate non-community property." *Id.* ¶ 117. This money "had been aside with the help of . . . [First Republic employee Catherine Evans] to help protect [Lee] and Patz's financial future." *Id.*

When First Republic "transferred Plaintiff's funds out of the banking system and onto a cryptocurrency exchange, the next phase of the fraud was underway: converting the fraud proceeds into cryptocurrency, laundering the funds once more, and transferring the funds to the custody of criminals." *Id.* ¶ 126. Crypto.com allegedly "assisted the fraudsters by converting the fiat currency into Tether, a cryptocurrency known by Crypto.com to be a favored vehicle for fraud." *Id.* ¶ 130.

On February 20, 2023, apparently at the direction of the scammers, Patz registered a new wallet as a "whitelisted" wallet on his Crypto.com account. *Id.* ¶ 148. During the "whitelisting" process, which refers to the process by which an entity "identifies trustworthy agents, applications, or sources that are then pre-approved for access to a system," Crypto.com contacted Patz and asked him questions about his account activity. *Id.* ¶¶ 149, 150. Patz answered that he was taking part in an investment opportunity. *Id.* ¶ 149. Later the same day, at 12:21 PM, Crypto.com

1  confirmed a withdrawal to the "newly whitelisted" wallet for an amount of 10,759.74 USDT (the
2  symbol for Tether), which has approximately the same value in USD. *Id.* ¶ 154. Two hours later,
3  at 2:21 PM, Crypto.com confirmed a deposit of 35,916.34 USDT. *Id.* ¶ 155.

After the fiat currency was converted into Tether, Patz "saw his account balance begin to grow at an exciting rate, prompting more and more investments," but when he tried to withdraw funds, "he was told he had to pay 'fees' to access them, totaling hundreds of thousands of dollars." *Id.* ¶¶ 134-136. At that point, the "scammer began suggesting that Mr. Patz liquidate other assets and approach friends and family for more money." *Id.* ¶ 137.

According to the pleadings, when Crypto.com made these conversions, "it knew that Patz was in fact a victim of fraud." *Id.* ¶ 131; *see also id.* ¶¶ 176-183 (alleging that Crypto.com knew that the "scam wallet" interacted with the "destination wallet" to which Patz was sending fiat currency when it enabled his transactions).[3] In total, Patz spent approximately $1.25 million USD; But it "was not until after his final transaction . . . that [he] noticed that the mirror site was not . . . associated with Changelly," and realized that he had been defrauded. *Id.* ¶¶ 141-142. Because Crypto.com collects fees for its transactions, Crypto.com "obtained hundreds of dollars in fees for transactions it allowed to go forward despite obvious red flag indicators." *Id.* ¶ 158.

### B. Procedural Background

On July 1, 2024, Lee filed this lawsuit against Crypto.com and the other defendants in Superior Court. Dkt. No. 1-1. On August 30, 2024, the FDIC, as Receiver for defendant First Republic Bank, filed a Notice of Substitution and removed the entire action to the United States District Court for the Northern District of California, pursuant to 12 U.S.C. § 1819(b)(2)(B) and 28 U.S.C. § 1441(a). *See* Dkt. No. 1 (Notice of Removal). Lee moved to remand, and all defendants moved to dismiss her claims. Motion to Remand [Dkt. No. 9]. In the Prior Order, I denied the motion to remand, stayed all claims against the FDIC-R and individual defendant

---

[3] Lee qualifies this allegation by stating that "Crypto.com perhaps did not know the entire scheme or its intricacies, or who in fact it was aiding and abetting, but it knew and understood that Mr. Patz was at extreme risk of being a victim, and . . . knew of all the facts and circumstances of the transactions that pointed unequivocally to fraud." FAC ¶ 112.

4

1  Evans, pending resolution of Lee's administrative appeal, and granted Crypto.com's motion to

2  dismiss, giving Lee leave to amend.

3        Lee filed the First Amended Complaint against all defendants on December 16, 2024,

4  asserting four causes of action.  She alleges that Crypto.com: violated the Elder Abuse Act;

5  violated the UCL; aided and abetted the purported scammers; and was negligent in its duty to

6  exercise due care in providing its services as a financial institution.  With the claims against its co-

7  defendants stayed, Crypto.com moves to dismiss all of Lee's claims, arguing that she lacks Article

8  III standing, lacks particularized standing to assert her Elder Abuse Act or UCL claims, and has

9  failed to allege facts that support her claims.  Motion ("Mot.") [Dkt. No. 67].

**LEGAL STANDARD**

**I.     RULE 12(B)(1)**

      A motion to dismiss filed pursuant to Rule 12(b)(1) is a challenge to the court's subject matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  "Federal courts are courts of limited jurisdiction," and it is "presumed that a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  The party invoking the jurisdiction of the federal court bears the burden of establishing that the court has the requisite subject matter jurisdiction to grant the relief requested.  *Id.*

      A challenge pursuant to Rule 12(b)(1) may be facial or factual.  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  In a facial attack, the jurisdictional challenge is confined to the allegations pled in the complaint.  *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). The challenger asserts that the allegations in the complaint "are insufficient on their face to invoke federal jurisdiction."  *See Safe Air Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  To resolve facial attacks, the court assumes that the allegations in the complaint are true and draws all reasonable inferences in favor of the party opposing dismissal.  *See Wolfe*, 392 F.3d at 362.

      "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."  *Safe Air*, 373 F.3d at 1039.  To resolve factual attacks, the court "need not presume the truthfulness of the plaintiff's allegations."  *Id.*

1  (citation omitted).  Instead, the court "may review evidence beyond the complaint without
2  converting the motion to dismiss into a motion for summary judgment." *Id.* (same).  Once the
3  moving party has made a factual challenge by offering affidavits or other evidence to dispute the
4  allegations in the complaint, the party opposing the motion must "present affidavits or any other
5  evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject
6  matter jurisdiction." *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989); *see also Savage
7  v. Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).

## II.     RULE 12(B)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim.  A claim may be dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cook v. Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011) (citation and quotation marks omitted). Rule 8 provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Thus, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Plausibility does not mean probability, but it requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 687 (2009).  A complaint must therefore provide a defendant with "fair notice" of the claims against it and the grounds for relief.  *Twombly*, 550 U.S. at 555 (quotations and citation omitted).

In considering a motion to dismiss, the court accepts factual allegations in the complaint as true and construes the pleadings in the light most favorable to the nonmoving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).; *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007).  However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en

6

1  banc) (citations and quotations omitted).  However, a court "may exercise its discretion to deny
2  leave to amend due to 'undue delay, bad faith or dilatory motive on part of the movant, repeated
3  failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing
4  party ..., [and] futility of amendment.'" *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892–
5  93 (9th Cir. 2010) (alterations in original) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## DISCUSSION

## I. COMMUNITY PROPERTY AND ARTICLE III STANDING

Crypto.com argues that Lee lacks Article III standing because her claims arise out of conduct solely involving her husband.  In response, Lee argues that she suffered particularized injury caused by Crypto.com's actions because money that her husband transferred to the scammers, allegedly with Crypto.com's help, is community property in which she also has an interest.

### A. Article III Standing

The modern standing doctrine is composed of three basic constitutional elements and a corollary "prudential" limitation.  The constitutional elements require: (1) an "injury in fact," which is neither conjectural or hypothetical, (2) causation, such that a casual connection between the alleged injury and offensive conduct is established, and (3) redressability, or a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  "To establish an injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized.'" *In re Facebook*, 956 F.3d at 597 (quoting *Spokeo v. Robins*, 578 U.S. 330, 339 (2016)).  "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo*, 578 U.S. at 339.  It must also be "concrete." *Id.*  A concrete injury is one that "actually exist[s]"; that is, it must be "real, and not abstract," but it need not be tangible. *Id.* at 340 (quotation marks and citations omitted).

The prudential limitation "encompasses 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's

1  complaint fall within the zone of interests protected by the law invoked.'" *Elk Grove Unified Sch.*
2  *Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (internal quotations omitted).

### B. California is a Community Property State

"In California, all property acquired by a married person during the marriage is generally considered community property." *See Cal. Ordlock v. Comm'r*, 533 F.3d 1136, 1138 (9th Cir. 2008) (citing Fam. Code § 760 ("Except as otherwise provided by statute all property, real or personal, wherever situated, acquired by a married person during the marriage while domiciled in this state is community property.")). These statutory presumptions act as the foundation for the division of marital property and the obligations and rights that arise from that property. *See Marriage of Benson*, 36 Cal.4th 1096, 1103 (2005). A cause of action by one spouse based on wrongs done to the other can be sustained where loss of community property is the relevant injury. *United States v. Hooper*, 229 F.3d 818, 820 (9th Cir. 2000) (finding that California may recognize a community property interest in a relief from forfeiture proceeding but finding it unnecessary to decide this issue at that time); *see* Cal. Fam. Code §§ 760, 751; *United States v. $349,370.39 in U.S. Currency*, 22 F. App'x 731, 733 (9th Cir. 2001) (finding that a spouse had standing to contest a forfeiture action of currency because of her community property interest in that currency).

### C. Lee Has Shown Concrete Injury to Community Property

The Prior Order explained that it was unclear from Lee's pleadings whether the financial loss that her husband suffered because of the cryptocurrency scam involved money to which she had a legal right, or whether it was all his money. Without clarity about which spouse had an interest in the property lost, I could not determine whether Lee had Article III standing to bring her claims or whether she was trying to bring claims that belonged solely to her husband.

Lee has clarified that the money her husband transferred to scammers is community property in which she has a legal interest, meaning the loss of that property constituted a concrete injury done to her. In the FAC, she states that "[n]ot one penny of any of the funds alleged in the First Complaint" was separate property; it was all community property. FAC ¶ 117.

Crypto.com insists that Lee has still failed to show either particularized injury or causation, both of which are prerequisites for Article III standing. It argues that the money Patz lost was not

actually community property. But its efforts to discredit Lee's allegations on that point come up short. It points to a message allegedly sent by Patz to a Crypto.com representative in the wake of the scam where Patz sought help retrieving "'his funds'" as evidence directly contradicting Lee's allegation that the lost money was community property. *See* Mot. at 13; Reply 4-5. Of course, the fundamental principle underlying community property in California is that it is property to which both spouses have a right. Patz's reference to the property as "his" in these purported customer service messages is not inconsistent with Lee's allegations that it was community property that was lost: the money was, allegedly, both of theirs.

The cases upon which Crypto.com relies are distinguishable because they involve contract claims. *See e.g. Iezza v. Saxon Mortg. Servs., Inc.*, No. 10-03634 DDP JCGX, 2010 WL 3834041, at *1 (C.D. Cal. Sept. 28, 2010). Where claims arise out of breach of contract, the state's community property presumptions do not confer standing on a non-contracting spouse based on injury to community property. *See Gutierrez v. State Farm Mut. Ins. Co.*, No. 5:11-CV-03111 EJD, 2012 WL 398828 (N.D. Cal. Feb. 7, 2010) (citing *Austero v. Nat'l Cas. Co.*, 62 Cal. App. 3d 511 (1976)); *see also Hatchwell v. Blue Shield*, 198 Cal. App. 3d 1027 (1988); *Wilkinson v. PHH Mortg. Corp.*, No. 2:24-CV-1416 TLN AC PS, 2025 WL 565971, at *3 (E.D. Cal. Feb. 20, 2025) ("courts regularly dismiss wrongful foreclosure-based claims . . . that are brought by persons who were not parties to the mortgage loan at issue."). But the same is not necessarily true for non-contract claims. *See e.g.*, *Anderson v. SeaWorld Parks and Entertainment, Inc.*, No. 15-CV-02172-JSW, 2018 WL 1981396 (N.D. Cal. Feb. 18, 2018) (standing for wife in statutory claim for advertising misrepresentations by SeaWorld where injury was loss of community property and wife relied upon advertisements in deciding to purchase tickets, even though her husband bought the tickets).

Lee's claims do not arise out of a contract, so the *Iezza* court's holding that a wife's community property interest did not give her standing to challenge an allegedly mismanaged loan agreement because she was not a contract party to the loan agreement is inapplicable.

Lee has shown a plausible causal link between Crypto.com's actions and the alleged injury to her community property. It is true that Patz, not Lee, was the Crypto.com user involved in the

1   underlying transactions and was the victim of the alleged scam, and nowhere in the FAC does Lee
2   allege that she too had a Crypto.com account or that she was in any way involved in the actions
3   that led to her husband wiring their money to scammers.  Lee's lack of relationship with
4   Crypto.com creates other problems, which I discuss later, but it does not by itself defeat her ability
5   to show that Crypto.com's actions caused her injury.

6   Finally, Crypto.com argues that Lee cannot show that it, and not unknown third-party
7   scammers, caused Patz to lose the couple's community property.  *See* Mot. 12-14.  It points to
8   more statements that Patz made to a Crypto.com representative in the aftermath of the scam to
9   make a factual challenge to Lee's allegations under Rule 12(B)(1).  *See* Mot. at 12.  Crypto.com
10  includes Patz's communications to "challenge the truth of Plaintiff's contentions that Plaintiff's
11  injury was caused by Crypto.com's conduct" under Rule 12(b)(1).  Mot. at 12.  It argues that
12  Patz's message to Crypto.com's customer support representatives stating that "I realize this is my
13  stupidity and not the fault of [Crypto.com]," forecloses Lee's theory that Crytpo.com is to blame
14  for the losses.  *Id.* at 11-12.

15  Crypto.com's factual attack may be successful at trial, but it is unpersuasive under Rule
16  12(b)(1).  To prove causation, a plaintiff must show that the injury is "fairly traceable to the
17  challenged action of the defendant, and not the result of the independent action of some third party
18  not before the court."  *Shulman v. Kaplan*, 58 F.4th 404, 408 (9th Cir. 2023) (quoting *Lujan*, 504
19  U.S. at 560–61) (cleaned up).  Taking the facts as alleged in the FAC as true, Crypto.com enabled
20  all of the transactions between Patz and the scammers.  FAC ¶¶ 146, 161, 190.  Patz's messages
21  with Crypto.com representatives do not constitute a waiver of liability and do not foreclose the
22  theory that Crypto.com (among other parties) caused Lee's injury.

23  For now, I assume that Lee has Article III standing to bring her claims.[4]

## II.   ELDER ABUSE ACT

25  Lee is not an elder and does not purport to be a representative for her elder husband.  She

---

[4] *See Lujan v. G & G Fire Sprinklers, Inc.,* 532 U.S. 189, 121 S.Ct. 1446, 1450, 149 L.Ed.2d 391 (2001) ("[w]e assume, without deciding, that the . . . respondent has a property interest . . . in its claim for payment").

asserts a claim *on her own behalf* against Crypto.com for violations of the Elder Abuse Act. The text of the statute—and the state of the caselaw—necessitate dismissal of her claim.

### A. The Purpose of the Elder Abuse Act

"The purpose of the Elder Abuse Act . . . is essentially to protect a particularly vulnerable portion of the population from gross mistreatment in the form of abuse and custodial neglect." *Delaney v. Baker*, 20 Cal. 4th 23, 33 (1999). The Elder Abuse Act was designed to encourage the reporting of abuse and neglect of elders and dependent adults. But the California Legislature noticed that elder abuse lawsuits were rarely pursued because few attorneys would take the cases, in part because survival statues did not permit compensation if the elder died before a verdict could be reached. Accordingly, the Legislature modified the statutory scheme so that incentives were available for private civil enforcement through lawsuits against elder abuse and neglect. *See Est. of Lowrie*, 118 Cal. App. 4th 220, 226 (2004) (discussing legislative history of the Elder Abuse Act). In Welfare and Institutions Code section 15657.3, the Legislature specified that the Elder Abuse Act was intended to "enable interested persons to engage attorneys to take up the cause of abused elderly persons and dependent adults." Welf. & Inst. Code, § 15600, subd. (j), added by Stats.1991, ch. 774, § 2, p. 3476 (emphasis added). The Legislature intended a broad definition of standing in the context of elder abuse cases, not an unlimited one.

The Elder Abuse Act has special standing requirements. It authorizes that an action may be brought not only by the elder but also by the elder's "personal representative," when the elder is alive but "lacks capacity pursuant to [s]ection 812 of the Probate Code, or is of unsound mind, but not entirely without understanding, pursuant to [section 38] of the Civil Code." *See Tepper v. Wilkins*, 10 Cal. App. 5th 1198, 1204-05 (2017).

### B. Lee Does Not Have Standing Under the Elder Abuse Act

As in the original complaint, Lee alleges that Patz (who is still living) is old enough to qualify as an elder whom the Elder Abuse Act is designed to protect, but not that he lacks capacity or that he has an unsound mind and she acts as his representative. FAC ¶ 21. To bring this claim, Lee would need to plausibly allege that she acts as her husband's "personal representative" in one of the ways outlined by the statute. *See* Elder Abuse Act § 156.30(d) (defining "representative" as

11

1  (1) conservator, trustee, or other representative of the estate, or (2) an attorney-in-fact acting

2  within the authority of a power of attorney); *see also Tepper*, 10 Cal. App. 5th at 1201 (explaining

3  that special standing rules apply to Elder Abuse Act claims, such that the still-living elder, or their

4  "personal representative" may bring the claims, and outlining when that representative may act on

5  the elder's behalf).

6  But Lee does not purport to bring this claim on Patz's behalf: She brings it on her own.

7  She argues that *Tepper* supports her standing claim, but her reading of that case is off. The court

8  in *Tepper* found that the plaintiff did not have standing to challenge a wrong done to her mother

9  because she herself was not personally aggrieved, and because she was not her mother's personal

10  representative such that she could sue under the Elder Abuse Act on her mother's behalf. *See*

11  *Tepper*, at 1201. Lee claims that she is different from the plaintiff in *Tepper* because the

12  "[p]laintiff in *Tepper* was not a spouse of an elder victim of financial exploitation, and was thus

13  not endowed under § 751 with a 'present, existing, and equal interest[]' in the property at issue."

14  Lee Opposition ("Oppo.") [Dkt. No. 68] 10. She also asserts that "*Tepper* does not impose

15  'special standing requirements' but for plaintiffs *who do not assert they are personally aggrieved*"

16  and did not decide whether special standing rules pertain to claims where someone *is* personally

17  aggrieved. Oppo. 8 (emphasis added). She concludes that because "she *was* personally

18  aggrieved" (by the loss of community property), those special standing rules do not apply to her.

19  *Id.* 10. She also points to "dozens, indeed perhaps hundreds of cases" that hold that wives are

20  entitled to seek for loss of community property. *Id.* 11.

21  Lee misreads *Tepper*. There, in discussing whether the plaintiff had standing to bring an

22  Elder Abuse Act on her mother's behalf, the court observed that the plaintiff would *either* need to

23  have been personally aggrieved by the defendant's at-issue actions (to establish Article III

24  standing to sue on her own behalf), *or* she would need to sue on behalf of her mother as her

25  mother's personal representative. *Tepper*, 10 Cal. App. 5th at 1204. And as for the caselaw Lee

26  references, in none of the "dozens, indeed perhaps hundreds" of cases where non-elder wives

27  brought claims asserting injury to community property did they assert Elder Abuse Act claims *on*

28  *their own behalf* based on loss of community property that they shared with their elder husbands.

1    Nothing in the statutory text or caselaw suggests that it was the aim of the California
2    Legislature in enacting the Elder Abuse Act to allow non-elder, non-representative plaintiffs to
3    bring claims *on their own behalf* under the Elder Abuse Act. An elder can bring a claim under the
4    Elder Abuse Act on his or her own behalf, as can someone acting as the elder's representative in a
5    manner anticipated by the statute. *See Ring v. Harmon*, 72 Cal. App. 5th 844, 851 (Cal. App.
6    2021). No court has interpreted the statute to confer standing on someone in Lee's position.
7    Crypto.com's motion to dismiss this claim is GRANTED with prejudice.

### III. UCL

Lee's second cause of action alleges that Crypto.com violated the UCL, which prohibits any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Lee claims that Crypto.com acted unfairly, fraudulently, and unlawfully by "purporting to be a legally operating cryptocurrency exchange … when, in fact, Crypto.com failed to comply with legal requirements imposed on such institutions." FAC ¶¶ 241-245, 249.

To assert a UCL claim, a private plaintiff needs to have "suffered injury in fact and . . . lost money or property as a result of the unfair competition." *Rubio v. Cap. One Bank*, 613 F.3d 1195, 1203–04 (9th Cir. 2010) (citing Cal. Bus. & Prof. Code § 17204). Where, as here, the alleged misconduct involves misrepresentations, the plaintiff "must demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions." *Kwikset Corp. v. Superior Court* ("*Kwikset*"), 51 Cal. 4th 310, 326-27 (2011) (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298, 306 (2009)). The California Supreme Court has emphasized that the standing requirements to bring a UCL claim changed in 2004 "to eliminate standing for those who have not engaged in any business dealings with would-be defendants and thereby strip such unaffected parties of the ability to file 'shakedown lawsuits,' while preserving for actual victims of deception and other acts of unfair competition the ability to sue and enjoin such practices." *Kwikset*, 51 Cal. 4th at 317 (citations omitted).

Courts have recognized that plaintiffs alleging fraudulent business practices under the UCL must allege their *own* reliance—not the reliance of third parties—to have standing. For example,

13

1    in *ZL Technologies v. Gartner, Inc.*, No. CV 09–02393 JF (RS), 2009 WL 3706821 (N.D. Cal.
2    Nov. 4, 2009), the court accepted the defendant's position that the plaintiff "lack[ed] standing to
3    bring a UCL claim sounding in fraud because [plaintiff] alleges not its own reliance upon the
4    Alleged Defamatory Statements, but that of third parties . . . resulting in a loss of profits and injury
5    to [plaintiff]." *Id.* at *11; *see also AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d 1133
6    (N.D. Cal. 2019).

7    In cases where injury to community property has been found sufficient to confer standing
8    upon a plaintiff for a UCL claim sounding in fraud arising from alleged misrepresentations, the
9    plaintiff has been *involved* in the actions giving rise to the UCL claim (showing reliance on the
10   defendant's alleged misrepresentations). For example, in *Anderson v. SeaWorld Parks and
11   Entertainment, Inc.*, No. 15-CV-02172-JSW, 2018 WL 1981396 (N.D. Cal. Feb. 18, 2018), the
12   plaintiff sued SeaWorld for fraudulent business practices, alleging that she relied on its
13   representations about how orcas were treated in captivity to make her purchase, but those
14   representations were false. SeaWorld challenged her standing to bring unfair business practice
15   claims, arguing that since her *husband* purchased the tickets, *she* did not rely on its
16   misrepresentations to her detriment. *Anderson*, at *9-10. Anderson successfully argued that
17   because she had a community property interest in the money used to purchase the tickets *and she,
18   not her husband, had made the decision to purchase the tickets*, she had shown (1) injury and (2)
19   reliance. *Id.*

20   Lee does not have standing to bring her claims under the unfair or fraudulent prongs of the
21   UCL because, unlike the plaintiff in *Anderson*, Lee cannot show that *she* relied on Crypto.com's
22   allegedly misleading or deceptive statements. She alleges that it was "Mr. Patz who relied on
23   these misleading and deceptive representations in using Crypto.com." FAC ¶ 258. Nowhere in
24   the FAC does Lee allege that she herself relied on Crypto.com's representations, whether made to
25   her directly or indirectly. She only alleges that her *husband* relied on its representations to both of
26   their detriment. *Id.* ¶¶ 126-196. That is not enough for Lee to bring this claim on her own behalf,
27   even if she did suffer injury to her community property.

28   Lee's unlawful UCL claim also fails. "By proscribing any unlawful business practice, [the

United States District Court
Northern District of California

UCL] borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Alvarez v. Chevron Corp.*, 656 F.3d 925, 933 n.8 (9th Cir. 2011) (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999)). Since Lee has failed to state a claim under the Elder Abuse Act (the law upon which her unlawful UCL claim is based), she cannot meet the standard set under the unlawful prong of the UCL.[5] *See* FAC ¶¶ 241-248. Crypto.com's motion to dismiss the UCL claim is GRANTED with prejudice under the fraudulent and unfair prongs, and with leave to amend under the unlawful prong.

## IV. AIDING AND ABETTING AN INTENTIONAL TORT

### A. Elements of Aiding and Abetting Liability

"Liability may . . . be imposed on one who aids and abets the commission of an intentional tort if [1] the person . . . knows the other's conduct constitutes a breach of a duty and [2] gives substantial assistance or encouragement to the other to so act." *In re First All. Mortg. Co.*, 471 F.3d 977, 993 (9th Cir. 2006) (quoting *Casey v. U.S. Bank National Assn.*, 127 Cal. App. 4th 1138 (2005)). There can be no aiding and abetting liability absent the commission of an underlying tort. *See Nasrawi v. Buck Consultants LLC*, 213 Cal. App. 328, 344 (2014). But a defendant may be found liable for aiding and abetting a tort arising from a breach of duty *even when that defendant has no independent duty to the plaintiff. See Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1137 (C.D. Cal. 2003); *see also Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.*, 131 Cal. App. 4th 802, 823, n.10 (2005) ("civil liability for aiding and abetting the commission of a tort . . . has no overlaid requirement of an independent duty").

"A defendant's actual knowledge may be shown, not only by direct evidence, but also by circumstantial evidence. . . . However, actual knowledge can be inferred from the circumstances only if, in the light of the evidence, such inference is not based on speculation or conjecture. Only where the circumstances are such that the defendant 'must have known' and not 'should have

---

[5] As the rest of this Order shows, none of Lee's other claims survive, so even if her "unlawful" claim was based on something other than the Elder Abuse Act, it would fail. If Lee amends her aiding and abetting claim so that it is plausible, I will reevaluate the plausibility of her UCL "unlawful" claim.

known' will an inference of actual knowledge be permitted." *Lin v. JP Morgan Chase Bank*, No. 2:24-CV-01837-JLS-E, 2024 WL 5182199, at *6 (C.D. Cal. Aug. 15, 2024) (internal citations omitted); *see also In re First All. Mortg. Co.*, 471 F.3d 977, 999, n.4 (9th Cir. 2006) ("We note that as it has been applied, the actual knowledge standard *does* require more than a vague suspicion of wrongdoing.") (emphasis added).

### B. The Underlying Tort

Lee's aiding and abetting claim as pleaded relies on the purported fraud committed by the unidentified Doe Defendant scammers. *See* FAC ¶¶ 273 ("Based on their knowledge and experience, as a regulated money transmitter, a sophisticated cryptocurrency exchange, and a federally registered money services business in the case of Crypto.com . . . [Crypto.com] [was] . . . aware of the virtual certainty that their financial transfer systems were being targeted by fraudsters and criminals to perpetrate financial crimes, including investment fraud and EFE against its customers, and money laundering of the proceeds of those frauds."); 277 ("[Crypto.com] 'whitelisted' the fraudulent destination accounts even after it contacted Mr. Patz and learned he was sending funds to a third party for patently incredulous reasons, thereby shielding all the fraudulent activity from any delay or further scrutiny"); 218 ("Defendants performed financial transactions that gave substantial assistance to the fraudsters who targeted Mr. Patz").

At the hearing on this matter, however, Lee's counsel seemed to suggest a different theory for Crypto.com's liability. In trying to convince me that the "actual knowledge" element has been satisfied for Lee's aiding and abetting claim, her counsel referenced *Lin v. JPMorgan Chase Bank, N.A.*, No. 2:24-CV-01837-JLS-E, 2024 WL 5182199, at *8 (C.D. Cal. Aug. 15, 2024), as an analog to this case. In *Lin*, the elderly plaintiff alleged that her bank assisted financial elder abuse against her in violation of the Elder Abuse Act. Her theory was "assister-liability" against her bank, not "aiding and abetting" liability. *See Lin*, at *3-5. Much of the *Lin* court's analysis focused on the then-unanswered question of what mental state must be shown to impose liability on a person who "assists in taking" a property from an elder but does not directly obtain it. *Id.* at *2 (pointing out that no California state court cases, nor any (non-binding) federal decisions that

16

1  the court could find "substantively discuss what allegations are sufficient to plead actual
2  knowledge under the Financial Elder Abuse Law").

3        Evaluating whether Lee has plausibly alleged that Crypto.com, as a financial institution,
4  had actual knowledge of a violation of what the *Lin* court called the "Financial Elder Abuse Law"
5  may require a different analysis than evaluating whether she has plausibly alleged that Crypto.com
6  had actual knowledge of more general financial fraud. *See Lin*, at *3 (examining the specific
7  caselaw surrounding the question of what must be shown to plausibly allege "assister-liability"
8  with respect to violations of Cal. Welf. & Inst. Code § 15610.30, finding it lacking, and
9  considering other civil liability contexts for guidance on what constitutes "actual knowledge" of
10 fraud). If this is the theory of liability Lee wishes to advance, it should be pleaded with
11 specificity. I cannot assess the plausibility of an aiding and abetting claim that has not been
12 pleaded. The one that has been pleaded is DISMISSED, with leave to amend.

### V.    NEGLIGENCE AND GROSS NEGLIGENCE

      The four elements of a negligence claim are "(1) duty; (2) breach; (3) proximate causation; and (4) injury." *L. Firm of Fox & Fox v. Chase Bank, N.A.*, 95 Cal. App. 5th 182, 192 (2023). "[T]here is no recognized cause of action for gross negligence under California law" that is distinct from negligence. *Trabulsi v. Wells Fargo Bank, Nat'l Ass'n*, No. 817CV02088JLSSK, 2018 WL 6444897, at *4 (C.D. Cal. Nov. 16, 2018) quoting *Alarcon v. Davey*, Case No. 16-cv-01461, 2017 WL 1881612, at *11 (E.D. Cal. May 9, 2017). Gross negligence is different from ordinary negligence in degree, not in kind. *Anderson v. Fitness Internat., LLC*, 4 Cal. App. 5th 867, 881 (2016). Because gross negligence is simply a degree of negligence, the elements of a claim for gross negligence are the same as one for ordinary negligence. *Rosencrans v. Dover Images, Ltd.*, 192 Cal. App. 4th 1072, 1082 (2011).

      Lee fails to state a claim for negligence. She did not have a Crypto.com account nor did she ever use her husband's. Nothing in the FAC suggests that Crypto.com had any knowledge of Lee's existence, much less that she shared joint accounts with her husband or that his money was connected to hers. Perhaps recognizing this, Lee predicates her negligence claim on the duty of care that she says Crypto.com owed to her husband, not herself. FAC ¶ 289.

17

1    Lee offers no case where a court has held that a financial institution like Crypto.com owed

2    a non-customer a duty where it *had no reason to know* that its actions could affect the non-

3    customer. Crypto.com offers *Chazen v. Centennial Bank*, 61 Cal. App. 4th 532, 545 (1998), for

4    the rule that a bank may have a duty of care to non-customers when a person deposits a check,

5    payable to someone else, into a personal account. But it asserts that "in the absence of a

6    suspicious instrument" bringing Lee to its attention, like the check in *Chazen*, it owed no duty of

7    care to Lee, a "complete stranger" to Crypto.com. Motion 27; *see also Software Design &*

8    *Application, Ltd. v. Hoefer & Arnett, Inc.*, 49 Cal. App. 4th 472, 478 (1996) (dismissing

9    negligence claim where plaintiff was not a customer of banks and banks had no knowledge of

10   plaintiff's ownership interest in funds).[6]

11   Lee barely responds to this. She insists that Crypto.com is negligent because "[t]he

12   transactions performed by Crypto.com were intended to affect Plaintiff [as] the principal purpose

13   was to effectuate the crypto 'investment opportunity' of moneys set aside for legitimate financial

14   investment." Oppo. 25. She argues that because she was Patz's wife and the funds that he

15   transferred were community property, she ostensibly "'invested' in crypto with the assistance of

16   Crypto.com's services." *Id*.

17   Lee relies on *Firm of Fox*, where that court found that "Chase [bank] owed the Law Firm a

18   duty of care based on the special relationship it had with the Law Firm as an intended beneficiary

19   of the probate court's order." *Firm of Fox*, 95 Cal. App. 5th 182 at 187. In that case, Chase owed

20   a duty of care because it was the intended beneficiary of the transaction; while the transaction

21   happened with another party, it was designed to release funds to the law firm. *Id.* at 194. In

---

[6] Most of the cases that Crypto.com offers against Lee's negligence claim consider the duties banks owe to customers and non-customers. The bank cases are not exactly on point; crypto exchanges like Crypto.com are not banks. *See Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1007 (9th Cir. 2023) (describing that because many traditional investment firms and banks do not sell crypto many people buy and sell through crypto exchanges and that cryptocurrency is not issued by a central bank). But while banks are held to a higher duty standard than cryptocurrency exchanges like Crypto.com, the rulings are nevertheless informative.

contrast, in Lee's case, Crypto.com had no way of knowing that Lee existed, much less that her funds were tied up with her husband's.[7]

At the hearing on this matter, Lee's counsel admitted that I would be ploughing new ground if I were to conclude from the facts alleged that Crypto.com owed Lee a duty. There is no case that supports her position. The regulation (or lack thereof) of decentralized financial institutions like Crypto.com may be the focus of legislation and other lawsuits in the future. Today, no authority suggests that Crypto.com owed Lee a duty. Its motion to dismiss Lee's negligence claim is GRANTED with prejudice.

## CONCLUSION

For the foregoing reasons, the motion to dismiss is GRANTED. Lee may amend her aiding and abetting and UCL (for the unlawful prong only) claims. The other causes of action against Crypto.com are DISMISSED with prejudice.

**IT IS SO ORDERED.**

Dated: April 10, 2025



William H. Orrick
United States District Judge

---

[7] Lee's per se negligence theory also fails. Lee argues that Crypto.com is liable for negligence per se because it did not comply with due diligence and reporting requirements to which financial institutions are subjected by federal law, or with state laws imposed on the same institutions for the prevention of elder abuse. FAC ¶¶ 295, 296. But the Elder Abuse Act bars private actions for failure to report financial abuse, *see* § 15630.1(g)(1); *see also Das v. Bank of Am., N.A.*, 186 Cal. App. 4th 727, 737 (2010) (holding §15630.1(g) barred negligence per se claim based on duty to report).