**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger (Bar No. 226112)
Galen K. Cheney (admitted *pro hac vice*)
Leah Rosa Vulić (Bar No. 343520)
548 Market St. #85399
San Francisco, CA 94104-5401
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
karl@kr.law
galen@kr.law
leah@kr.law

Attorneys for Plaintiff Jung Min Lee

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JUNG MIN LEE**, an individual, | Case No. 3:24-cv-06194-WHO |
| Plaintiff, | |
| v. | **SECOND AMENDED COMPLAINT** |
| **FORIS DAX, INC. D/B/A CRYPTO.COM**, a Delaware corporation; **FIRST REPUBLIC BANK**, a California corporation; **CATHERINE EVANS**, an individual; and **DOES 1 through 25**, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff, Jung Min Lee (hereinafter, "Plaintiff" or "Lee"), by and through her undersigned counsel, respectfully submits this Second Amended Complaint ("SAC") against Defendants Foris Dax, Inc. d/b/a/ Crypto.com ("Crypto.com"), First Republic Bank ("First Republic"), Catherine Evans ("Evans"), and Does 1 through 25 ("Doe Defendants") (collectively, "Defendants"),[1] and alleges as follows:

**INTRODUCTION**

1.      This case is just one of many tens of thousands of annual cases of financial abuse and exploitation in America perpetrated against older adults and involving financial institutions legally required to prevent such abuse. Such elder abuse scams have skyrocketed with the advent of new financial technology. Purveyors of these technologies, like cryptocurrency exchanges, promise convenience and speed but have proved woefully behind their traditional consumer financial counterparts in terms of compliance and safety. Even traditional financial institutions like banks, where older Americans tend to keep their money and investments, have acted as entry points for fraudsters because the banks routinely permit fraudulent transfers to cryptocurrency exchanges without remotely adequate due diligence.

2.      The result has been a disaster for older Americans. This case is part of an exploding technology-driven fraud epidemic whereby untold numbers of older Americans are losing their entire life savings with the click of a mouse. At the same time, the cryptocurrency exchanges that are pivotal to these scams are growing fantastically wealthy. This cryptocurrency exchange enabled crime wave is of unprecedented size and scale, estimated to carry a volume of $75 billion in recent years.[2] Sadly, as is the case here, a vast majority of such crimes are preventable, but they go unreported and

---

[1] The SAC refers to "scammers" or the singular "scammer" interchangeably throughout, but it is unknown currently how many individual co-tortfeasors are implicated here. The yet-identified Doe Defendants in this case consist of these individuals.

[2] Yuhgen Zhan, 'Pig-Butchering' Scams Have Netted Criminals $75 Billion in Stolen Crypto, Study Says (Mar. 1, 2024), https://markets.businessinsider.com/news/currencies/crypto-crime-pig-butchering-scam-bitcoing-trafficking-fraud-cryptocurrency-2024-2.

KRONENBERGER ROSENFELD

unmitigated.

3.      These frauds are not happening in the shadows or in secret—quite the opposite. They are happening on public ledgers and on public platforms in full view of the cryptocurrency exchanges.  As one researcher notes, the large "reputable" cryptocurrency exchanges like Crypto.com enable fraudsters to freely interact with these public exchanges and use them as gateways to reach victims because the exchanges fail to protect consumers.[3] Where fraudsters might otherwise be stopped dead in their tracks by the compliant traditional financial system where industry-standard due diligence, basic "know your customer" ("KYC") inquiries, and anti-money laundering ("AML") controls are supposed to be the norm, fraudsters are free to reign and exploit even more older Americans each year on these "reputable" exchanges. What is more, the traditional financial system institutions (like First Republic Bank) have been instrumental in exfiltrating older Americans' money by their willful blindness to these scams.

4.      This situation could largely be avoided and mitigated—in fact, the financial system should be safer than ever with these blockchain technologies. Unfortunately, that is not the case. Cryptocurrency exchanges like Crypto.com are equipped with revolutionary blockchain technology, promising a new frontier of transparency and safety. Cryptocurrency ledgers are inherently transparent and inalterable, unlike the normal financial system, which can be rife with human error. The exchanges can trace and monitor transaction activity with exacting precision, and in real time, collecting and analyzing data previously impossible to reach in the traditional financial system. Exchanges like Crypto.com possess mountains of transaction data, which, if used competently and under commercially reasonable standards, would provide unparalleled transaction risk monitoring and due diligence to fight fraud, money laundering, and financial exploitation and abuse of older Americans.

---

[3] John M. Griffin & Kevin Mei, How Do Crypto Flows Finance Slavery? The Economics of Pig Butchering (Mar. 28, 2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4742235.

5.      But rather than make even a reasonable investment towards compliance and consumer safety, exchanges like Crypto.com instead rely on ostentatious but empty claims about security and safety. This hype and its false claims perniciously attract even more victims.

6.      In the past, the State of California and the federal government have endeavored to protect older Americans from such financial exploitation and abuse through a blanket of laws and policies designed to punish wrongdoers and to encourage "mandated reporters" to do their duty to protect older Americans.

7.      But these efforts are impeded by cryptocurrency exchanges like Crypto.com and enablers like First Republic that openly shirk their professional responsibilities.

8.      Plaintiff's husband was a victim of such an elder financial exploitation and abuse scam, enabled and assisted by Crypto.com's cryptocurrency platform and First Republic's banking and investment services. Rather than trying to investigate the scam or warn Plaintiff or her husband, Defendants took willful and deliberate action in an attempt to contrive ignorance about the fraud they were enabling. Plaintiff lost her family's life savings as a result.

9.      Before the scam was fully executed, Defendants were each inundated with a plethora of red flags tied expressly to the financial regulatory frameworks with which Defendants purported to comply. Moreover, Defendants each possessed the professional experience, industry knowledge, and technological know-how to know that Plaintiff's husband's transmittal orders would send the married couple's hard-earned savings right into the hands of criminals. Defendants possessed *actual knowledge* that Plaintiff's husband was a victim of fraud. Crypto.com in particular had *actual knowledge* that the destination cryptocurrency wallets had been already flagged or associated with known scammers. Defendants attempted to remain willfully blind by taking deliberate and concerted action to shirk their responsibilities in a futile attempt to limit their liability. These attempts only further prove their knowledge.

10.      Defendants are each "mandated elder abuse reporters" equipped with every

necessary tool to protect and warn Plaintiff's husband.

11.    Instead of following basic industry norms and legal requirements, Defendants each instead chose to bury their proverbial heads in the sand. Defendants knowingly assisted the fraud against Plaintiff's husband.

12.    This case seeks to right a terrible wrong. Older Americans are vulnerable, and subject to disproportionate financial exploitation and abuse. Older Americans ought to be protected—indeed, that is what the law requires. Older Americans should not be exploited, and those mandated to protect them ought not be allowed to just bury their heads in the sand when they have a duty to do otherwise. Plaintiff brings this lawsuit to recover her stolen property, and to punish Defendants for preying on and profiting from vulnerable older Americans.

### JURISDICTION & VENUE

13.    This Court has jurisdiction over this matter under the California Constitution, Article VI, §10.

14.    The Court has personal jurisdiction over this matter because Plaintiff, a citizen and resident of the State of California, was harmed here by Defendants' actions; and because Defendant Crypto.com conducts business in California, Defendant First Republic is a California corporation that conducts business in California, and Defendant Evans is a citizen and resident of the State of California.

15.    Venue is proper in this judicial district and the County of San Francisco pursuant to Code of Civil Procedure §395 because Defendants' unlawful actions and omissions, as set forth herein, occurred in the County of San Francisco. Defendant First Republic maintains its principal place of business in San Francisco, California, in the County of San Francisco.

### DIVISIONAL ASSIGNMENT

16.    Pursuant to L.R. 3-2(c), this case has been assigned to the San Francisco Division, which is where a substantial part of the events or omissions giving rise to the claim occurred.

**PARTIES**

17.    Plaintiff Jung Min Lee is an individual who, at all times relevant to this action, resided in the State of California.

18.    Plaintiff Lee is and was, at all times relevant to this action, the wife of Donald Patz (hereinafter, "Mr. Patz").

19.    Donald Patz is an individual who, at all times relevant to this action, resided in the State of California.

20.    Donald Patz is 69 years of age, and is and was, at all times relevant to this action, an "elder" under Cal. Welf. & Inst. Code §15610.27.

21.    Defendant Foris Dax, Inc. d/b/a Crypto.com is a foreign for-profit corporation organized under the laws of the State of Florida. Its principal place of business is located at 1111 Brickell Avenue, Sabadell Financial Center Building, Suite 2725, Miami, Florida 33131.

22.    At all times material hereto the name of "Crypto.com" was used by the Defendant Foris Dax, Inc. to conduct business and describe its cryptocurrency exchange website and/or program.

23.    Defendant First Republic Bank is a domestic for-profit corporation organized under the laws of the State of California. Its principal place of business is located at 111 Pine Street, San Francisco, California 94111. Defendant First Republic was a California-chartered bank and trust company. Defendant First Republic and its subsidiaries offered private banking, and private wealth management. Defendant First Republic provided consumers residential, commercial, and personal loans; deposit services; private wealth management; investment brokerage; insurance; trust; and foreign exchange services.[4]

24.    On May 1, 2023, the Federal Deposit Insurance Corporation ("FDIC") seized control of First Republic following a collapse of the bank and failed attempts at rescue. Most of First Republic's assets were sold to JPMorgan Chase & Co.[5]

---

[5] First Republic is under federal investigation by numerous bodies for executive and board

Case No. 3:24-cv-06194-WHO                    5                    **SECOND AMENDED COMPLAINT**

25.    Defendant Catherine Evans is an individual who, at all times relevant to this action, resided in the State of California.

26.    Defendant Evans was a Senior Managing Director and Wealth Manager and employee at First Republic.

27.    Doe Defendants 1–25 are individuals or entities whose identities are currently unknown. Plaintiff does not know the true names or capacities of Doe Defendants 1–25 and therefore sues these Defendants by fictitious names pursuant to Code of Civil Procedure §474. Plaintiff will amend this SAC to state the true names and capacities of Doe Defendants 1–25 once this information is obtained through discovery. Plaintiff is informed and believes, and upon that basis alleges, that the Doe Defendants are in some way and to some degree liable and responsible to Plaintiff on the facts alleged.

**STANDING**

28.    Every action must be prosecuted by a "real party in interest," unless a statute provides otherwise. Code Civ. Proc. §367. A real party in interest is a "person aggrieved by the alleged conduct or otherwise beneficially interested in the controversy."[6]

29.    Each spouse has a "present, existing, and equal interest[]" in community property during continuance of the marriage relation. Cal. Civ. Proc., §751.

30.    That interest imparted to each spouse independently includes the right of action to recover losses against the community property.

31.    Each spouse – by virtue of being a member of the martial community with an independent interest in the community property – has independent standing, having actual and substantial interest in recovering damages for the loss of community property. Cal.

member misconduct involving reported allegations of insider trading aimed at dumping failing stock in the days leading up to the firm collapse in May 2023. Nicholas Reimann, Forbes.com, First Republic Bank Executives Reportedly Under Investigation for Possible Insider Trading (May 5, 2023), https://www.forbes.com/sites/nicholasreimann/2023/05/05/first-republic-bank-executives-reportedly-under-investigation-for-possible-insider-trading/.

[6] *Tepper v. Wilkins*, 10 Cal. App. 1198, 1204 (2017).

Civ. Proc., §367.[7]

32.    In any legal action, a married person may sue independently and individually (without his or her spouse being joined as a party). Cal. Civ. Proc., §370.

33.    Financial exploitation and abuse schemes targeting elders frequently result in community-wide harm. When an elder spouse falls victim to financial abuse, resulting in the depletion of marital community assets, the non-elder spouse suffers a direct injury distinct from that of the elder spouse. Depleting community property undermines the non-elder spouse's property rights and financial stability.

34.    At all times material hereto, notwithstanding any possible interpretation of the allegations in the SAC, all the funds at issue (all the money originating from First Republic that was lost due to Defendants' misconduct) were and continue to be the community property of the marriage between Plaintiff and Mr. Patz.

## FACTS

35.    Prior to the facts alleged in this SAC, Plaintiff was established as a positive industry leader in the business world. She co-owns a prominent wine company and has achieved significant financial success in her life.

36.    Crypto.com operates a cryptocurrency exchange at https://www.crypto.com, at which users can purchase, trade, sell, and transfer various cryptocurrencies ("crypto") and tokens.

37.    Crypto.com purports on its website to be a registered broker dealer, a licensed derivatives clearing organization, a licensed designated contracts market, a registered money services business (MSB), and a licensed money transmitter.

38.    As a registered MSB, Crypto.com would have maintained a risk-based anti-money laundering (AML) program reasonably designed to prevent money laundering on its platform. 31 U.S.C. §5318(h); 31 C.F.R. §1022.210. If Crypto.com were a duly compliant MSB, the AML program must have contained written policies, procedures and internal controls; a designated individual responsible for BSA compliance; provision of training,

---

[7] *See Turner v. Seterus Inc.*, 27 Cal. App. 5th 516, 524-25 (2018).

including on how to detect suspicious transactions; and the provision of an independent review of the AML program. 31 U.S.C. §§ 5318(a)(2) and (h); 31 C.F.R. §§ 1022.210(c) and (d).

39.    Crypto.com would have been required to actively monitor transactions for suspicious activity, to collect sender/receiver information about all transfers over $3,000 sufficient to identify the parties involved, and to screen transactions against known or suspected criminal or sanctioned recipients. *Id*.; 31 C.F.R. §1022.380(a). Crypto.com would have been required to adhere to the Travel Rule, codified at 31 C.F.R. §103.33(g), which requires MSBs to collect beneficiary information, including the name of the recipient, account number, address, and specific identifiers, e.g., tax id, ssn, or driver's license.

40.    The Financial Crimes Enforcement Network ("FinCEN), an office of the U.S. Department of Treasury, (through examiners of the Internal Revenue Service and state regulators) regulates MSBs and has expressly identifies pig butchering and elder financial exploitation as causes for concern that must be detected and prevented. *See* SAR Field 38(d); FIN-2023-Alert005.

41.    BSA violations are commonly enforced. Even negligent failures to perform BSA duties, in whole or in part, are violations. *See* 31 U.S.C. §§5321(a)(6)(A) and (B).

42.    A common BSA violation occurs when an MSB fails to establish or maintain an adequate AML program, e.g., because they fail to adequately maintain the necessary policies, procedures, and internal controls to detect and prevent money laundering on their platforms. For violations of the requirement to implement an adequate AML program, "a separate violation occurs for each day that the violation continues." *See* 31 U.S.C. § 5321(a)(1) and 31 C.F.R. § 1010.821.

43.    According to FinCEN, the most cited BSA violation against MSBs engaged in cryptocurrency activity is failure to adhere to the Travel Rule.[8]

44.    That is, cryptocurrency exchanges like Crypto.com often shirk their

---

[8] Fincen (Nov. 15, 2019), https://www.fincen.gov/news/speeches/prepared-remarks-fincen-director-kenneth-blanco-chainalysis-blockchain-symposium.

responsibility for performing recordkeeping due diligence on the recipients of their transfers.

45.    A reasonable consumer would understand Crypto.com's representation that it was purportedly BSA/AML compliant as a registered MSB to suggest it was, at a minimum, not breaking the law with respect to the BSA.

46.    In this capacity, Crypto.com holds itself out to consumers as an industry leader in the world of cryptocurrency, and at minimum a BSA compliant MSB.

47.    Crypto.com also represents that its financial systems are secure: "The Crypto.com ecosystem consists of financial services, payment solutions, a world-class trading platform, and decentralized finance offerings. Built on industry-leading security infrastructure, Crypto.com is the first crypto company in the world to meet several ISO security and privacy standards."

48.    Indeed, on January 24, 2022, Crypto.com began touting its status as the "first virtual asset platform to achieve ISO 27017 and ISO 27018 security and privacy certifications," in addition to its existing ISO 27001, 27701, and 22301 certifications.[9]

49.    An ISO 27001 certification means that a company has a certified Information Security Management System ("ISMS").

50.    ISO 27001 is "the world's best-known standard for information security management systems," and is important because it "helps organizations become risk-aware and proactively identify and address weaknesses."[10]

51.    Crypto.com advertises that it is PCIDSS v3.2.1 Level 1 compliant.[11]

52.    Crypto.com advertises that it is assessed at Tier 4 for both NIST Cybersecurity and Privacy Frameworks and Service Organization Control ("SOC") 2 frameworks.[12]

---

[9] Crypto.com (Jan. 24, 2023), https://crypto.com/company-news/crypto-com-becomes-the-first-virtual-asset-platform-to-achieve-iso-27017-and-iso-27018-security-and-privacy-certifications.
[10] iso.org (Oct. 2022), https://www.iso.org/standard/27001.
[11] Crypto.com, https://crypto.com/us/security (last visited June 21, 2024)
[12] Id.

53.    In other words, Crypto.com holds itself out to the public, repeatedly, as an industry leader in cybersecurity—not just in safeguarding assets, but in proactively protecting them from criminals using best practices and international security standards.

54.    The timing of Crypto.com's publication assuring customers of its security is ironic, however, given that Crypto.com's systems were "hacked" or compromised on January 17, 2022. On that date, 483 of its users were robbed of over $30 million in Bitcoin and Ethereum tokens due to inadequate two-factor authentication ("2FA") methods employed by the company.[13]

55.    Crypto.com acknowledged this loss and the cause, stating that its risk monitoring systems had noticed unauthorized activity "where transactions were being approved without the 2FA authentication control being inputted by the user."

56.    As a result of this hack, Crypto.com migrated its 2FA system, requiring all of its existing customers to switch over to the new system. Crypto.com proudly reported that all victims of this activity had been reimbursed for their losses.

57.    But this is not the only way that Crypto.com's users fell victim to criminal activity on its platform.

58.    Many of Crypto.com's users have been targeted by investment scams, in which criminals attempt to persuade users to invest money when, in fact, the investment is a fraud. Users often appear to see funds in their accounts, supposedly generating significant profits, only to find they are unable to withdraw these funds.

59.    In 2022, the Department of Homeland Security estimated that U.S. consumer losses related to investment scams exceeded $3.3 billion.

60.    Crypto.com's users have long found themselves the targets of such investment scams.

61.    For example, in January of 2022, one Crypto.com user found himself the target of such a scam. He wired over $100,000 from his bank to Crypto.com, used this to

---

[13] April Wong, *Crypto.com Security Report & Next Steps*, (Jan. 20, 2022), Crypto.com (Jan. 20, 2022), https://web.archive.org/web/20220331023703/https://blog.crypto.com/crypto-com-security-report-next-steps/.

purchase Ethereum, and then sent the funds from there to the fraudulent investment wallet.[14]

62.    When this user reached out to Crypto.com, he was told the exchange would not help him recover the funds—even though he had been sending the funds to the same fraudulent wallet over a period of months.

63.    The account activity was so irregular, in fact, that this user's local bank closed his checking and savings accounts due to transfers he made in response to this investment scam.

64.    Other Crypto.com users have been defrauded by similar scams, including one who was defrauded on or around October 20, 2021, losing a total of $50,000.[15]

65.    In fact, according to researchers, pig butchering scams have drained over $75 billion from victims around the world between January 2020 and February 2024, exploiting exchanges like Crypto.com for money laundering.[16]

66.    There is no doubt that Crypto.com knew, by no later than October of 2021, that its users were being targeted by pig butchering scams.

67.    Nevertheless, although Crypto.com was armed with this knowledge and knew that its users were relying on its supposedly robust security to keep their funds safe, it waited until September 15, 2023, to begin warning its users about this type of scam.[17]

68.    In its conclusion to this warning and suggestions on how to avoid this sort of scam, Crypto.com advised users to "use only secure, reputable platforms like Crypto.com that employ strong security features, including multi-factor authentication ("MFA") and Anti-Phishing Codes."

69.    This was nearly a year after state attorneys general had begun issuing

---

[14] Rohan Goswami, CNBC.com (May 2, 2023), https://www.cnbc.com/2023/05/02/pig-butchering-scammers-make-billions-convincing-victims-of-love.html.

[15] Cyrus Farivar, forbes.com (Sept. 9, 2022), https://www.forbes.com/sites/cyrusfarivar/2022/09/09/pig-butchering-crypto-super-scam/?sh=23289b10ec8e.

[16] John M. Griffin & Kevin Mei, ssrn.com (Mar. 28, 2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4742235.

[17] Crypto.com (Sept. 15, 2023), https://crypto.com/university/pig-butchering-scams.

blanket warnings to consumers about these sorts of scams. Delaware released a consumer alert in September of 2022;[18] Michigan in October of 2022;[19] and New Jersey in February of 2023.[20]

70. In addition to failing to timely warn users of this well known, highly visible threat, Crypto.com failed to exercise due care in implementing security practices to safeguard consumer funds from criminal activity.

71. Among other things, Crypto.com failed to implement a system that would allow it to identify and act on fraudulent activity by criminals targeting its customers, in violation of several duties imposed on financial services providers not only to protect individual users, but interests of national security, such as preventing international money-laundering schemes.

72. Pig butchering scams involving cryptocurrency were also not unknown to First Republic or Defendant Evans, either.

73. In September of 2023, FinCEN[21] released a bulletin[22] to Defendants summarizing the existing industry standard of several "red flag indicators" of this type of investment scam that financial institutions use to ascertain whether activity is suspicious:

   a) A customer with little to no history or background of using, exchanging, or otherwise interacting with virtual currency attempts to exchange high amounts of fiat currency for virtual currency;

   b) A customer mentions or expresses interest in an investment opportunity

---

[18] Delaware.gov (Sept. 28, 2022), https://news.delaware.gov/2022/09/28/investor-protection-unit-grills-pig-butchering-scammers/.

[19] Michigan.gov, https://www.michigan.gov/consumerprotection/protect-yourself/consumer-alerts/scams/cryptocurrency-scam-pig-butchering.

[20] njoag.gov (Feb. 3, 2023), https://www.njoag.gov/bureau-of-securities-orders-three-website-operators-to-stop-offering-fraudulent-cryptocurrency-investment-opportunities-urges-nj-residents-to-beware-of-pig-butchering-scams/.

[21] Financial Crimes Enforcement Network, a bureau of the United States Department of the Treasury.

[22] FIN-2023-Alert005, FinCEN.gov (Sept. 8, 2023), https://www.fincen.gov/sites/default/files/shared/FinCEN_Alert_Pig_Butchering_FINAL_508c.pdf.

leveraging cryptocurrency with significant returns that they were told about from a new contact who reached out to them online via unsolicited message;

c) This new contact supplied the cryptocurrency wallet address to the customer at which to send the virtual currency;

d) The customer seems distressed or anxious to access funds to meet the timeline;

e) The customer finances purchases by liquidating savings accounts prior to maturation and/or by taking out loans;

f) A customer receives what appears to be a deposit of virtual currency in an amount at or slightly above the amount previously transferred out of the customer's virtual currency account;

g) Accounts with large balances that are inactive or have limited activity begin to show constant, uncharacteristic, sudden, abnormally frequent, or significant withdrawals of large amounts of money;

h) A customer sends part of their available balance from an account maintained with a crypto platform with notes indicating that the purpose of the transaction is for "taxes," "fees," or "penalties";

i) A customer with a short history of conducting several small-value electronic funds transfers to a crypto provider abruptly starts sending multiple high-value wire transfers to accounts with which the customer has no prior transaction history;

j) System monitoring and logs show that a customer's account is accessed repeatedly in ways inconsistent with prior access history;

k) A customer mentions they are investing crypto in a website or application with poor spelling or grammatical structure, dubious testimonials, or a generally amateurish site design;

l) A customer mentions visiting a website or application that purports to be legitimate but shows warning signs like a recently registered domain, no

Case No. 3:24-cv-06194-WHO                    13                    **SECOND AMENDED COMPLAINT**

physical address, international contact information, or a domain that appears to be mimicking that of another business;

m) A customer mentions that they downloaded an application on their phone directly from a third-party website, rather than from an established application store; or

n) A customer receives a large amount of crypto at an exchange, subsequently converts the crypto into something with lower transaction fees, then abruptly sends the crypto out of the exchange.[23]

74.    FinCEN had previously released an advisory to BSA-regulated entities,[24] such as Defendants, on Elder Financial Exploitation ("EFE") in June 2022, which specifically addressed the behavioral and financial red flags associated with EFE.[25]

75.    FinCEN's EFE red flags list includes, in part:

a) An older customer's account shows sudden and unusual changes in contact information or new connections to emails, phone numbers, or accounts that may originate overseas;

b) An older customer appears distressed, submissive, fearful, anxious to follow others' directions related to their financial accounts, or unable to answer basic questions about account activity;

c) An older customer mentions how an online friend or romantic partner is asking them to receive and forward money to one or more individuals on their behalf or open a bank account for a "business opportunity";

d) An older customer suddenly begins discussing and buying convertible virtual currency;

---

[23]    FinCEN.gov    (Sept.    8,    2023), https://www.fincen.gov/sites/default/files/shared/FinCEN_Alert_Pig_Butchering_FINAL_508c.pdf.

[24] The Bank Secrecy Act (BSA) is a series of laws and regulations that help fight money laundering and terrorism financing in the United States.

[25] FinCEN.gov (Apr. 18, 2024), https://www.fincen.gov/news/news-releases/fincen-issues-analysis-elder-financial-exploitation.

   e) Uncharacteristic and sudden significant transfers of assets from an older customer's account;

   f) An older customer receives and transfers money interstate or abroad to recipients with whom they have no in-person relationship, and the explanation seems suspicious or indicative of a scam or money mule scheme; and

   g) Uncharacteristic attempts to wire large sums of money.[26]

76. All of the "red flag indicators" described above were expressly promulgated by FinCEN to serve as factors that when present require a cryptocurrency exchange, a bank, or an investment advisor, exercising due care, to deem as suspicious for fraud or abuse. In other words, someone patently fails to meet a standard of due care if it ignores or fails to investigate these red flags, much less willfully and deliberately fails to carry out the necessary means of detecting and monitoring for these red flags.

77. Worse yet, as is the case here, Defendants knew Mr. Patz was a victim but nonetheless took overt steps to consciously avoid an appearance of knowing the truth by shirking their professional responsibilities in a cynical attempt at limiting their culpability.

78. Notably, several of FinCEN's "red flag indicators" require Defendants to exercise due diligence by asking customers questions about the nature of the transactions they are sending.[27] These questions, which embody basic due diligence and KYC, require a cryptocurrency exchange to, at a minimum, ascertain (1) the true purpose of the transaction, (2) the true identities of the sender and recipients, (3) the true source of funds, and (4) the true nature of the relationship between the sender and recipients, among other basic inquiries.

79. All of the aforementioned red flags are echoed by the Federal Financial Institutions Examination Council ("FFIEC"), which is a U.S. government interagency body

[26] FinCEN.gov (June 15, 2022), https://www.fincen.gov/sites/default/files/advisory/2022-06-15/FinCEN%20Advisory%20Elder%20Financial%20Exploitation%20FINAL%20508.pdf.
[27] FinCEN.gov, https://www.fincen.gov/resources/statutes-and-regulations/cdd-final-rule.

of regulators (including Crypto.com and First Republic's primary federal regulators) that sets the uniform, objective standards for what is considered "suspicious," among other things.[28] Crypto.com and First Republic's policies, procedures, and internal controls must necessarily follow the guidance of FinCEN and the FFIEC.

80.    The presence of any number of the aforementioned red flags, though not exhaustive, objectively establish suspicious activities for money laundering and fraud.

81.    Defendants' practices, policies, procedures, and internal controls failed to mitigate the fraud and money laundering that Defendants necessarily must have detected and observed in this case.

82.    Further, Defendants endeavored to deliberately avoid learning about these red flags altogether by omitting further necessary inquiry and due diligence.

83.    For example, industry standard—one previously adopted by Crypto.com— holds that when a user "whitelists" an address for withdrawal (meaning that the user identifies it as a "known" address), there should be a hold period of at least 24 hours before withdrawals to the newly registered address become available.

84.    When Crypto.com initially re-enabled whitelisting, it followed this standard, as demonstrated here:

---

[28]    FinCEN.gov    (June    15,    2022),    chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.fincen.gov/sites/default/files/advisory/2022-06-15/FinCEN%20Advisory%20Elder%20Financial%20Exploitation%20FINAL%20508.pdf.

Case No. 3:24-cv-06194-WHO                    16                    **SECOND AMENDED COMPLAINT**



85.    However, at some point, for unclear reasons other than as a cost-saving measure, Crypto.com decided to eliminate this delay safeguard; now, a user can register a "whitelisted" address and immediately withdraw funds to it—enabling cyber criminals and elder abuse scammers to quickly bypass any security red flag screening that Crypto.com might otherwise employ.

86.    What is more, Crypto.com does not do due diligence on whitelisted addresses; it does not ask users to provide any information about the wallet other than its name, currency, network type, and address.

87.    First Republic similarly took no action when presented with the knowledge that fraud and money laundering were afoot, based on the red flags.

88.    For example, on at least two occasions, Mr. Patz told First Republic and Defendant Evans that he needed her to sweep his investment account and checking account, and to wire the money to Crypto.com, because he was "investing" in cryptocurrency. Mr. Patz also sent an email to Defendant Evans complaining that he was unable to withdraw his funds after the wires to Crypto.com.

89.    Defendants do not follow basic industry norms for understanding and mitigating money laundering, fraud, and elder financial exploitation risks, or what regulators refer to as due diligence and KYC.

90.    Defendants do not, for example: attempt to ascertain the true identity of the recipient; attempt to ascertain the true purpose of the transmittal order; attempt to ascertain the source of funds for the transmittal order; attempt to ascertain the relationship between the sender and recipient; or attempt to pause or delay the transmittal to effectuate the foregoing.

91.    Instead, Defendants make such due diligence impossible, burying their proverbial heads in the sand, even when red flags are present.

92.    Crypto.com's "whitelisted" addresses do not even undergo due diligence at the time when the wallet is whitelisted—which means Crypto.com has no way of screening for potential red flag indicators of investment scams and other common vehicles of crypto theft.

93.    Crypto.com makes no attempt at complying with the Travel Rule, 31 CFR 103.33(g), which would require the MSB to identify the recipient of a money transfer request, either by collecting identifying information or proving ownership over the receiving wallet.

94.    In other words, Defendants have endeavored to remain deliberately ignorant by ignoring indications of fraud and money laundering and foregoing proper mitigation and due diligence, all in a futile attempt to avoid liability, brought on by Defendants' morally hazardous incentive to avoid appearing to know the truth.

95.    This is exactly how the criminals were able to utilize Defendants' substantial assistance to orchestrate the scam against Mr. Patz resulting in a loss of Plaintiff's funds.

**FINANCIAL ABUSE AND EXPLOITATION**

96.    The FBI estimates that millions of elderly Americans fall victim to some type of financial fraud each year, leading to more than $3 billion in reported losses annually.[29] The total of unreported losses is estimated to be far, far greater.[30] According to one

---

[29] ic3.gov (Sept. 19, 2019), https://www.ic3.gov/Media/Y2019/PSA190919.

[30] Yuheng    Zhan,    BusinessInsider.com    (Mar.    1,    2024), https://markets.businessinsider.com/news/currencies/crypto-crime-pig-butchering-scam-bitcoing-trafficking-fraud-cryptocurrency-2024-2.

estimate, the total is around 5 million older Americans a year, resulting in as much as $37 billion in annual losses.[31]

97.    Victims of financial abuse and exploitation suffer severe impacts to their mental health and wellbeing. Medical science has found that victims of elder financial abuse and exploitation are three times more likely to die earlier than non-victims[32]—a morbidity factor rivaling that of heart disease, dementia, or cancer.

98.    The Consumer Financial Protection Bureau ("CFPB") data has shown a steep acceleration in suspected elderly financial exploitation reported by financial institutions, totaling $3.4 billion in 2020, expected to nearly triple by 2025. This trend is only expected to worsen, especially amongst non-depository, money services businesses ("MSBs"), like Crypto.com, a federally registered cryptocurrency exchange.[33]

99.    Over the years, federal law enforcement agencies have brought many civil and criminal legal actions against MSBs such as Crypto.com for, among other things, failing to meet their anti-money laundering ("AML") obligations under the Bank Secrecy Act, and for failing to file Suspicious Activity Reports.[34]

---

[31]    Nick    Leiber,    Bloomberg.com    (May    3,    2018), https://www.bloomberg.com/news/features/2018-05-03/america-s-elderly-are-losing-37-billion-a-year-to-fraud.

[32] ovc.ojp.gov, https://ovc.ojp.gov/2023-report-nation/elder-abuse-financial-exploitation

[33]    confsumerfinance.gov    (Nov.    15,    2021),    https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-suspicious-activity-reports-on-elder-financial-exploitation/full-report/

[34]    ftc.gov    (Nov.    8,    2018),    https://www.ftc.gov/news-events/news/press-releases/2018/11/moneygram-agrees-pay-125-million-settle-allegations-company-violated-ftcs-2009-order-breached-2012; justice.gov (Jan. 19, 2017), https://www.justice.gov/opa/pr/western-union-admits-anti-money-laundering-and-consumer-fraud-violations-forfeits-586-million#:~:text=The%20Western%20Union%20Company%20%28Western%20Union%29%2C%20a%20global,of%20Pennsylvania%20and%20the%20Southern%20District%20of%20Florida (2017 agreement between the Western Union Company, the Department of Justice, the Federal Trade Commission and several U.S. Attorneys' Offices); FinCEN.gov (Jan. 19, 2017), https://www.fincen.gov/news/news-releases/fincen-fines-western-union-financial-services-inc-past-violations-anti-money (related 2017 FinCEN penalty against Western Union for AML program failures and violations of its SAR filing obligations); FinCEN.gov (Nov. 9, 2012), https://www.justice.gov/opa/pr/moneygram-international-inc-admits-anti-money-laundering-and-wire-fraud-violations-forfeits (2012 agreement between MoneyGram International Inc. and the Department of Justice).

100.    The State of California amended the definition of "financial abuse" under the Elder Abuse and Dependent Adult Civil Protection Act ("Elder Abuse Act") in 2000 to include not only the persons committing fraud "but also anyone who assists in committing" fraud.

101.    California crafted the amendment to the law to hold liable entities "deemed to have known" about the fraud "by basing such knowledge on information received by the person or entity that would have made it obvious that the elder" was a victim of financial abuse.[35]

102.    In the years after the amendment to the law, it became apparent to California that "financial abuse often occurs in the transactions at banks, savings and loans, and credit unions [where] employees there are well situated to identify and prevent financial abuse."[36] So, California added financial institutions to the list of "mandated reporters" for financial abuse of elders.[37]

103.    The CFPB has been persistent in its guidance that MSBs and cryptocurrency exchanges such as Crypto.com play a role in the proliferation of elder financial exploitation. The CFPB blames MSBs for not "blocking money transfers to people who previously aroused suspicion" and not "providing conspicuous warnings about current scams on money transfer forms."[38] Moreover, the CFPB faults MSBs like Crypto.com for not "assist[ing] victims of fraudulent activity by refunding money transfer amounts and associated fees when appropriate and by ensuring that agents and frontline employees are complying with anti-fraud programs and controls."

104.    Similarly, the FDIC has consistently warned banks including First Republic

[35] Senate Committee on Judiciary on Assembly Bill 2107 (1999-2000 Regular Session), August 8, 2000, p. 9.
[36] Assembly Committee on Judiciary on Senate Bill 1018 (2005-2006 Regular Session), July 7, 2005, p. 5.
[37] Assembly Committee on Judiciary on Senate Bill 1018 (2005-2006 Regular Session), July 7, 2005, p. 5
[38] consumerfinance.gov (Feb. 2019), https://files.consumerfinance.gov/f/documents/cfpb_suspicious-activity-reports-elder-financial-exploitation_report.pdf

that pig butchering scams involve customers with no prior interaction with virtual currency exchanges, who suddenly make massive transfers, wires, or withdrawals to a cryptocurrency exchange.

**SCAM ALERT: "PIG BUTCHERING"**

**BEWARE: THIS SCAM CAN CAUSE SERIOUS HARM TO YOUR BANK AND YOUR CUSTOMERS!**
This scam is named in reference to the practice of fattening a pig before slaughter. It is a type of confidence and investment fraud in which the victim is gradually lured into making increasing monetary contributions, generally in the form of cryptocurrency, to a seemingly sound investment before the scammer disappears with the contributed monies.

**How the Scam Works:**
- **Perpetrators contact victims at random** via text messages, dating apps, social media platforms, and later switch to VOIP chat applications.
- **Perpetrators develop meaningful relationships with victims,** gain their trust, and offer them high-yield investment opportunities in virtual assets, such as cryptocurrency.
- **Perpetrators tell victims to open accounts on online investment websites** and instruct them to deposit money via wire transfer to shell companies, or direct transfers on legitimate virtual asset service providers (VASPs) or cryptocurrency exchanges.
- **Perpetrators pressure victims to investment more money,** or the relationship will end.
- **Victims are duped and the fraud ends:** When a victim attempts to withdraw money, websites may demand that victims pay additional fees to do so; other victims are locked out of the account and never hear back from the perpetrator. **Perpetrators disappear with all of the victim's funds.**

**What to Watch For: "Red Flags"**
- A customer with no prior interactions with virtual exchanges suddenly exchanges large sums of fiat currency from their bank account for virtual currency or transfers money to VASPs.
- A customer's account shows frequent and large withdrawals of money or multiple wire transfers to a VASP-when in the past, there was limited or no activity in the account.
- A customer appears distressed or anxious to access funds immediately to meet the timeline of a virtual currency investment opportunity or a bank receives calls from a victim requesting the cancellation of a transfer.

**What to Do: Mitigate Your Risk!**
- **Focus on "Know Your Customer" (KYC) requirements:** Do the businesses and individuals have websites? Are they registered with the appropriate state and federal compliance office?
- **Immediately freeze accounts and conduct compliance checks:** Follow up with account owners who you suspect to be victims. Justify the origin of the money. Request supporting documentation, such as invoices for services provided.
- **Contact recipients of outbound transactions:** Ensure transfers are for legitimate purposes.

**OIG** Office of Inspector General

**REPORT:** File a Suspicious Activity Report (SAR) and 314(b) filings. Financial institutions are encouraged to refer their customers who may be victims of Pig Butchering Scams to their local police department to file a police report and to file a complaint on the FBI's Internet Crime Complaint Center (IC3): https://www.ic3.gov.

Scan to learn more

**DEFENDANTS KNOWINGLY ASSIST A SCAM**

105.    The scammers (who is one or more of Defendants Does 1 to 25) first contacted Mr. Patz, who at the time had not invested in cryptocurrency, via Instagram in early January 2023.

106.    The opening message, "Hi," is so prevalent that it frequently features among

Case No. 3:24-cv-06194-WHO                         21                         **SECOND AMENDED COMPLAINT**

opening salvos for pig butchering scammers.

107. The scammer quickly persuaded Mr. Patz to move the conversation onto WhatsApp, at which point the two began discussing this so-called investment opportunity.

108. The scammer targeted and exploited Mr. Patz's age and inherent vulnerability.

109. On January 10, 2023, via WhatsApp, Does 1 to 25, identified as user "Alisa (Weyna) Chen with email address chenbingbing33@yahoo.com (the scammer) falsely stated, "I studied finance and financial management in university." The scammer also falsely identified herself as "Alisa (Weyna) Chen." The scammer falsely stated that had a trusted team of more than a dozen people and financial analysts who provided market "nodes" that she used to "analyze the market through bitcoin price and trading data" to predict "the correct trading timing to achieve profitability." The scammer encouraged Mr. Patz to start with small payments to "accumulate more wealth," then to ramp up larger and larger payments as the scammer gave Mr. Patz false data showing enormous returns on investment.

110. On January 11, 2023, via WhatApp, the scammer falsely stated that she would give Mr. Patz a "very profitable investment" if he followed her advice, so he could "add more liquidity" while "avoid[ing] taxes.". In fact, the "advice" the scammer gave was to send money to Does 1 to 25 in furtherance of the fraud.

111. The scammer also made false statements about a fake business operation. On January 11, 2023, via WhatsApp, the scammer falsely claimed, "I started an import and export trading company with my friends." On January 12, 2023, via WhatsApp, the scammer falsely claimed to be making "at least [$]100000 profits monthly." The scammer sent fraudulent and/or doctored images to Mr. Patz purporting to show high returns on investment. The scammer then falsely suggested Mr. Patz could do the same if he sent his money to Does 1 to 25.

112. On January 14, 2023, via WhatsApp, the scammer, in furtherance of the scheme to defraud Mr. Patz, guided Mr. Patz to setting up an account at Crypto.com so

that the fraud induced crypto transfers could be made. The scammer told Mr. Patz to use a driver's license to verify his Crypto.com account as it is "very fast" and to prepare to wire transfer to his Crypto.com account. The scammer false promised a "Bitcoin short-term trading buy long buy short operation naturally flexible income [that] is also very stable, trade at any time, at any time income," and that her advice was based on "long analysis" and "market trends." The scammer also sent Mr. Patz doctored and/or staged photos of financial data designed to lend credence and credibility to her false statements. This information was all designed to entice Mr. Patz to make fraud induced transfers to Does 1 to 25.

113. The scammer showed great familiarity with Crypto.com, advising Mr. Patz on how to set up his account, how long verification would take (including longer wait periods on weekends), how to link his bank account to Crypto.com and how to wire money to the account, and how to whitelist the criminal recipients to avoid delay or due diligence. The scammer warned Mr. Patz that if he purchased crypto directly with a credit card or via his bank account, then the banks might delay the transactions. The scammer told Mr. Patz to instead wire the money to Crypto.com, and to do so by calling his bank to request the wire be made immediately. The scammer warned Mr. Patz that banks (rather than crypto exchanges) do not understand cryptocurrency, and that he needed to be careful otherwise they might block his transfer. The scammer told Mr. Patz to purchase crypto directly Crypto.com's exchange after the transfers were made. The scammer knew that Crypto.com had weak anti-money laundering controls and lacked due diligence standards.

114. On January 15, 2023, via WhatsApp, scammer fraudulently told Mr. Patz should fire his financial advisor, stating "I don't think you should keep your money there [with her]… Instead, use those funds to generate profits to create value for the coming year." The scammer fraudulently encouraged Mr. Patz to substitute his financial advice from his professional advisor to the scammer, stating "I will share the good nodes with you, but you must follow my instructions" to generate money, because "as long as [they] trade it at the right time, [Mr. Patz] will be profitable." The scammer then sent Mr. Patz an image

that falsely portrayed an account purporting to belong to the scammer that had massive returns on investment. All this information was false, and intended to convince Mr. Patz to transfer his money to Does 1 to 25.

115. The scammer persistently checked with Mr. Patz again and again if Crypto.com had finished verifying his account, insisting that he had to move quickly to make the transfers soon.

116. The scammer lured Mr. Patz with promises of speedy returns and said that the investment would be managed via the common cryptocurrency application, Changelly.

117. On January 17, 2023, via WhatsApp, the scammer sent to Mr. Patz via WhatsApp messages a detailed, step-by-step instruction on how to set up both a "Changelly" account. The scammer sent more messages to Mr. Patz promising enormous returns on his "investment."

118. Mr. Patz researched Changelly and discovered it was a reputable cryptocurrency site. Unbeknownst to him, however, the scammer followed the extremely common procedure of mirroring the legitimate Changelly site with an illegitimate, high-quality application.

119. The scammer told Mr. Patz that he would need to invest in the fund via Crypto.com and provided him with detailed instructions on creating and funding the account.[39] Specifically, the scammer told Mr. Patz that if he transferred money to a specified recipient via Crypto.com, that Mr. Patz would be rewarded in the form of lucrative investment returns. This was a lie.

120. On January 19, 2023, via WhatsApp, the scammer sent Mr. Patz a false image of an investment options menu at Changelly purporting to show that Mr. Patz could

---

[39] Mr. Patz created an account on the Crypto.com app but did not consent to any terms and conditions as part of the signup. Crypto.com's terms and conditions are both procedurally and substantively unconscionable. Notably, the terms and conditions for signup in the Crypto.com app were hidden by using a) a very small font, and b) a deceptive blue font against a blue background, placed in the middle of the signup process without a checkbox, rendering it unnoticeable. Moreover, Mr. Patz's use of Crypto.com as a service was fraudulently induced.

earn over 50% returns on options contracts (calls or puts) over a period of just minutes. The scammer fraudulently led Mr. Patz through multiple small "trades," instructing him on what orders to make and when, and falsely portraying to Mr. Patz that he was making money.

121.    Mr. Patz was not aware at this time that Crypto.com had already sent Mr. Patz's money to criminals, and in fact there was no investment menu—it was all an illusion to defraud Mr. Patz.

122.    On information and belief, the Doe Defendants chose Crypto.com specifically because it was a favored platform for money laundering and making fraud-induced transfers against other victims. Doe Defendants had successfully preyed on others via Crypto.com and they knew the platform failed to meet its BSA obligations, i.e., Crypto.com had a "whitelisting" process in lieu of actual due diligence or Travel Rule compliance.

123.    On information and belief, Mr. Patz was just one of many victims on Crypto.com's platform involved in this same scheme by Doe Defendants.

124.    On January 19, 2023, via WhatsApp, the scammer falsely sent Mr. Patz a series of images purporting to show his $2,881.52 investment had profited $487.00 in just minutes. This false representation to Mr. Patz was designed to entice Mr. Patz to put in more money into the scam. When discussing how much Mr. Patz should add to the fake investment platform, the scammer falsely told Mr. Patz, "150k is an amount suitable for beginners. If it is this amount of funds, I am confident that you will make a profit of at least 60-80k a week. … remember to go to the bank tomorrow to wire the funds to Crypto.com." The scammer was persistent: "Don't forget to complete the wire transfer of funds tomorrow … I just remind you that I am worried that you will forget because you are usually very busy." Does 1 to 25 knew these statements were false when they were made because there was no legitimate investment opportunity, no actual trading platform generating returns, and the statements were made to deliberately exploit Mr. Patz to keep transferring funds.

125.    Mr. Patz assured the scammer that he would make a wire transfer request to

the bank that night.

126.    The following day, on January 20, 2023, via WhatsApp, the scammer instructed Mr. Patz to physically go into the bank to do a $200,000 wire transfer to Crypto.com. Mr. Patz commented to the scammer the bank was "eager to help [him."

127.    On January 23, 2023, First Republic Bank finished the wire transfer of $200,000 to Crypto.com. Because Crypto.com had "whitelisted" the criminal's receiving wallet days before, Crypto.com sent a $146,693.39 transfer to Does 1 to 25 without any due diligence or delay.

128.    On January 23, 2023, via WhatsApp, the scammer falsely told Mr. Patz "if you have a lot of free funds, you can pledge the funds to changelly's mining pool. This income is fixed, 10% monthly income … that is[,] if you pledge one million, it will give you 4200USDT interest every day. One month is 126000. Most importantly it is 0 risk … much better than putting it in the bank." These false statements were intended to entice Mr. Patz about fake profits and to make more wires to Crypto.com and for Crypto.com to send more money to Does 1 to 25. Through a later exchange that day, the scammer convinced Mr. Patz that he was losing money by letting his family's money sit in a traditional investment account.

129.    Also on January 23, 2023, via WhatsApp, the scammer falsely sent Mr. Patz another round of images that purported to show enormous profits for options contracts. The scammer again walked Mr. Patz through the amount and types of contracts to buy, and when to buy them. Mr. Patz followed these instructions, without knowing the money sent by Crypto.com was already in the hands of criminals and that he would never get his money back. The scammer falsely told Mr. Patz that he had earned $32,400.00 from the evenings investing. The scammer then directed Mr. Patz to "load" another $50,000.00 into Changelly. The following day, Crypto.com transferred another nearly $45,000.00 of Plaintiff's money to Does 1 to 25. Also on the following day, at the direction of the scammer, Mr. Patz requested another $200,000.00 wire from Defendant First Republic Bank, which was sent to Crypto.com.

130.   On January 24, 2023, via WhatsApp, the scammer falsely told Mr. Patz that he could deposit his profits back from the fake trading platform to his bank. When Mr. Patz was unable to do so, the scammer falsely told Mr. Patz that the problem must have been his bank account. The scammer warned Mr. Patz that some banks might try to dissuade him from investing in cryptocurrency and to be firm, but Mr. Patz told the scammer that First Republic Bank "seem[ed] happy" to be helping him.

131.   Not being permitted to withdraw earnings from the fake investment platform is a telltale sign of elder abuse and pig butchering fraud that FinCEN notified Defendants First Republic Bank and Ms. Evans about in the past.

132.   On January 25, 2023, Mr. Patz sent an email to Defendant Evans saying that he "recently set up an account to trade crypto currency" on Crypto.com but was not able to get money out. Defendant. Evans failed to act on this red flag, shirking her responsibility to take action to monitor for money laundering and elder financial abuse. Defendants Evans and First Republic Bank instead attempted to remain willfully blind by avoiding their Bank Secrecy Act obligations.

133.   The pattern of false statements from Does 1 to 25 to Mr. Patz via WhatsApp, followed by fraud induced wire transfers and funds transfers performed by Defendants First Republic Bank, Ms. Evans, and Crypto.com of Plaintiff's property to Does 1 to 25, continued in this same pattern for weeks. As the days continued, the scammer falsely promised more and more returns to Mr. Patz. and encouraged Mr. Patz to move more and more money to the fake "investment." Consequently, Defendants First Republic Bank, Ms. Evans, and Crypto.com made more and more fraud induced transfers, misappropriating Plaintiff's property to Does 1 to 25.

134.   On January 26, 2023, via WhatsApp, the scammer falsely positioned herself as an essential partner in Mr. Patz's financial activities, stating "If my crypto account comes back up, I'm not going to do anything until we can do it together" and creating artificial urgency with "You can ask them when they can solve it. You need an accurate time," fraudulently inducing $150,000 in transactions via the Crypto.com account.

Case No. 3:24-cv-06194-WHO                    27                    **SECOND AMENDED COMPLAINT**

135. On January 27, 2023, via WhatsApp, the scammer falsely maintained the fabricated narrative of a shared investment venture requiring Mr. Patz's ongoing financial participation, expressing gratitude for his "trust" and suggesting that his continued investment demonstrated his intelligence and sophistication, fraudulently inducing another $50,000 in transactions from the Crypto.com account.

136. On January 31, 2023, via WhatsApp, the scammer falsely directed Mr. Patz to review fabricated transaction records, stating "Click anywhere" and "You can see the record here," while sharing fraudulent screenshots purporting to show successful investment activity. These false statements fraudulently induced another $90,000 in transactions from the Crypto.com account. Does 1 to 25 knew these statements were false when they were made because there were no legitimate investment records or transaction histories to review, and the visual "evidence" was deliberately fabricated to create an illusion of legitimacy and success.

137. On February 1, 2023, via WhatsApp, the scammer falsely reinforced Mr. Patz's perception that his prior transfers had generated significant returns, creating the impression that an additional substantial transfer would simply reinvest profits rather than risking new capital. These statements fraudulently induced $150,000 in transfers from Crypto.com.

138. On February 6, 2023, via WhatsApp, the scammer falsely represented that Mr. Patz had quickly lost a sizeable amount of money because he did not properly follow the scammer's trading instructions. The scammer falsely told Mr. Patz was needed to "stabilize" or "rebalance" the portfolio after this fabricated emergency, fraudulently inducing Mr. Patz to transfer more than $60,000. Does 1 to 25 knew these statements were false because there was no investment loss, no real trading, and the crisis was manufactured to induce fear and urgency, compelling Mr. Patz to send additional funds.

139. Between February 14 and 20, via WhatsApp, the scammer used emotional manipulation and other false statements to continue to induce more and more fraudulent transfers. The scammer again gave Mr. Patz false trading instructions, saying "Option: buy

KRONENBERGER ROSENFELD

fall, Time: 180s, Amount: 100k, Click ok to confirm the transaction"—and claimed, "Maybe we can still try to find some, because usually such opportunities are not always available," referring to the urgency that Mr. Patz needed to transfer more money or risk his "investment." Does 1 to 25 knew these statements were false because there was no real trading platform, no time-sensitive opportunity, and the instructions were designed to create urgency and FOMO (fear of missing out), compelling Mr. Patz to send more funds.

140.   After the final transfer on February 20, Mr. Patz attempted to withdraw his money from the fake investment platform only to find his account was "locked." The scammer falsely blamed Mr. Patz via WhatsApp chats for "abnormal activity," i.e., for using public wifi, and that he would need to pay a "security deposit" to unlock his account. In fact, this was another lie to induce more fraudulent transfers.

141.   As the days and weeks passed, Mr. Patz realized the promises of returns would never be fulfilled and that he had been defrauded. Mr. Patz and Plaintiff tried seeking help from customer service, including the financial institutions involved, and law enforcement, but the funds were never recovered.

142.   All of these communications from Doe Defendants 1 to 25 (including the scammer) were made using interstate wire communications.

**A.   First Republic assists fraudsters in raiding Plaintiff's bank accounts and laundering fraud proceeds to a cryptocurrency exchange.**

143.   Having no idea he was being targeted by fraudsters, Mr. Patz turned to his family's bank accounts at First Republic to fund the fake investment. All the money in these accounts were part of the married couple's community property.

144.   First Republic Bank was an FDIC-insured bank, also responsible for designing and implementing a risk-based anti-money laundering program to prevent its financial system from being utilized for money laundering under the BSA and its implementing rules and regulations. 31 U.S.C. §5318(h). Evans, too, was required to adhere to the BSA. *See Id*. and Financial Industry Regulatory Authority (FINRA) Rule 3310.

145.   Plaintiff and Mr. Patz had banked with First Republic for many years,

maintaining multiple accounts for their business, personal checking, retirement, and wealth management. All the money in these accounts were part of the married couple's community property.

146.    Plaintiff and Mr. Patz used First Republic to conservatively manage their hard earned and carefully saved money.

147.    Defendant Evans was the financial planner and investment manager of Plaintiff and Mr. Patz. Defendant Evans was acutely aware that Plaintiff's family investment strategy was conservative.

148.    Neither Plaintiff nor Mr. Patz had ever made a transaction at First Republic related to cryptocurrency.

149.    Tragically, however, fraudsters stole almost a million dollars from Plaintiff when they targeted her elderly husband with a scam tailored to his inherent vulnerabilities and with the expectation that First Republic would actively assist and participate in the fraud by moving their money to a cryptocurrency exchange.

150.    Within a matter of days, and without making even a single inquiry for due diligence or KYC purposes, First Republic and Evans wired almost a million dollars of community property from the married couple's checking account to Crypto.com, where it was eventually transferred on to fraudsters.

| Date (2023) | Wire Transfer Amount from First Republic to Crypto.com |
|---|---:|
| January 17 | $3,000 |
| January 23 | $200,000 |
| January 25 | $200,000 |
| January 31 | $300,000 |
| February 14 | $200,000 |

151.    All the above funds had originated from accounts that were part of Plaintiff and Mr. Patz's community property via the marital estate. Not one penny of any of the

funds alleged in the SAC were alienated from the couple's marital estate nor were they in any way separate non-community property.[40]

152. Every penny alleged herein was Plaintiff's property.

153. In an email exchange with Defendant Evans, Mr. Patz told Evans and First Republic that he was making the transfers to "invest" in cryptocurrency.

154. In another exchange with a teller at the Napa branch of First Republic, Mr. Patz told First Republic that he was "investing" in cryptocurrency.

155. During the process, Mr. Patz swept funds from retirement and investment accounts—money that had been aside with the help of Defendant Evans to help protect Plaintiff and Mr. Patz's financial future. All the money in these accounts were part of the married couple's community property.

156. As mentioned above, all of these retirement and investment account funds were community property owned by Plaintiff and part of the marital estate.

157. Even though these transfers were highly erratic and inconsistent with the family investment strategy, and despite knowing Mr. Patz was an elder inherently vulnerable to scams involving cryptocurrency platforms, First Republic and Defendant Evans nonetheless authorized the transactions without any delay or inquiry.

158. At no time before, during, or after the transaction did First Republic or Defendant Evans perform due diligence or further inquiry.

159. First Republic and Defendant Evans endeavored to consciously avoid appearing to know the truth and to forego a paper trail about the fraud they were assisting by omitting legally required due diligence and KYC.

**B.   Crypto.com further launders the fraud proceeds and exfiltrates to the criminals.**

160. Once First Republic and Defendant Evans transferred Plaintiff's funds out of the banking system and onto a cryptocurrency exchange, the next phase of the fraud was

---

[40] California is a community property state, and each spouse has a respective interest that is "present, existing, and equal" during the marriage. Fam. Code, §§751, 760.

underway: converting the fraud proceeds into cryptocurrency, laundering the funds once more, and transferring the funds to the custody of criminals.

161. To be clear, this $75 billion fraud industry that preys on elders never existed before the likes of Crypto.com.

162. Fraudsters running pig butchering schemes prefer and rely on exchanges like Crypto.com because they can avoid the most fundamental anti-money laundering and fraud controls that exist in the normal financial system. It is not that these laws do not apply to the likes of Crypto.com—they do. It is that Crypto.com and others have for many years since their inception simply not followed the rules.[41]

163. Once the fraudsters have their victim's funds on an exchange like Crypto.com, they are nearly home free. The next steps are in the exchange's hands.

164. First, Crypto.com assisted the fraudsters by converting the fiat currency into Tether, a cryptocurrency known by Crypto.com to be a favored vehicle for fraud.

165. When Crypto.com made these conversions, it knew that Mr. Patz was in fact a victim of fraud. Crypto.com perhaps did not know every fact of the entire scheme or its intricacies, i.e., the true identifying information of the Doe Defendants that Crypto.com was aiding and abetting, but it knew and understood that Mr. Patz was a victim, and Crypto.com knew of all the facts and circumstances of the transactions that pointed unequivocally to fraud.

166. Crypto.com then transferred the Tether to criminals over the course of a series of transactions. Again, Crypto.com did so with knowledge that Mr. Patz was a victim of fraud.

167. From Mr. Patz's perspective, he was "investing."

168. Once Mr. Patz had "invested," he saw the account balance begin to grow at

---

[41] The extreme risk these exchanges pose to consumers due to their fundamental failures in preventing money laundering and fraud are starting to catch up to them, however. *See* https://www.justice.gov/opa/pr/binance-and-ceo-plead-guilty-federal-charges-4b-resolution; https://www.nytimes.com/2023/01/04/business/coinbase-settlement-anti-money-laundering.html.

an exciting rate, prompting more and more investments.

169.   All of this, however, was an illusion.

170.   When Mr. Patz began trying to withdraw funds, he was told he had to pay "fees" to access them, totaling hundreds of thousands of dollars.

171.   The scammer began suggesting that Mr. Patz liquidate other assets and approach friends and family for more money.

172.   On February 20, 2023, via WhatsApp, the scammer falsely stated, "Crypto transactions... If we can build higher, I think we will get more profits and opportunities... Sometimes we need to face the necessary risks, and don't be too conservative to insist on what we think is right," causing Mr. Patz to transfer more substantial funds into a purported trading account on the Changelly platform in reliance on the promise of high returns.

173.   On February 22, 2023, via WhatsApp, the scammer falsely assured Mr. Patz, "It's not a difficult thing in itself. Of course, if [your wife] wants to join in, I think it's a good thing. At least it can make you more money," and further stated, "You now just have to do what they say and get your account back," after Mr. Patz reported being unable to withdraw funds from Changelly. Relying on these statements, Mr. Patz refrained from taking immediate remedial action and continued to attempt to comply with fraudulent "security verification" and "fees" procedures, resulting in further financial harm.

174.   Desperate to access his money, Mr. Patz continued to pour more and more into the "investment" scheme.

175.   Mr. Patz's desperation translated to Defendants making more and more sporadic and patently corrupt transfers in assistance of the criminals that were preying on Mr. Patz.

176.    All told, Mr. Patz had spent approximately $1,250,000 on the "investment" and its "penalties."

177.   It was not until after his final transaction, however, that Mr. Patz noticed that the mirror site was not, in fact, associated with Changelly, as he had been led to believe.

178.   In that moment, Mr. Patz realized he had been defrauded.

179. What makes this particularly heartbreaking, however, is that these transactions took place over a period of more than a month, during which time Defendants each had all of the information, tools, and duties necessary to stop this fraud from occurring, but inexplicably did nothing.

180. Still worse, First Republic and Defendant Evans were both keenly and uniquely aware of Plaintiff and Mr. Patz's financial history and investment strategy. This knowledge combined with the other facts and circumstances made their knowledge that Mr. Patz was a victim of an elder abuse scam unavoidable.

181. Still, First Republic and Defendant Evans did try to avoid an appearance of having this knowledge. They did so by consciously shirking their professional responsibilities.

182. Additionally, and similarly, it was Crypto.com's unique approach to whitelisting and to bypassing due diligence that enabled the scam to operate.

183. Crypto.com consciously and deliberately chose to deploy this whitelisting process despite knowing that Mr. Patz was a victim of an elder abuse scam to avoid an appearance of having knowledge.

184. For example, on February 20, 2023, at 12:13 PM, at the direction of the criminals, Mr. Patz registered a new wallet ("Wallet DeC") as a whitelisted wallet on his Crypto.com account.

185. During the whitelisting process, Crypto.com contacted Mr. Patz and asked him some perfunctory questions about his account activity. Mr. Patz responded by telling Crypto.com that his sudden and erratic behavior was because he was taking part in an investing opportunity—a telltale sign of pig butchering, when taken together with Mr. Patz's age and inherent vulnerability.

186. To Crypto.com's credit, Crypto.com followed the script by appearances when Crypto.com asked questions ascertaining whether Mr. Patz was a victim of an investment scam or not. Nonetheless, Crypto.com got answers indicating M. Patz *was* in fact a victim but Crypto.com deliberately ignored these facts.

187. Crypto.com took the opposite action that it had been advised for years by law enforcement and regulators that it must take. As if ignoring extreme indicia of fraud was bad enough, Crypto.com also overtly channeled Mr. Patz into a fast lane to be defrauded.

188. Crypto.com asked Mr. Patz who he was receiving his investment advice from, i.e., if it was a professional advisor or not, and Mr. Patz told Crypto.com that the advice he was receiving was from an online "friend" and not a professional advisor. Mr. Patz was also evasive with Crypto.com when asked about where the money was coming from or what the purpose of the transfers was—even more indicia of fraud.

189. Mr. Patz gave no response to Crypto.com's questions that would have justified suspending further due diligence and transaction monitoring. In fact, it was the opposite: Mr. Patz gave even more indications he was a victim of a scam, not less.

190. Nonetheless, despite knowing Mr. Patz was a victim, Crypto.com was happy to make any possibility of due diligence or further inquiry impossible by whitelisting the accounts.

191. On February 20, 2023, at 12:21 PM, Crypto.com confirmed a withdrawal to the newly whitelisted Wallet DeC for the amount of 10,759.74 USDT (approximately $10,759.74).

192. Two hours later, at 2:21 PM, Crypto.com confirmed a deposit to Mr. Patz's Crypto.com account in the amount of 35,916.34 USDT (approximately $35,916.34).

193. Notably, despite the fact that these transactions alone show a significant number of red flags, Crypto.com never delayed the transactions—simply allowing the whitelisted wallet withdrawals to go forward, in some cases mere minutes after the wallets were whitelisted in the first place.

194. All told, over a period of just over a month, from on or around January 18, 2023 to around February 22, 2023, Mr. Patz opened a Crypto.com account and then made a series of dozens of deposits, exchanges, and withdrawals to an off-site wallet, totaling approximately $1,250,000 USD.

195. Crypto.com collects fees with each transaction. In Plaintiff's case,

Crypto.com obtained hundreds of dollars in fees for transactions it allowed to go forward despite obvious red flag indicators.

196.   Throughout this time, Defendants never once performed any sort of due diligence regarding the source of the funds, the destination of the funds, true identity of the recipient, purpose of the transactions, etc.

197.   Mr. Patz told Defendants he needed the transfers for his "investment" in crypto, but rather than inquiring further upon this obviously nefarious set of facts and circumstances, Defendants instead took deliberate and concerted action to avoid learning the truth by openly shirking their responsibilities.

198.   Crypto.com's whitelisted wallet protocols enabled the criminals to bypass these legally required safety checks altogether and, upon information and belief, is why the scammer chose Crypto.com to begin with as the platform of choice for the scam.

199.   When Mr. Patz was first contacted by the criminals, he was totally inexperienced with cryptocurrency. The scammer was the one to suggest Crypto.com, and to suggest he whitelist the destination wallet.

200.   In other words, the scammer knew that Crypto.com's security systems could be exploited and sought to leverage those gaps by specifically instructing the victim to create a Crypto.com account.

201.   The fact that Crypto.com is a hub for money laundering, fraud, and pig butchering is a well-known subject of discussion.[42] Criminals simply favor cryptocurrency exchanges like Crypto.com because they completely fail at basic compliance, enabling unprecedented growth in these types of scams preying on elders.[43]

202.   Here, the scammer walked Mr. Patz through every step of opening the Crypto.com account, funding it, whitelisting the destination wallet, and withdrawing funds from it. It was as if Crypto.com had a user experience built for fraud.

---

[42] Zeke Faux, time.com (Feb. 29, 2024), https://time.com/6836703/pig-butchering-scam-victim-loss-money-study-crypto/.
[43] chainalaysis.com (Feb. 15, 2024), https://www.chainalaysis.com/blog/2024-crypto-money-laundering/.

203. Mr. Patz was completely unaware of the existence of pig butchering scams at the time; Defendants, on the other hand, were not.

204. Defendants were each unequivocally aware of how to spot these kinds of frauds, especially when concerning elders, whom they were required to report on for fraud.

205. Defendants here were equipped with full knowledge of the facts and circumstances that such a scam was occurring, and that Mr. Patz was a victim:

a) Defendants knew Mr. Patz was an elder adult and therefore vulnerable to such scams by virtue of Mr. Patz's age, because Defendants are mandated reporters.

b) On information and belief, Defendants knew the elderly Mr. Patz was following another's directions related to his financial account.

c) Defendants knew the elderly Mr. Patz was seeking a sudden purchase of cryptocurrency.

d) Defendants knew the elderly Mr. Patz sought a sudden, uncharacteristic, and significant transfer of assets from his account.

e) Defendants knew of no personal relationship between the elderly Mr. Patz and the recipient despite a request for a massive transfer of funds without any explanation not seeming suspicious or indicative of a scam.

f) Defendants knew Mr. Patz had little to no history or background in using or exchanging or otherwise interacting with virtual currency, yet Defendants also knew Mr. Patz made a sudden request to exchange a huge amount of fiat currency for virtual currency.

g) Defendants knew Mr. Patz was either liquidating savings or borrowing money to make the crypto purchases and transfers by virtue of the massive scale of funds involved.

h) Defendants knew Mr. Patz had limited to no activity on Crypto.com's platform before a sudden, uncharacteristic, abnormally frequent and significant level of activity involving massive amounts of money.

i) Defendants knew of no history of electronic funds transfers by Mr. Patz for the stated purposes, yet Defendants also knew Mr. Patz abruptly started sending multiple high-value wire transfers to accounts where Defendants had observed no prior transaction history, nor established any KYC due diligence.

206. What is more, Defendant Crypto.com had another reason to know that something was amiss—knowledge that was not afforded to Plaintiff or Mr. Patz at any time.

207. Unlike Mr. Patz, Crypto.com had access to technology and tools designed to safeguard against fraud that allow for real-time wallet scanning.

208. Real-time wallet scanning allows exchanges to check destination wallets against known blacklisted wallets connected with reported fraud.

209. The United States Office of Foreign Assets Control ("OFAC") publishes a list of known Specially Designated Nationals ("SDNs") which includes information on digital wallet addresses associated with SDNs.

210. Tools available to screen against these blacklisted SDN wallets, which are required to comply with federal BSA/AML and OFAC requirements, easily allow cryptocurrency exchanges to identify wallets associated with known criminals and bad actors.

211. These technologies are commercially available to Crypto.com and are commonplace in the industry.

212. Upon information and belief, Crypto.com has the technology to perform real time wallet scanning as part of its KYC process, but either refuses to do so to deliberately remain ignorant to the risks in which it places its customers, or simply ignores the prolific money laundering in its system.[44]

213. Crypto.com would have immediately noted that the destination wallet was the same address that had been used by several seemingly unrelated Crypto.com users over the two-week period leading up to Mr. Patz's transfers to said wallet—a strong indicator of a scam by itself.

---

[44] *See* https://crypto.com/university/what-is-kyc-in-crypto.

214. Crypto.com was in receipt of this information, and therefore knew the destination wallet was a scammer, given all the other facts and circumstances about Mr. Patz.

215. Even a cursory review of the destination wallet using analytical tools would have revealed, as well, that funds sent to this wallet were then funneled from there to additional destination wallets which were actively under investigation as being associated with scam activity.

216. The most recent of these so-called "scam tags," which indicate a wallet is actively under investigation due to reports of scam activity by investigators or other cryptocurrency exchanges, were published on January 25, 2023.

217. However, the majority of the funds that Mr. Patz transferred to the destination wallet went directly from there to a third-party wallet that was *confirmed* to be associated with criminal activity as of December 5, 2022.

218. The first time this known scam wallet interacted with the destination wallet was on January 14, 2023—notably, days before Mr. Patz began transacting on Crypto.com.

219. The Financial Crimes Enforcement Network ("FinCEN") cemented that the Funds Travel Rule applies to cryptocurrency exchanges like Crypto.com in 2019. *See* FIN-2019-G001. FinCEN is the federal agency with authority to make rules and regulate financial institutions under the Bank Secrecy Act. *See* 31 U.S.C. §310.

220. Specifically, under the Travel Rule, Crypto.com is required to collect the names, addresses, and account numbers of both senders and recipients for transactions of $3,000 or more.

221. Under the Financial Action Task Force ("FATF"), which sets the standards for most of the world, that threshold for identifying and maintaining records of the recipient is set at $1,000.

222. Defendant Crypto.com purports to comply with the Travel Rule and FATF standards on its website. *See* https://help.crypto.com/en/articles/6306139-travel-rule-faq.

223. Unhosted wallets (where the recipient is not transacting at a regulated exchange) are no exception. Crypto exchanges must collect the recipient information from the sender.

224. Unhosted or "non-custodial" wallets are particularly risky because they are outside of the "regulated" financial system. Both FinCEN and FATF require Crypto.com to take special enhanced due diligence when interacting with unhosted wallets because these technologies present even a higher level of risk of money laundering.

225. Notwithstanding, Crypto.com did not make any meaningful attempt to perform any due diligence on the recipient in this case. Crypto.com did not attempt to ascertain the identity or collect any information about the recipient. Instead, Crypto.com buried its head in the sand by whitelisting the criminal wallets.

226. Crypto.com transferred nearly $1 million to the criminals in less than 30 days:

| Date (2023) | Amount Transferred by Crypto.com |
| --- | --- |
| January 19 | $2,881.52 |
| January 23 | $146,693.39 |
| January 24 | $42,665.72 |
| January 26 | $143,817.05 |
| January 27 | $48,897.79 |
| January 30 | $1,446.81 |
| January 31 | $83,413.88 |
| February 1 | $143,818.49 |
| February 2 | $57,526.82 |
| February 6 | $2,893.63 |
| February 14 | $192,340.76 |
| February 19 | $49,205.67 |
| February 20 | $10,588.80 |

227. All of the above transactions occurred *after* Crypto.com knew the recipient was associated with criminal activity. These transactions represent only one of many victims of this particular scheme perpetrated via Crypto.com's platform.

228. At no time did Crypto.com make any meaningful effort to perform any due diligence to mitigate the risk of any of the red flags presented by these activities.

229. Each of the transactions above made by Crypto.com to Does 1 to 25 occurred with a coinciding fraudulent statement transmitted to Mr. Patz from the scammer via WhatsApp designed to entice Mr. Patz to make the fraud induced transfers.

230. Mr. Patz, Crypto.com, First Republic Bank and Ms. Evans communicated via interstate wire communications to effectuate these fraud induced transactions, i.e., emails, chats, and other electronic communications via the internet.

231. On information and belief, during this same time period, Crypto.com was facilitating fraud induced transfers to Does 1 to 25 from other victims and to the same recipient address it had "whitelisted" in the first place.

232. Crypto.com's attempts at remaining willfully ignorant to the fraud it was assisting in by "whitelisting" the criminal addresses and shirking due diligence is probative of Crypto.com's actual knowledge of the fraud.

233. Had Crypto.com properly performed the Travel Rule's recordkeeping requirements, Crypto.com would have necessarily identified the recipient wallet's beneficiary. Instead, it is obvious Crypto.com failed to meet the Travel Rule, in whole or in part, because of the conduct that occurred in this case.

234. Crypto.com was eager to remain willfully ignorant of the massive scale of fraud on its platform due to the moral hazards in play. Being compliant and using commercially reasonable means to protect consumers is costly, whereas Crypto.com believes it can escape private civil liability by plausibly denying it knows anything about the fraud occurring on its platform, thereby putting even more consumers at risk.

235. This SAC does not allege constructive knowledge. Defendants did not have mere "constructive knowledge," which involves a theory of negligence. Rather, Defendants here each had *actual knowledge* of fraud and even took steps to avoid culpability by attempting to remain willfully ignorant. "Constructive knowledge," a distinct and separate concept, is imputed by law based on knowledge that one would have obtained by using reasonable care. On the other hand, conscious avoidance (sometimes called willful blindness or deliberate ignorance) involves a culpable state of mind that tries to refrain

from confirming facts it knows exist to try and deny knowledge later.

236. Defendants are each putative aiders and abettors who attempted to consciously avoid confirming facts that, if known, would demonstrate the fraudulent nature of the endeavor they furthered.

237. Each Defendant played a part in assisting the criminals.

238. Had Defendants followed up on even the most basic due diligence that they would have necessarily performed, they could have stopped the fraud from being carried out.

239. Instead, armed with actual knowledge that a fraud was occurring, they sought to give themselves plausible deniability through willful ignorance and omitting further due diligence.

240. Crypto.com enabled the scammers by allowing them to use non-compliant "whitelisting" measures to completely bypass the due diligence requirements imposed on it by law.

241. Rather than following through with basic due diligence, Crypto.com stuck its proverbial head in the sand by "whitelisting" the transactions.

242. By "whitelisting" in lieu of performing due diligence, Crypto.com made a futile attempt to shirk its responsibility and avoid liability notwithstanding the fact that Crypto.com knew fraud was occurring.

243. Defendants' failure to comply with the BSA requirements—including 31 U.S.C. §5318(h) and implementing rules and regulations mandating effective AML policies, procedures, and controls reasonably designed to prevent money laundering—enabled the fraud scheme in this case.

244. By eliminating whitelisting delays, foregoing customer due diligence in exchange for more profits for itself, and by approving transfers to flagged wallets known to be criminally associated, Crypto.com created a conduit for rapid criminally derived fund exfiltration from the regulated financial system to criminals.

245. First Republic and Evans similarly ignored numerous regulatory guidance

and shirked their responsibilities to perform transaction monitoring or due diligence, which assisted the fraud.

246. But for Defendants' failure to satisfy its compliance obligations, Plaintiff's funds would not have been stolen.

247. But for Defendants' failure to warn Mr. Patz, or to report on the elder financial abuse that was occurring, Plaintiff's funds would not have been stolen.

248. But for Defendants' failure to exercise due care in safeguarding the funds that Mr. Patz entrusted to it, Plaintiff's funds would not have been stolen.

249. At minimum, the scammer directed Mr. Patz to use Crypto.com and demonstrated intimate knowledge of its security protocols.

250. Plaintiff has not seen any evidence indicating the scammers were not in fact representatives or core members of the Crypto.com company itself.

251. Plaintiff includes the Doe Defendants as defendants here to include other persons involved in the conspiracy that have not yet been fully identified.

252. Immediately following the facts previously alleged, Plaintiff and Mr. Patz have suffered physical symptomology, including but not limited to reflux caused by stress, stomach pain, chest pain, inability to eat, chest pressure, insomnia, difficulty breathing, vomiting, choking, anxiety, and panic attacks.

253. Plaintiff and Mr. Patz continue to experience the above referenced physical symptomology, and prior to the facts alleged in the SAC, did not experience them.

254. Defendants' acts and omissions set forth herein were in all respects reckless, fraudulent, oppressive, and/or malicious, and manifested conscious disregard for the rights of Plaintiff. Plaintiff is therefore entitled to an award of exemplary and punitive damages pursuant to Cal. Civ. Code §3294, according to proof at trial.

## FIRST CLAIM FOR RELIEF

### Aiding and Abetting[45]

---

[45] When Plaintiff has identified the Doe Defendants 1 to 25 (the principal tortfeasors in the aiding and abetting scheme) through discovery in this case, Plaintiff will seek leave to amend her allegations to add direct claims against those persons.

KRONENBERGER ROSENFELD

**(Against All Defendants)**

255.   Plaintiff incorporates all other paragraphs as if alleged herein.

256.   Under California law, liability for aiding and abetting an intentional tort attaches if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance to the other to so act, or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person.

257.   Defendant aided and abetting the following intentional torts:

a) Fraud;

b) Conversion;

c) Trespass to Chattels.

258.   Defendants Does 1 to 25 made fraudulent misrepresentations to Mr. Patz about a fake investment opportunity, fraudulently inducing Mr. Patz to transfer Plaintiff's property to Does 1 to 25.

259.   By the same token, Defendants Does 1 to 25 substantially interfered with Plaintiff's property by knowingly and intentionally taking possession of the property without consent. Defendant Does 1 to 25 misappropriated Plaintiff's property, unlawfully converting her funds. Defendant Does 1 to 25 wrongfully trespassed Plaintiff's property.

260.   Defendants Evans, First Republic, and Crypto.com knew of and substantially aided in this tortious conduct: fraud, conversion, and trespass to chattels.

261.   Defendants did not merely have knowledge or a passive presence to the fraud, conversion, and trespass they knew was occurring. Rather, Defendants intentionally acted to assist or encourage the wrongful conduct, with knowledge the tortious conduct was being committed.

262.   A financial institution's "ordinary business transactions" satisfy the substantial assistance element of aiding and abetting.

263.   Defendants made the transactions alleged herein with actual knowledge that Mr. Patz was a victim of fraud, conversion, and trespass to chattels.

264. To be clear, Plaintiff is not alleging that Defendants are strictly liable for performing transactions that resulted in fraud, conversion and trespass. Rather, Plaintiff pleads that Defendants knowingly aided in the commission of a tort.

265. Defendants did not have mere "constructive knowledge," which involves a theory of negligence. Plaintiff does not allege constructive knowledge. Rather, Defendants here each had *actual knowledge* of fraud, conversion, and trespass to chattels, and even took steps to avoid culpability by attempting to remain willfully ignorant by openly shirking their legal duties.

266. "Constructive knowledge," a distinct and separate concept, is a mental state imputed by law based on knowledge that one would have obtained by using reasonable care. On the other hand, conscious avoidance (sometimes called willful blindness or deliberate ignorance) involves an existing culpable state of mind that tries to refrain from confirming facts it knows exist to provide plausible deniability later.

267. Defendants' willful blindness as alleged here is probative of their actual knowledge of fraud.

268. Defendants are each putative aider and abettors.

269. Defendants each attempted to consciously avoid confirming facts that would demonstrate the fraudulent nature of the endeavor they knowingly furthered.

270. Each Defendant played a part in assisting the criminals.

271. Based on their knowledge and experience, as a regulated money transmitter, a sophisticated cryptocurrency exchange, and a federally registered money services business in the case of Crypto.com, a state chartered bank subject to federal oversight in the case of First Republic, and an experienced financial advisor in the case of Catherine Evans, Defendants were each aware of the virtual certainty that their financial transfer systems were being targeted by fraudsters and criminals to perpetrate financial crimes, including investment fraud and EFE against its customers, and money laundering of the proceeds of those frauds.

272. In this specific instance, Defendants were each aware of the material facts

and circumstances sufficient to conclude Mr. Patz was a victim of fraud:

a) Defendants knew Mr. Patz was a vulnerable elder adult.

b) Upon information and belief, Defendants knew the elderly Mr. Patz was following another's directions related to his financial account by virtue of his aberrant activity.

c) Defendants knew the elderly Mr. Patz was seeking a sudden purchase of cryptocurrency.

d) Defendants knew the elderly Mr. Patz sought a sudden, uncharacteristic, and significant series of transfers of assets from his account.

e) Defendants knew of no personal relationship between the elderly Mr. Patz and the recipient of the transfers, despite a request for a massive transfer of funds without any explanation not seeming indicative of a scam.

f) Defendants knew Mr. Patz had no history or background in using or exchanging or otherwise interacting with virtual currency, yet Defendants also knew Mr. Patz made a sudden request to exchange a huge amount of fiat currency for virtual currency.

g) Defendants knew Mr. Patz was liquidating savings to make the crypto purchases and transfers.

h) Defendants knew Mr. Patz had no activity on Crypto.com's platform before a sudden, uncharacteristic, abnormally frequent and significant level of activity involving massive amounts of money.

i) Defendants knew Mr. Patz had no history of electronic funds transfers outside his established business purposes, yet Defendants also knew Mr. Patz abruptly started sending multiple high-value wire transfers to destinations where Defendants had observed no prior transaction history, nor established any proper KYC due diligence.

j) Defendant Crypto.com knew that the destination wallets were associated with financial crime.

273. Despite knowing Mr. Patz was a victim of a fraud, Defendants deliberately avoided making further inquiry to learn the truth or to dispel the indicia of fraud.

274. Rather than making further inquiry, Defendants instead willfully attempted to appear ignorant of the facts by omitting legally required due diligence.

275. Defendant Crypto.com "whitelisted" the fraudulent destination accounts even after it contacted Mr. Patz and learned he was sending funds to a third party for patently incredulous reasons, thereby shielding all the fraudulent activity from any delay or further scrutiny.

276. Defendants chose to bury their proverbial heads in the sand despite every indication that Mr. Patz was a victim of fraud, conversion, and trespass. Defendants' misconduct here goes beyond mere negligence or incompetence. Defendants had a culpable state of mind when they omitted proper due diligence and inquiry, because they did not want to confirm what they knew to be true: Mr. Patz was a victim of fraud.

277. Defendants' actual knowledge is further evidenced by their willful misconduct, taken in an effort to avoid learning the truth.

278. Despite knowing Mr. Patz was a victim of fraud, Defendants deliberately, willfully, and consciously engaged in a series of misconduct in an effort to appear plausibly deniable:

   a) Defendants omitted proper due diligence and in particular Crypto.com "whitelisted" offending accounts and recipients, thereby shielding them from any delay or scrutiny.

   b) Defendants made no effort to delay the transactions to facilitate a meaningful investigation.

   c) Defendants made no effort to meaningfully scrutinize the transactions.

   d) Defendants made no effort to determine the source of the funds for the transactions.

   e) Defendants made no effort to determine the true purpose of the transmittals.

   f) Defendants made no effort to gather and analyze the details of the

relationship between the sender and recipient.

g) Defendants made no effort to form a reasonable belief about the true identity of the recipient.

h) Defendants made no effort to determine the true destination of the transmittal.

i) Defendants made no effort to warn Mr. Patz he was a suspected victim of fraud.

j) Defendants made no effort to report elder abuse.

279.    Defendants performed financial transactions that gave substantial assistance to the fraudsters who targeted Mr. Patz.

280.    Defendants profited from their wrongful conduct by collecting fees from Plaintiff and Mr. Patz, and by omitting the costs and expense of a lawful compliance program to prevent money laundering and fraud.

281.    At the time Defendants performed the transactions, Defendants had actual knowledge they would give assistance in accomplishing the fraud.

282.    Defendants' actual knowledge is further evidenced by Defendants' deliberate ignorance and willful blindness.

283.    As a result of Defendants' misconduct, Plaintiff has suffered damages including, without limitation, general and economic damages, in an amount to be proved at trial.

284.    Defendants' acts and omissions set forth herein were in all respects reckless, fraudulent, oppressive, and/or malicious, and manifested conscious disregard for the rights of Plaintiff. Plaintiff is therefore entitled to an award of exemplary and punitive damages pursuant to Cal. Civ. Code §3294, according to proof at trial.

285.    Wherefore, Plaintiff prays for relief as set forth below.

## SECOND CLAIM FOR RELIEF

### Violation of California's Unfair Competition Law ("UCL")

### Cal. Business & Professions Code §§17200, *et seq.*

**(Against All Named Defendants)**

286.   Plaintiff incorporates by reference all allegations in this Second Amended Complaint and restates them as if fully set forth herein.

287.   The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code §17200.

288.   A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

### Defendants Violated the UCL's "Unlawful" Prong

289.   Defendants have violated the "unlawful" prong under the UCL and have engaged in "unfair, deceptive, untrue or misleading" advertising, by violating at least the following ten (10) laws and regulations:

    a) Assisting Financial Elder Abuse against Mr. Patz (Cal. Welf. & Inst. Code §15610.30)

    b) Receiving Stolen Property (Cal. Pen. Code §496(a))

    c) Violations of False Advertising Law (FAL) (Bus. & Prof. Code §17500)

    d) Violations of the Consumers Legal Remedies Act (CLRA) (Cal. Civ. Code §§1750, *et seq.*)

    e) Funds Transfers Involving the Proceeds of Wire Fraud (18 U.S.C. §1957)

    f) Violations of Bank Secrecy Act (BSA) and implementing anti-money laundering (AML) rules and regulations (31 U.S.C. §5318(h), 31 C.F.R. §1022.210(a)).

        i.  Willful Violations of the BSA (31 U.S.C. §§5321(a), 5322(a)(b) & (c)).

        ii.  Negligent Violations of the BSA (31 U.S.C. §5321(a)(6)(A)), and

        iii.  Patterns of Negligent Activity (31 U.S.C. §5321(a)(6)(B)).

    g) Violations of the FTC Act, Section 5, Unfair or Deceptive Acts or Practices (15 U.S.C. §45(a)).

    h) Violations of the Consumer Financial Protection Act, Unfair, Deceptive, or

Abusive Acts or Practices (12 U.S.C. §5336(a)).

290. By violating the abovementioned laws, rules, and regulations, Defendants engaged in "unlawful" business practices within the meaning of Cal. Bus. & Prof. Code §17200.

291. As a direct and proximate result of Defendants unlawful conduct, Plaintiff suffered injury in fact and lost money or property, including but not limited to the loss of over $1.25 million in community property funds.

292. **Defendants violated the Elder Abuse and Dependent Adult Civil Protection Act Cal., Welf. & Inst. Code §§15600, *et seq.***

293. Specifically, Defendants violated §15610.30 (Financial Elder Abuse) by "[a]ssist[ing] in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder ... for a wrongful use or with intent to defraud, or both." *See* Cal. Welf. & Inst. Code §15610.30(a)(2).

294. The *mens rea* required to prove a §15610.30 violation is the same as aiding and abetting, i.e., (1) actual knowledge, and (2) substantial assistance.

295. Defendants violated the Elder Abuse and Dependent Adult Civil Protection Act, Cal. Welf. & Inst. Code §§15600, *et seq.*, by aiding and abetting the financial exploitation of an elder, to wit, Plaintiff's husband, when Defendants assisted fraudsters in the taking of Plaintiff's property.

296. At all times herein mentioned, Mr. Patz was an elder within the meaning of the California Welfare & Institutions Code and a resident of California. Defendants knew Mr. Patz was an elder.

297. Mr. Patz was substantially more vulnerable to the deceptive taking of his savings and assets because of his age. Defendants knew or should have known this fact.

298. Plaintiff is and was, at all times herein mentioned, the wife of Mr. Patz.

299. Plaintiff has a property right and a legally cognizable interest in and claim against the property affected by these proceedings, because the funds at issue are her property. Thus, Plaintiff is a real party in interest in this action.

300. Defendants are mandated reporters of suspected financial abuse of elder adults pursuant to Cal. Welf. & Inst. Code §15630.1.

301. Defendants are also required under federal law to detect, document, and report suspected elder financial exploitation. SAR Field 38(d).[46]

302. Defendants were in direct contact with Mr. Patz, and reviewed his financial documents, records, and transaction history in providing financial services to him. Defendants observed and knew, based on professional experience and industry standards, that Mr. Patz's transaction activity was highly unusual and overtly suspicious for financial elder abuse.

303. Defendant First Republic was aware of Mr. Patz's family's banking transaction history, including wire transfers, and were acutely aware of Mr. Patz's family's conservative investment strategy.

304. Defendant Evans was in personal contact with Mr. Patz and personally supervised his family's investment and wealth management strategy.

305. Defendant Crypto.com was aware that Mr. Patz, having no previous transaction history on its platform, was nonetheless transferring enormous sums of money to flagged recipients in a pattern of activity consistent with fraud.

306. Named Defendants' policies, procedures, and internal controls directed Defendants to continuously detect, monitor, report, and thwart financial crime committed on their platforms, including the utilization of its money transfer system to commit financial abuse of an elder.

307. Defendants' policies, procedures, and internal controls directed that, under the circumstances, Defendants must not facilitate any money transfers given the self-evident presence of fraud without first performing adequate monitoring and due diligence to ascertain the true purpose of the transactions, to ascertain the true destination of the

---

[46] *See* 31 C.F.R. §§1020.320(e)(1)(ii)(A)(2)(i), 1021.320(e)(1)(ii)(A)(2)), 1022.320(d)(1)(ii)(A)(2), 1023.320(e)(1)(ii)(A)(2)(i), 1024.320(d)(1)(ii)(A)(2), 1025.320(e)(1)(ii)(A)(2), 1026.320(e)(1)(ii)(A)(2)(i), 1029.320(d)(1)(ii)(A)(2), and 1030.320(d)(1)(ii)(A)(2).

transfer requests, and to warn Mr. Patz that he was a suspected victim of fraudulent activity and elder financial exploitation.

308.   Defendants sufficiently observed and had knowledge of the facts and circumstances that would necessarily lead a competent financial institution to know that financial abuse of an elder under California law was occurring and that Mr. Patz was a victim of such abuse. Moreover, Defendants' attempts to remain willfully blind by omitting proper due diligence—and in particular Crypto.com's "whitelisting" the criminal addresses, despite the knowledge they did possess—is further proof that Defendants had actual knowledge that Mr. Patz was a victim of financial elder abuse.

309.   Defendants did not have mere "constructive knowledge," which involves a theory of negligence. Rather, Defendants here each had *actual knowledge* of fraud and took steps to avoid culpability by attempting to remain willfully ignorant. Constructive knowledge is imputed by law based on knowledge that one would have obtained by using reasonable care. On the other hand, conscious avoidance (sometimes called willful blindness or deliberate ignorance) involves a culpable state of mind from the onset based on existing knowledge. Conscious avoidance satisfies the actual knowledge element for an Elder Abuse Act "assisting" violation.

310.   Defendants had actual knowledge that Mr. Patz was a victim of a financial elder abuse scam when Defendants performed the transactions effectuating the scam on their financial systems. Under the doctrine of conscious avoidance, deliberate ignorance, or willful blindness, Defendants' culpable mental state is further evidenced by their efforts to avoid appearing to have that knowledge.

311.   Defendants were each aware of a high probability equal to a virtual certainty that Mr. Patz was a victim of financial abuse of an elder at the time they performed the transactions at issue, but Defendants nonetheless deliberately avoided learning the truth or appearing to have knowledge of the facts by omitting proper due diligence and further inquiry.

312.   Defendants openly shirked their professional responsibility by insulating and

KRONENBERGER ROSENFELD

immunizing the offending accounts from industry standard due diligence and scrutiny. Most egregiously so, Crypto.com's so-called "whitelisting" process made any non-assistance of the fraud impossible.

313. Crypto.com contrived to apply its "whitelisting" process to Mr. Patz to avoid learning the truth and to appear to lack the requisite culpable knowledge of fraud, in the face of overwhelming, unambiguous, and unavoidable facts and circumstances pointing to financial abuse of an elder.

314. Crypto.com's "whitelisting" process was a systematic but futile attempt at avoiding liability for assisting in financial abuse against elders by willfully manufacturing an appearance of being blind to the facts. In this specific case, Crypto.com used "whitelisting" as an excuse to bury its proverbial head in the sand.

315. Defendants made no meaningful effort to report, prevent, or delay the transactions as would be necessary to perform an adequate investigation, due diligence, or to warn Mr. Patz that he was a suspected victim of financial abuse of an elder.

316. Crypto.com instead asked Mr. Patz a few perfunctory questions that only elicited even more nefarious facts pointing to fraud.

317. Rather than performing a suspicious activity investigation or additional due diligence, Cryptbo.com instead whitelisted the offending recipient accounts and took no other meaningful action.

318. Crypto.com's whitelisting process only purported to validate Mr. Patz's identity—not to determine the true purpose of the transaction, the true source of funds, or true identities of the recipients, etc.

319. Crypto.com's whitelisting process insulated the fraudsters from scrutiny, giving Crypto.com cover to omit further necessary inquiry.

320. Defendants aided and abetted an elder abuse scam perpetrated against Mr. Patz and affecting Plaintiff's property interests when Defendants performed financial transactions that knowingly gave substantial assistance to the fraudsters.

321. Defendants' culpable mental state that the financial transactions it performed

would assist a fraud is also evidenced by Defendants' deliberate and willful conduct intended to contrive ignorance and avoid learning the truth in spite of knowing fraud was afoot. Defendants' conduct constitutes assisting in the taking of funds from Plaintiff and Mr. Patz for a wrongful purpose.

322. Defendants' conduct, including their false statements purporting to show that Defendants' platform and financial products were safe and compliant with the various state and federal laws and regulations, preyed on Mr. Patz's inherent vulnerability as an elderly adult and unduly influenced the taking of Plaintiff's and Mr. Patz's property.

323. Defendants knew or should have known their wrongful conduct was likely to harm Plaintiff.

324. **Defendants violated Cal. Pen. Code §496(a).**

325. Under California law, every person who receives property that has been obtained in any manner constituting theft, knowing the property was so obtained, and who aids in concealing or withholding the property from the owner, is liable to any injured person for treble damages, attorney's fees, and costs.

326. Property obtained by "theft" includes "fraudulently appropriate[d] property which has been entrusted" to a person. Cal. Pen. Code §484(a).

327. "Theft" also includes "money" or "personal property" "knowingly and designedly, by any false or fraudulent representation or pretense, defraud[ed] from [an]other person." Cal. Pen. Code §496(a); *see* Cal. Pen. Code §532.

328. Defendants received the property, which was the subject of a fraud scheme against Mr. Patz.

329. At the time, Defendants knew the property had been obtained in a manner constituting theft under California law, i.e., by fraudulent appropriation or by false or fraudulent representation or pretenses. That is, Defendants knew Mr. Patz was a victim of an elder financial abuse fraud scam, and that the funds transfers requested by Mr. Patz were fraud-induced. Nonetheless, Defendants took custody of and manifested control over the property when they received it from Mr. Patz during the facilitation of the fraud induced

transfers. Defendants knew the property that they had custody over (belonging to Plaintiff and Mr. Patz) was in their custody because of a fraud scheme.

330. The property at issue was Plaintiff's and Mr. Patz's community property.

331. Defendants aided in the receiving and withholding of the property.

332. Defendants aided by facilitating the fraud-induced funds transfers from the victims to the criminals, knowing the transfers were fraud-induced, with the intent that the transfers be facilitated notwithstanding knowledge of the natural consequence of their conduct.

333. Defendants each took custody of or manifested control over the property at issue.

334. When Defendants came to possess the property, the property was obtained in a manner constituting theft under California law, i.e., by false pretenses and fraud. This is because the deposits, withdrawals, exchanges, and transfers at issue were all induced by fraud.

335. Defendants concealed and withheld and/or aided in concealing and withholding the property by transferring the funds to the criminals.

336. Defendants aided in concealing the funds by facilitating money laundering, such that the property could not be readily traced or easily recovered.

337. Defendants aided in withholding the funds by transferring the funds from Mr. Patz to the custody of criminals, knowing that Mr. Patz's property would be lost.

338. Defendants knew that the property had been obtained in a manner constituting theft under California law because Defendants knew the funds transfers were fraud-induced. Defendants knew Mr. Patz was a victim of an elder financial abuse scam.

339. In sum, Defendants each facilitated fraud-induced funds transfers, and their conduct falls within the ambit of section 496(a): They "receive[d]" "property" (the fraud-induced funds transfer payments) belonging to Plaintiff, having "obtained" the fraud-induced funds "in [a] manner constituting theft" under California law. *Id*. Defendants also "conceal[ed]" or "withh[e]ld[ ]" those funds (and/or aided in concealing or withholding them)

from Plaintiff when Defendants performed the funds transfers from the victims to the criminals and by committing and/or facilitating money laundering in the process. *Id.* Defendants did all of this "knowing" the diverted funds were so ... obtained," because the funds were fraud-induced.

340. Plaintiff was injured because of the Cal. Pen. Code §496(a) violations.

341. Defendants are liable to Plaintiff for treble damages, attorney's fees, and costs. Cal. Pen. Code §496(c).

342. Defendants' acts and omissions set forth herein were in all respects reckless, fraudulent, oppressive, and/or malicious, and manifested conscious disregard for the rights of Plaintiff. Plaintiff is therefore entitled to an award of exemplary and punitive damages pursuant to Cal. Civ. Code §3294, according to proof at trial.

343. **Defendants violated the False Advertising Law ("FAL") (Bus. & Prof. Code §17500) and the Consumers Legal Remedies Act ("CLRA") (Cal. Civ. Code §§1750, *et seq.*).**

344. California's FAL and CLRA prohibit disseminating, or causing to be disseminated, any advertisements about services which are not to be performed as advertised.

345. They also prohibit a business from advertising goods or services with intent not to sell them as advertised.

346. As referenced above, Defendants advertise themselves to be legally operational financial institutions (a cryptocurrency exchange, an investment advisor, and a chartered bank), and that they comply with all the requirements of a licensed state money transmitter and registered money services business, federally insured and state chartered bank, and investment advisor.

347. Defendants purport to comply with the Bank Secrecy Act and its implementing regulations, that they are a duly registered money services business, a federally insured, state-chartered bank, and a licensed broker dealer.

348. Defendants also claim to meet specific security standards. Crypto.com

specifically represents that it is at the cutting edge of ensuring consumer safety.

349. Yet, Defendants fail to comply with legal requirements imposed on such institutions to protect consumers from harm; namely, to protect their money transfer systems from being utilized to launder money including via fraud schemes, to perform fraud-induced payments, and to promote elder financial exploitation.

350. Further, Defendants at all times knew there were defects in their services but fraudulently failed to disclose them to consumers.

351. Defendants' statements were false at the time they were made or disseminated.

352. Defendant Crypto.com held itself out to the public, repeatedly, as an industry leader in cybersecurity—not just in safeguarding assets, but in proactively protecting them from criminals using best practices and international security standards.

353. Further, Crypto.com was aware of facts concerning it not meeting industry security standards but fraudulently failed to disclose them to Plaintiff when making statements about how Crypto.com was an industry leader in cybersecurity.

354. **Defendants violated 18 U.S.C. §1957.**

355. Defendants engaged in monetary transactions exceeding $10,000, in the United States, knowing the property involved was derived from some form of criminal activity. The property was, in fact, derived from a specified unlawful activity. This conduct is also known as money laundering.

356. A person is liable for money laundering under 18 U.S.C. §1957 if they (i) knowingly engage or attempt to engage in a monetary transaction, (ii) knowing the transaction involves criminally derived property, (iii) the property having a value of $10,000 or greater, (iv) the property being, in fact, derived from specified unlawful activity, and (v) the transaction having occurred in the United States.

357. "Criminally derived property" means any property constituting, or derived from, the proceeds obtained from a criminal offense. Under §1957, Plaintiff does not need to prove that Defendants knew the precise nature of the criminal offense, or knew the

Case No. 3:24-cv-06194-WHO                    57                    **SECOND AMENDED COMPLAINT**

property involved in the transaction represented the proceeds of specified unlawful activity alleged. All that is required is that Defendants knew the transactions they performed involved the proceeds of crime, i.e., the property subject to money transfers by Defendants were the proceeds of a scam perpetrated against Mr. Patz.

358. The scam against Mr. Patz was illegal and criminal in nature.

359. Unlike 18 U.S.C. §1956, claims under §1957 need not establish that defendants intended to promote the criminal activity at issue, or knew anything more than the fact the money being laundered was the proceeds of criminal activity.

360. Here, Defendants knowingly engaged or attempted to engage in monetary transactions, to wit: deposits, withdrawals, transfers, and exchanges, in or affecting interstate commerce, of funds or a monetary instrument by, through, or to financial institutions.

361. Defendants knew the transaction(s) involved criminally derived property, meaning property constituting, or derived from, the proceeds obtained from a criminal offense.

362. Defendants knew at the time they made the financial transactions that the property constituted the proceeds of an elder financial abuse scam and fraud against Mr. Patz, but they performed the financial transactions anyway.

363. The property at issue had a value of $10,000 or greater. Defendants made monetary transactions exceeding $10,000.

364. Indeed, the property was valued at $1,250,000.

365. The property was in fact derived from specified unlawful activity, to wit: wire fraud. 18 U.S.C. §1343.

366. Doe Defendants (1) knowingly participated in and devised a scheme or plan to defraud for the purposes of obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts, (2) the statements made were material, (3) they acted with intent to defraud, and (4) they used or caused to be used interstate or foreign wire communication to carry out or attempt to carry out an essential

KRONENBERGER ROSENFELD

part of the scheme.

367. In more colloquial terms, Doe Defendants would be guilty of 18 U.S.C. §1343 wire fraud because they made or caused to be made interstate communications via the internet and WhatsApp as part of a plan to defraud Mr. Patz. Doe Defendants knowingly participated in or devised a scheme or plan to defraud Mr. Patz by making false or fraudulent statements and promises. Doe Defendants made false and fraudulent statements, promises, and representations to Mr. Patz, devised and intended to induce Mr. Patz to part with his money. These statements were material because they had a natural tendency to influence, or were capable of influencing, a person to part with money or property. Doe Defendants also caused to be used interstate wire communications to carry out an essential part of their scheme, i.e., to effectuate the money transfers of the fraud proceeds via the named Defendants they caused Mr. Patz to make interstate communications with the named Defendants as an essential part of the scheme.

368. In addition to the wire fraud scheme, Doe Defendants also had a money laundering scheme, whereby Mr. Patz would be fraudulently induced to make monetary transactions at First Republic and Crypto.com. When the named Defendants were engaging in money transactions, i.e., when they were withdrawing, transferring, and exchanging the property at issue, the named Defendants knew that the property at issue was involved in criminal activity. They knew the property was the proceeds of a scam against Mr. Patz. They knew that Mr. Patz was a victim of a fraud and an elder exploitation scam.

369. The property at issue was in fact derived from a wire fraud scheme, which would be a violation of 18 U.S.C. §1343.

370. The transaction(s) occurred in the United States.

371. Defendants' unlawful conduct mentioned above constitutes a violation of 18 U.S.C. §1957.

372. **Violation of the Bank Secrecy Act: Ineffective Anti-money Laundering**

**Program (31 U.S.C. §5318(h); 31 C.F.R. Chapter X).[47]**

373.   Under 31 U.S.C. §5318(h) and implementing rules and regulations, named Defendants were required to implement and maintain effective anti-money laundering (AML) programs reasonably designed to prevent their financial systems from being used to facilitate money laundering.

374.   Willful failure to do so is a civil and criminal violation of the Bank Secrecy Act. *See* 31 U.S.C. §§5321(a), 5322(a)(b) & (c).

375.   A negligent violation of the Bank Secrecy Act, and patterns of negligence, are also civil violations of the Bank Secrecy Act. 31 U.S.C. §§5321(a)(6)(A) and (B).

376.   Under the BSA, Defendant Crypto.com was required as a "money services business" under 31 C.F.R. §1022, and Defendants First Republic Bank and Evans under the rules for banks and for brokers or dealers in securities under 31 C.F.R. §§1020, and 1023, to implement an effective AML program, to include:

    a) The development of internal policies, procedures, and controls to ensure AML compliance,

    b) The designation of a compliance officer to ensure day-to-day AML compliance,

    c) An ongoing employee training program for AML compliance,

    d) An independent audit function to test programs and ensure AML compliance, and

    e) Risk based procedures for conducting ongoing customer due diligence (CDD).

377.   At all relevant times, named Defendants were subject to the BSA and its AML rules and regulations.

---

[47] The Bank Secrecy Act (BSA) is the original authority for AML requirements, codified at 12 U.S.C. §§1829b, 1951-1960 and 31 U.S.C. §§5311–5336. The BSA has implementing regulations at 31 C.F.R. Chapter X (formerly Part 103). In 2001, the BSA was amended under the USA PATRIOT Act, Public Law 107-56, Title III ("International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001), expanding the scope of BSA's AML requirements.

378. Defendants willfully failed to establish and implement an effective AML program.

379. Defendants intended that their deficient and ineffective AML program be implemented as-is, notwithstanding having knowledge of their BSA/AML duties and obligations.

380. Defendants failed to develop effective internal policies, procedures, and controls to ensure AML compliance.

381. Despite clear and unambiguous signs of money laundering, and because Defendants failed to implement an effective AML program, Defendants failed to detect and/or prevent their financial systems from being used to facilitate the money laundering that occurred in this case.

382. Defendants failed to monitor and investigate large, atypical, and suspicious transactions.

383. Defendant Crypto.com failed to detect and/or prevent the transfer of close to $1 million from an elderly person to a recipient known to be associated with criminal activity.

384. Defendant Crypto.com failed to perform the necessary recordkeeping under the Travel Rule.

385. Defendant Crypto.com's "whitelisting" process in lieu of due diligence and/or proper recordkeeping, especially under circumstances of high risk, represents a critical AML failure.

386. Defendant Crypto.com failed to integrate AML compliance procedures with its automated data processing systems as required under 31 C.F.R. §1022(d)(1)(ii).

387. To the extent Defendants had designated compliance officers, that designation was ineffective to ensure day-to-day AML compliance.

388. Defendants failed to implement effective ongoing employee training, including training of front-line employees on detecting and preventing investment scams, pig butchering, and elder financial exploitation and abuse.

389. On information and belief, Defendants had no meaningful or ongoing training of front-line employees for detecting and preventing investment scams, pig butchering, and elder financial exploitation and abuse. To the extent there was training done, it was ineffective at ensuring AML compliance.

390. To the extent Defendants performed independent audits, those audits failed to effectively ensure AML compliance.

391. Defendants failed to develop effective procedures for conducting ongoing customer due diligence.

392. Defendants failed to require or enforce enhanced due diligence or verification for high-risk transactions or accounts of elderly persons.

393. Defendants made no attempt to ascertain the true purpose or nature of Mr. Patz's account or his transactions, nor make any attempt to ascertain the true identities or intentions of the recipients.

394. Defendant Crypto.com also facilitated fraud-induced transfers against other victims on its platform. This conduct shows a pattern of BSA violations.

395. Defendants violated the BSA willfully.

396. Defendants' violations were knowing and intentional.

397. Defendants knew their legal duties to adhere to the BSA and implementing AML rules and regulations.

398. Defendants acted with intentional or reckless disregard for their BSA and AML duties and the risks of non-compliance.

399. In violating the BSA, Defendants acted negligently and showed a pattern of negligence.

400. Defendants had legal duties to perform their BSA obligations, in particular, to maintain effective AML programs.

401. A separate BSA violation occurs for each day that the misconduct is not mitigated.

402. Defendants failed to exercise the care that a reasonably prudent person

would exercise in similar circumstances, resulting in numerous BSA and AML violations, and over a pattern of weeks or more.

403.   But for Defendants' BSA and AML violations, the harms and money laundering that occurred in this case would never have happened.

404.   **Violations of the FTC Act, Section 5, 15 U.S.C. §45(a).**

405.   Section 5(a) of the FTC Act, 15 U.S.C. §45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

406.   Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

407.   Defendants have failed to take timely, appropriate, and effective action to detect and prevent fraud-induced money transfers.

408.   Defendants have failed to comply with the BSA and implementing AML rules and regulations, failing to prevent money laundering and fraud.

409.   Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

410.   Defendants' acts and/or practices as set forth above constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §45(a).

411.   Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

412.   **Violations of the Consumer Financial Protection Act (CFPA), 12 U.S.C. §§5531(c) and 5536(a)(1)(B).**

413.   Under the CFPA, it is unlawful to engage in an unfair act or practice in connection with the offering or provision of a consumer financial product or service. 12

U.S.C. §§5531(c) and 5536(a)(1)(B).

414. An act or practice is unfair under the CFPA if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers" and "such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. §5531(c)(1).

415. Defendants' acts and/or practices as set forth above constitute unfair acts or practices in violation of the CFPA, 12 U.S.C. §§5531(c) and 5536(a)(1)(B).

416. Defendants have failed to take timely, appropriate, and effective measures to prevent, detect, limit, and address fraud committed via their offering or provision of consumer financial products or services.

417. Defendants' deficient security and regulatory compliance puts consumers at risk of being defrauded.

418. Defendants' facilitation of fraud-induced transfers causes and is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers.

419. Consumers could not reasonably avoid such substantial injury or likely injury because Defendants control and set their own anti-fraud protocols for their respective platforms, which were ineffective. Therefore, consumers could not have reasonably anticipated or acted to avoid the harm.

420. The substantial injury was not outweighed by the countervailing benefits to consumers or protection.

421. Indeed, lack of sufficient protections to detect and prevent fraud-induced transfers does not benefit consumers or competition in any meaningful way.

422. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the CFPA. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

### THIRD CLAIM FOR RELIEF[48]

---

[48] Plaintiff adds this claim for relief to her SAC because the Order dismissing the First

**Receiving Stolen Property**

**Cal. Pen. Code §496(c)**

**(Against All Defendants)**

423.   Plaintiff incorporates all other paragraphs as if alleged herein.

424.   Under California law, every person who receives property that has been obtained in any manner constituting theft, knowing the property was so obtained, and who aids in concealing or withholding the property from the owner, is liable to any injured person for treble damages, attorney's fees, and costs.

425.   Property obtained by "theft" includes "fraudulently appropriate[d] property which has been entrusted" to a person. Cal. Pen. Code §484(a).

426.   "Theft" also includes "money" or "personal property" "knowingly and designedly, by any false or fraudulent representation or pretense, defraud[ed] from [an]other person." Cal. Pen. Code §496(a); *see* Cal. Pen. Code §532.

427.   Defendants received the property, which was the subject of a fraud scheme against Mr. Patz.

428.   At the time, Defendants knew the property had been obtained in a manner constituting theft under California law, i.e., by fraudulent appropriation or by false or fraudulent representation or pretenses. That is, Defendants knew Mr. Patz was a victim of an elder financial abuse fraud scam, and that the funds transfers requested by Mr. Patz were fraud-induced. Nonetheless, Defendants took custody of and manifested control over the property when they received it from Mr. Patz during the facilitation of the fraud induced

---

Amended Complaint [D.E. 79] removed Plaintiff's access to certain crucial remedies, such as attorney's fees and costs. The addition of this claim will not prejudice Defendants because it arises out of the same conduct, transaction, or occurrence set out in the original pleadings, relying on the same nucleus of facts as all the other claims at issue. Even if this claim were based on newly pled conduct or facts, it would still not prejudice Defendants at this early stage of the case because trial is still many months away, and there has been no discovery. [*See* D.E. 64.] The Court's Order did not specify whether new claims could be added, but leave should be given since justice so requires. Fed. Rule Civ. P. 15(a)(2). Plaintiff will offer full briefing on this issue if the Court requests so.

Case No. 3:24-cv-06194-WHO                    65                    **SECOND AMENDED COMPLAINT**

transfers. Defendants knew the property that they had custody over (belonging to Plaintiff and Mr. Patz) was in their custody because of a fraud scheme.

429. The property at issue was Plaintiff's and Mr. Patz's community property.

430. Defendants aided in the receiving and withholding of the property.

431. Defendants aided by facilitating the fraud-induced funds transfers from the victims to the criminals, knowing the transfers were fraud-induced, with the intent the transfers be facilitated.

432. Defendants each took custody of or manifested control over the property at issue.

433. When Defendants came to possess the property, the property was obtained in a manner constituting theft under California law, i.e., by false pretenses and fraud. This is because the transfers at issue were all induced by fraud.

434. Defendants concealed and withheld and/or aided in concealing and withholding the property by transferring the funds to the criminals.

435. Defendants aided in concealing the funds by facilitating money laundering, such that the property could not be readily traced or easily recovered. Defendants aided in withholding the funds by transferring the funds from Mr. Patz to the custody of criminals.

436. Defendants knew that the property had been obtained in a manner constituting theft under California law because Defendants knew the funds transfers were fraud-induced. Defendants knew Mr. Patz was a victim of an elder financial abuse scam.

437. In sum, Defendants each facilitated fraud-induced funds transfers, and their conduct falls within the ambit of section 496(a): They "receive[d]" "property" (the fraud-induced funds transfer payments) belonging to Plaintiff, having "obtained" the fraud-induced funds "in [a] manner constituting theft" under California law. *Id*. Defendants also "conceal[ed]" or "withh[e]ld[ ]" those funds (and/or aided in concealing or withholding them) from Plaintiff when Defendants performed the funds transfers from the victim to the criminals and by committing and/or facilitating money laundering in the process. *Id.* They

KRONENBERGER ROSENFELD

did all of this "knowing" the diverted funds were so ... obtained," because the funds were fraud-induced.

438.   Plaintiff was injured because of the Cal. Pen. Code §496(a) violations.

439.   Defendants are liable to Plaintiff for treble damages, attorney's fees, and costs. Cal. Pen. Code §496(c).

440.   Defendants' acts and omissions set forth herein were in all respects reckless, fraudulent, oppressive, and/or malicious, and manifested conscious disregard for the rights of Plaintiff. Plaintiff is therefore entitled to an award of exemplary and punitive damages pursuant to Cal. Civ. Code §3294, according to proof at trial.

441.   Wherefore, Plaintiff prays for relief as set forth below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in favor of Plaintiff and against all Defendants, jointly and severally, and award the following relief to Plaintiff and against Defendants, jointly and severally:

A.   Actual damages requested of $1.25 million, or in an amount to be proven at trial;

B.   General damages in an amount of at least $3,000,000, or in an amount to be proven at trial;

C.   Treble damages;

D.   Punitive and exemplary damages to the greatest extent permissible by law;

E.   Disgorgement of wrongfully retained fees, interest, and other revenues collected by Defendants on the fraud-induced transfers and transactions made at the expense of Plaintiff;

F.   Private injunctive relief, including restitution of property;

G.   Declaratory relief, including declaring Defendants' practices violate the abovementioned state and federal laws and regulations;

H.   Declaring Defendants aided and abetted fraud, conversion, and trespass of Plaintiff's property;

I.   Public injunctive relief, including an order that named Defendants must implement a compliance overhaul, enact commercially reasonable fraud prevention protocols, make clear and public warnings to consumers about the dangers of elder financial abuse and exploitation, and to submit to the oversight of an independent monitor during the period of implementation;

J.   Enjoining Defendants from continuing to commit the violations alleged herein;

K.   Pre-judgment and post-judgment interest;

L.   Attorney's fees and costs; and

M.   All other relief as the Court deems just and proper.

Respectfully Submitted,

DATED: May 22, 2025                              **KRONENBERGER ROSENFELD, LLP**

By: /s/ Karl S. Kronenberger
        Karl S. Kronenberger

Attorneys for Plaintiff Jung Min Lee

**REQUEST FOR JURY TRIAL**

Plaintiff hereby demands a trial of this action by jury of all issues that may be tried to the jury.

Respectfully Submitted,

DATED: May 22, 2025                    **KRONENBERGER ROSENFELD, LLP**


By: /s/ Karl S. Kronenberger
      Karl S. Kronenberger

Attorneys for Plaintiff Jung Min Lee