1

2

3        UNITED STATES DISTRICT COURT

4        NORTHERN DISTRICT OF CALIFORNIA

5

6   JUNG MIN LEE,                           Case No.  24-cv-06194-WHO

7                    Plaintiff,
                                            **ORDER GRANTING FDIC-R AND**
8          v.                               **EVANS MOTIONS TO DISMISS AND**
                                            **GRANTING IN PART AND DENYING**
9   FORIS DAX, INC., et al.,                **IN PART CRYPTO.COM MOTION TO**
                                            **DISMISS**
10                   Defendants.
                                            Re: Dkt. Nos. 89, 91, 92
11

12          Plaintiff Jung Min Lee ("Lee") alleges that defendant Foris DAX, Inc. (d/b/a and hereafter,

13   "Crypto.com") enabled unknown internet cryptocurrency scammers to take advantage of her

14   "elderly" husband, Patz, who is over the age of 65, by soliciting him to withdraw fiat currency that

15   was their community property from various accounts that he held at First Republic Bank and to

16   invest those funds in fraudulent cryptocurrency schemes, ultimately resulting in close to $1

17   million in losses.  She alleges that Crypto.com, together with defendant First Republic Bank

18   (Receiver, FDIC) (hereafter, "FDIC-R") and individual defendant First Republic Bank employee

19   Catherine Evans, aided and abetted the scammers in their fraudulent actions, unlawfully received

20   stolen property, and violated the unlawful prong of California's Unfair Competition Law

21   ("UCL").

22          Lee's claims against the FDIC-R and Evans are dismissed for lack of jurisdiction pursuant

23   to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA").  Lee

24   filed her administrative claim too late, the FDIC-R disallowed it, and the narrow statutory

25   exception for late-filed claims does not apply.  The FDIC-R and Evans' motions to dismiss Lee's

26   claims are GRANTED, and her claims against those parties are dismissed with prejudice.  Her

27   claims against Crypto.com for aiding and abetting fraud and receipt of stolen property are

28   implausible.  She has not shown that Crypto.com had "actual knowledge" of the underlying torts,

much less that it "substantially assisted" in their commission.  Crypto.com's motion to dismiss those claims is GRANTED.  But Lee's unlawful UCL claim is plausible under the theory that Crypto.com violated the Bank Secrecy Act by failing to comply with its responsibilities as a money services business.  Crypto.com's motion to dismiss that claim is DENIED.

**BACKGROUND**

I assume familiarity with the facts of this case given the extensive motion practice that has preceded this Order.  The facts alleged in the SAC are largely the same as prior iterations of the complaint, except the SAC adds new potential predicate violations for the unlawful UCL claim (arising from the same facts), and a new claim for receiving stolen property in violation of Cal. Pen. Code § 496.  They all stem from the conduct of Lee's husband, who lost almost a million dollars in a cryptocurrency scam.  Patz is over 65 years old and Lee makes claims that the scam was elder abuse.

On November 25, 2024, I denied Lee's motion to remand this case back to state court and dismissed her claims with leave to amend because she had not administratively exhausted them as to defendant First Republic Bank (Receiver, FDIC) and it appeared that Lee lacked standing to assert them.  At that point, she had not pleaded facts from which I could infer that she had been injured by conduct that solely affected her husband.  *See* Order Denying Motion to Remand, Staying Claims in Part, and Granting Motions to Dismiss [Dkt. No. 59].  I stayed the case for the FDIC-R and Evans so that Lee could attempt to administratively exhaust her claims.

Lee amended her complaint.  Crypto.com moved once again to dismiss the First Amended Complaint ("FAC").  I dismissed most of Lee's claims against Crypto.com after the FAC, finding that while she had now pleaded facts to show Article III standing because she plausibly alleged injury arising from her husband's being scammed out of property that belonged to the marital community, she lacked standing to prosecute an Elder Abuse Act claim or a UCL claim under the unfair and fraudulent prongs.  I also dismissed her negligence claim with prejudice because she was a stranger to Crypto.com.  I granted leave to amend the aiding and abetting theory of liability (to specify the underlying tort that the defendants purportedly aided and abetted), and her unlawful UCL claim.  Order Granting Motion to Dismiss FAC ("the last Order") [Dkt. No. 79].

United States District Court
Northern District of California

1    After I denied Lee's request for permission to file an interlocutory appeal challenging my

2    dismissal of the Elder Abuse Act claim, *see* Dkt. No. 82, Lee filed the Second Amended

3    Complaint ("SAC") [Dkt. No. 84].  The SAC clarifies Lee's theory of aiding and abetting liability

4    (the underlying torts that defendants are alleged to have aided and abetted are fraud, conversion,

5    and trespass to chattels), amends the unlawful UCL claim to include multiple new statutes that

6    defendants are alleged to have violated, and adds a new claim for receipt of stolen property in

7    violation of Cal. Pen. Code § 496(c).  Now that the stay is lifted, all defendants move to dismiss.

8    Dkt. Nos. 89, 91, 92.

9                                                **LEGAL STANDARD**

10    **A.    Rule 12(b)(6)**

11    A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal

12    sufficiency of a claim.  A claim may be dismissed only if it appears beyond doubt that the plaintiff

13    can prove no set of facts in support of his claim which would entitle him to relief." *Cook v.*

14    *Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011) (citation and quotation marks omitted). Rule 8

15    provides that a complaint must contain a "short and plain statement of the claim showing that the

16    pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Thus, a complaint must plead "enough facts

17    to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

18    570 (2007).  Plausibility does not mean probability, but it requires "more than a sheer possibility

19    that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 687 (2009).  A complaint

20    must therefore provide a defendant with "fair notice" of the claims against it and the grounds for

21    relief. *Twombly*, 550 U.S. at 555 (quotations and citation omitted).

22    In considering a motion to dismiss, the court accepts factual allegations in the complaint as

23    true and construes the pleadings in the light most favorable to the nonmoving party. *Manzarek v.*

24    *St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).; *Erickson v. Pardus*, 551

25    U.S. 89, 93-94 (2007).  However, "the tenet that a court must accept a complaint's allegations as

26    true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere

27    conclusory statements." *Iqbal*, 556 U.S. at 678.

28    If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no

*United States District Court*
*Northern District of California*

1    request to amend the pleading was made, unless it determines that the pleading could not possibly

2    be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en

3    banc) (citations and quotations omitted).  However, a court "may exercise its discretion to deny

4    leave to amend due to 'undue delay, bad faith or dilatory motive on part of the movant, repeated

5    failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing

6    party ..., [and] futility of amendment.'" *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892–

7    93 (9th Cir. 2010) (alterations in original) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

8        **B.      Rule 12(b)(1)**

9        Federal Rule of Civil Procedure 12(b)(1) requires dismissal where the court lacks subject

10   matter jurisdiction. A plaintiff must allege a proper basis for subject matter jurisdiction. *See* Fed.

11   R. Civ. P. 8(a)(1); *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 183 (1936) ("It is

12   incumbent upon the plaintiff properly to allege the jurisdictional facts.").  A federal court is

13   "presumed to lack jurisdiction" unless such showing is made "affirmatively." *Stock West, Inc. v.*

14   *Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989).  Unless a complainant establishes that

15   the court has subject jurisdiction, upon motion, the court must dismiss the complaint. *Id.*; *see also*

16   *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *St. Clair v. City of Chico*, 880 F.2d

17   199, 201 (9th Cir. 1989).

18       A court evaluating a Rule 12(b)(1) motion may consider any evidence outside the

19   pleadings to resolve factual disputes regarding jurisdiction. *McCarthy v. United States*, 850 F.2d

20   558, 560 (9th Cir. 1988) ("the district court is not restricted to the face of the pleadings, but may

21   review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the

22   existence of jurisdiction."). "Once the moving party has converted the motion to dismiss into a

23   factual motion by presenting affidavits or other evidence properly brought before the court, the

24   party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden

25   of establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch., Dist. No. 205,*

26   *Maricopa Cou*nty, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).

27

28

United States District Court
Northern District of California

4

**DISCUSSION**

## I.    CRYPTO.COM'S MOTION TO DISMISS

In the last Order, I granted Crypto.com's motion to dismiss with prejudice for all of Lee's claims except for aiding and abetting the commission of a tort and the unlawful UCL claim.  Lee amended to clarify the aiding and abetting claim, add theories of liability to her unlawful UCL claim, and allege a claim for "Receiving Stolen Property" in violation of Cal. Pen. Code § 496(c).  SAC ¶¶ 423-441.

Crypto.com's first argument in favor of dismissal is that Lee lacks constitutional and prudential standing to bring her claims; I rejected that argument in the last Order.  *See* Dkt. No. 79 at 7 - 10.  Crypto.com's Motion to Dismiss the SAC ("Crypto.com Mot.") [Dkt. No. 89] 4-6.  Lee alleges that the money her husband lost because of the scam was community property.  I again assume, without deciding, that Lee has Article III standing to bring these claims.  I address Crypto.com's remaining arguments in favor of dismissal below.

### A.  Aiding and Abetting an Intentional Tort

It is uncontested that Crypto.com, as a cryptocurrency exchange, is not held to the same high fiduciary standard to its users as a bank would be.  That distinguishes this case from most of those that Lee invokes to support her aiding and abetting claim.  But for the purposes of evaluating Lee's claim, the extent of the duty that Crypto.com owed Patz is not, by itself, determinative.  The dispositive question is whether the complaint set forth allegations that, if true, would show that Crypto.com "must have known" from the circumstances that Patz was being victimized by scammers.  The answer is no.

#### 1.    The law

"Liability may . . . be imposed on one who aids and abets the commission of an intentional tort if [1] the person . . . knows the other's conduct constitutes a breach of a duty and [2] gives substantial assistance or encouragement to the other to so act."  *In re First All. Mortg. Co.*, 471 F.3d 977, 993 (9th Cir. 2006) (quoting *Casey v. U.S. Bank National Assn.*, 127 Cal. App. 4th 1138

United States District Court
Northern District of California

(2005)).[1]  In the last Order, I explained that it was unclear what underlying tort Crypto.com allegedly aided and abetted.  *See* Prior Order 15-17.  Now, Lee clarifies that Crypto.com aided and abetted the intentional torts of fraud, conversion, and trespass to chattel by processing her husband's transactions "with actual knowledge that Mr. Patz was a victim of fraud, conversion, and trespass to chattels." SAC ¶ 263.  As Lee points out, the elements of these torts overlap in this case "in that they describe a scheme by Doe Defendants to misappropriate Plaintiff's property." Opposition to Crypo.com Motion ("Oppo. to Crypto.com Mot.") [Dkt. No. 97] 6.

"California courts have long held that liability for aiding and abetting depends on proof the defendant had actual knowledge of the specific primary wrong the defendant substantially assisted."  *Casey*, 127 Cal. App. 4th 1145; *see also In re First All. Mortg. Co.*, 471 F.3d 977, 999, n.4 (9th Cir. 2006) ("We note that as it has been applied, the actual knowledge standard does require more than a vague suspicion of wrongdoing.").  The parties clash over whether Lee has sufficiently alleged that Crypto.com had "actual knowledge" of the underlying torts such that she can assert an aiding and abetting claim.  Her claim rises and falls on this issue because the second element of aiding and abetting liability (that the purported aider and abettor "substantially assisted" in the tort) also requires that plaintiff demonstrate actual knowledge.

### 2.    Factual allegations underlying aiding and abetting claim

Across three complaints, Lee's theory has been that cryptocurrency exchanges like Crypto.com are equipped with "revolutionary blockchain technology," which should make financial transactions on their platforms safe, but that Crypto.com negates that benefit by shirking its responsibility to utilize the tools at its disposal.  As set forth in the SAC, "[e]xchanges like Crypto.com possess mountains of transaction data which, if used competently and under commercially reasonable standards, would provide unparalleled transaction risk monitoring and

---

[1] Of course, there can be no aiding and abetting liability absent the commission of an underlying tort.  *See Nasrawi v. Buck Consultants LLC*, 213 Cal. App. 328, 344 (2014).  But a defendant may be found liable for aiding and abetting a tort arising from a breach of duty even when that defendant has no independent duty to the plaintiff.  *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1137 (C.D. Cal. 2003); *see Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.*, 131 Cal. App. 4th 802, 823, n.10 (2005) ("civil liability for aiding and abetting the commission of a tort . . . has no overlaid requirement of an independent duty").

due diligence to fight fraud, money laundering, and financial exploitation and abuse of older Americans." SAC ¶ 4.  But "rather than make even a reasonable investment towards compliance and consumer safety, exchanges like Crypto.com instead rely on ostentatious but empty claims about security and safety." *Id.* ¶ 5.

Lee alleges that before the scam against her husband started, "[d]efendants were each inundated with a plethora of red flags tied expressly to the financial regulatory frameworks with which Defendants purported to comply." *Id.* ¶ 9.  "Moreover," she claims, "[d]efendants each possessed the professional experience, industry knowledge, and technological know-how to know that Plaintiff's husband's transmittal orders would send the married couple's hard-earned savings right into the hands of criminals." *Id.*[2]  Specifically as to Crypto.com, she states that it "had actual knowledge that the destination cryptocurrency wallets had been already flagged or associated with known scammers." *Id.* ¶ 9.  Lee also points to the prevalence of so-called "pig butchering scams," financial fraud aimed at particularly elderly individuals, and says that "Crypto.com knew, by no later than October 2021, that its users were being targeted by pig butchering scams." *Id.* ¶ 66.

### 3.   The SAC does not set forth facts from which I can infer that Crypto.com had "actual knowledge" of the underlying torts

"A defendant's actual knowledge may be shown, not only by direct evidence, but also by circumstantial evidence.  . . .  However, actual knowledge can be inferred from the circumstances only if, in the light of the evidence, such inference is not based on speculation or conjecture.  Only where the circumstances are such that the defendant 'must have known' and not 'should have

---

[2] Lee also, throughout the SAC, often references conduct by "the Defendants," without specifying further which defendant has done what.  As an example: Lee alleges that "Defendants do not follow basic industry norms for understanding and mitigating money laundering, fraud, and elder financial exploitation risks, or what regulators refer to as due diligence and KYC … Defendants do not, for example: attempt to ascertain the true identity of the recipient; attempt to ascertain the true purpose of the transmittal order; attempt to ascertain the source of funds for the transmittal order; attempt to ascertain the relationship between the sender and recipient; or attempt to pause or delay the transmittal to effectuate the foregoing." *Id.* ¶ 90.  On three occasions, Lee claims that "Defendants" "buried their proverbial heads in the sand," *id.* ¶¶ 11, 91, 276, and on two occasions, she uses the same phrase to describe Crypto.com's conduct, *id.* ¶¶ 241, 314.  Each of the defendants points this out, arguing that it makes it impossible to determine what conduct Lee claims creates distinct liability for each defendant individually.  It is true that many of Lee's allegations are too generalized.  Because I am dismissing the vast majority of Lee's claims for other reasons, it is a largely moot point.

United States District Court
Northern District of California

known' will an inference of actual knowledge be permitted." *Lin v. JP Morgan Chase Bank*, No. 2:24-CV-01837-JLS-E, 2024 WL 5182199, at *6 (C.D. Cal. Aug. 15, 2024) (quoting *Uccello v. Laudenslayer*, 44 Cal. App. 3d 504, 514 n.4 (1975) (citations omitted)) (emphasis added). Lee insists that she has shown "direct evidence" of actual knowledge, or, in the alternative, that she has shown sufficient circumstantial evidence to meet the high standard articulated in *Lin* and *Uccello*.

### a.    Lee relies upon circumstantial evidence of actual knowledge

I find that Lee relies upon circumstantial rather than direct evidence. Lee disagrees, halfheartedly. She argues that the SAC outlines the direct evidence that Crypto.com had of the scam. But Lee's allegations of "direct evidence" of actual knowledge are too conclusory to support her claim. She alleges that "Defendants had actual knowledge" either that "Mr. Patz was a victim of a financial elder abuse scam," SAC ¶¶ 308, 310 or that "they would give assistance in accomplishing the fraud," *id.* ¶ 281. And she alleges that "[w]hen Crypto.com made … conversions [of fiat currency into Tether] it knew that Mr. Patz was in fact a victim of fraud." *Id.* ¶ 165. But Lee never alleges that Crypto.com knew that the recipient of Patz's funds was a fraudulent actor at the time it processed his transactions or that it knew that the recipient intended to wrongfully take his money in any way. Crypto.com Mot. 10 (citing *Casey*, 127 Cal. App. 4th at 1152 ("[B]ecause the banks were ignorant of the source of the funds deposited into those accounts, they did not know that allowing [third parties] to withdraw money from the accounts was assisting a diversion of corporate funds—the primary violation.")).

The SAC alleges at one point that Crypto.com knew that the wallets to which Patz directed the funds had been flagged as being associated with scammers, but that still constitutes circumstantial evidence of actual knowledge. Contradicting that same allegation, Lee also alleges that Crypto.com failed to conduct due diligence before "whitelisting" addresses, meaning that it "has no way of screening for potential red flag indicators of investment scams and other common vehicles of crypto theft." SAC ¶¶ 91-92. As I have pointed out in prior orders, Lee's allegations across her various amended complaints have conceded that "Crypto.com perhaps did not know the entire scheme or its intricacies, i.e., the true identifying information of the Doe Defendants that Crypto.com was aiding and abetting…." SAC at ¶ 165; *see also id.* at ¶ 278 (suggesting that

Crypto.com lacked knowledge about "the true identity of the recipient" and "the true destination of the transmittal").

The nature of these allegations do not show that Crypto.com had direct evidence of specific torts being committed such that it could have "aided and abetted" in their commission. Lee's aiding and abetting claim would have to rely on circumstantial evidence to survive. But, as I explain below, the circumstantial evidence Crypto.com allegedly had of the underlying fraud does not rise to the level of "must have known."

### b. The facts alleged do not show that Crypto.com "must have known" of the underlying scheme

Where actual knowledge is to be shown via circumstantial evidence, the "distinction between what a defendant must have known and what a defendant should have known is crucial." *ConAgra*, 17 Cal. App. 5th at 84; *see also Cf. In re A.L.*, 38 Cal. App. 5th 15, 24–25 (2019) ("We note that while actual knowledge is a higher standard than criminal negligence, both standards are proven in much the same way: Circumstantial evidence tending to show that a reasonable person would have known [a fact] will likewise tend to show that a particular defendant was aware of that fact.")).[3] Lee relies on *Lin v. JP Morgan Chase Bank* to argue that Crypto.com, like Chase Bank in *Lin*, had sufficient circumstantial evidence of fraud that it "must have known" Patz was being victimized. Crypto.com agrees that *Lin* is instructive but disagrees about what it instructs.

In *Lin*, the plaintiff, a seventy-nine-year-old-woman, alleged that her bank, Chase, through its employees, aided and abetted fraudsters in scamming her out of $721,500 of her retirement savings. Lin sued Chase and a Chase branch manager under California's Financial Eder Abuse Law and California's Unfair Competition Law for processing her transfers rather than flagging and reporting them as suspicious, speaking with her about the nature of the transactions, and/or calling her daughter, who was a joint accountholder. *See Lin*, at *1. "Based on the unique factual

---

[3] This standard—"must have known"—is a high bar, but sometimes can be cleared after the pleading stage, with the benefit of discovery. *See, e.g, ConAgra*, 17 Cal. App. 5th at 85 (affirming finding of actual knowledge following bench trial); *Donchin*, 34 Cal. App. 4th 1832, 1843–44 (concluding at summary judgment there was a genuine dispute as to actual knowledge). Where the facts alleged, if true, would not show that the defendant "must have known," however, the aiding and abetting claim does not proceed. *See Uccello*, 44 Cal. App. 3d at 514 n.4.

United States District Court
Northern District of California

circumstances presented [in *Lin*]," which involved "*six* large wire transfers processed by the *same* employee at the *same* branch over the course of *less than three weeks*," the *Lin* court concluded that Lin had plausibly pleaded that the Chase Branch Manager "must have known" that financial elder abuse was occurring, not just that he "should have known." *Id.* at *7 (emphasis in original).

To reach that conclusion, the court relied upon allegations concerning the "series of high-amount, quick-succession transfers" that had the "hallmark signs of financial elder abuse" as indicated by the "Interagency Guidance on Privacy Laws and Reporting Financial Elder Abuse of Older Adults," guidance that Lin invoked her complaint and that Lee cites in the SAC.[4]  The *Lin* court pointed out that that guidance identifies as a "possible sign of abuse" "erratic or unusual banking transactions," such as "[u]ncharacteristic attempts to wire large sums of money." *Id.* at *7-8.  Lin alleged that both of those things occurred and that her bank ignored them.

*Lin* supports Crypto.com's arguments.  First, and most importantly, the *Lin* court identified that Lin was a "long-time Chase customer [who] prior to the events at issue in this action, [] had not sent a wire transfer for at least seven years" and whose "banking behavior dramatically changed" when the alleged scheme began.  *Lin*, at *8.  Here, in contrast, Lee admits that Patz had no prior history with Crypto.com before the fraud started.  *See* SAC ¶ 272 (noting that "Mr. Patz had no history or background in using or exchanging or otherwise interacting with virtual currency").  This means that Crypto.com could not identify whether Patz's transactions were "erratic," "unusual," or "uncharacteristic," regardless of whether the cryptocurrency exchange was (rightly, wrongly, or otherwise) considering the CFPB's issued guidance with respect to identifying so-called "pig butchering" schemes.

According to the SAC, the alleged fraud unfolded over a series of about five weeks in early 2023.  On January 14, 2023, the scammer "guided Mr. Patz into setting up an account at Crypto.com." SAC ¶ 112.  On January 20, 2023, the scammer instructed Patz to "physically go into the bank to do a $200,000 wire transfer to Crypto.com," SAC ¶ 126, and on January 23, 2023,

---

[4] The Guidance itself was jointly promulgated by the Federal Reserve, the Consumer Financial Protection Bureau ("CFPB"), and several other federal agencies.

"First Republic Bank finished the wire transfer of $200,000 to Crypto.com," *id.* ¶ 127.  "Because Crypto.com had 'whitelisted' the criminal's receiving wallet days before, Crypto.com sent a $146,693.39 transfer to Does 1 to 25 without any due diligence or delay." *Id.*[5] On January 24, 2023, also at Patz's direction, Crypto.com transferred "another nearly $45,000.000 of Plaintiff's money to Does 1 to 24.  Also [on January 24, 2023] at the direction of the scammer, Mr. Patz requested another $200,000.00 wire from Defendant First Republic Bank, which was sent to Crypto.com." *Id.* ¶ 129.  The same thing happened on January 27, January 31, February 1, February 6, and on various occasions until February 20.  SAC ¶¶ 135-139.  Between January 14, 2023, when Patz set up his Crypto.com account, and February 20, 2023, when the last transaction was completed, Patz made dozens of transactions, leading him to "invest" "almost a million dollars" in cryptocurrency, in what was later revealed to be a financial fraud scheme.  *Id.* ¶ 149.

While the size and frequency of these transactions may look comparable to those that the *Lin* court found rose to the level of circumstantial evidence from which Chase "must have known" that fraud was afoot, the rest of the situation does not mirror *Lin*.  Crypto.com is not a bank, meaning that it is subject to a less stringent duty of care toward its customers.  It also was unfamiliar with Patz up until January 14, 2023, when his account was opened.  He was not a "long-time customer" whose habits Crypto.com could have (let alone should have) noted and flagged as odd or suspicious when they varied from the norm—there was no norm from which to depart, suspiciously or otherwise.

The court in *Lin* also noted that Chase did not question Lin about the nature of her transactions.  *Lin*, at *1 (noting bank's failure to "speak[] with Plaintiff about the nature of the transactions and/or call[] Plaintiff's daughter, who is a joint accountholder").  In contrast, Crypto.com did contemporaneously ask Patz questions about his account activity. *See* SAC at ¶¶ 184-189 (describing how "Crypto.com contacted Mr. Patz" to ask him questions "about his account activity" in addition to "questions ascertaining whether Mr. Patz was a victim of an investment scam or not.").  Patz responded that "he was taking part in an investing opportunity."

---

[5] The SAC is unclear as to what became of the difference between those amounts.

1   SAC ¶ 185.

2       Lee makes a lot out of the transparency-enabling tools at Crypto.com's disposal to argue

3   that it must have known about the fraud.  She claims, among other things, that Crypto.com, as a

4   "money services business," "would have maintained a risk-based anti-money laundering program

5   reasonably designed to prevent money laundering on its platform." SAC ¶ 38.  She speculates that

6   "[i]f Crypto.com were a duly compliant MSB, the AML program must have contained written

7   policies, procedures and internal controls; a designated individual responsible for BSA

8   compliance; provision of training, including on how to detect suspicious transactions; and the

9   provision of an independent review of the AML program." *Id.* (citing statutes).  She points out that

10  Crypto.com "represents that its financial systems are secure," offering various cutting-edge

11  security infrastructure, SAC ¶¶ 45-50, and that it knew that its users were "being targeted by pig

12  butchering scams." *Id.* ¶¶ 60-65.  These arguments may be credible in a vacuum, but general

13  allegations about Crypto.com's security offerings and knowledge of its users' general

14  vulnerability to scams does not constitute circumstantial evidence of fraud underlying Lee's aiding

15  and abetting claim that would meet the high standard of "must have known."   These same

16  arguments are better suited to Lee's unlawful UCL claim, insofar as it proceeds under a theory of

17  liability arising from the Bank Secrecy Act and related statutes.[6]

18      Because Lee has shown neither direct evidence that Crypto.com had actual knowledge of

19  the underlying fraud it purportedly assisted, nor circumstantial evidence that satisfies the

20  applicable high standard, her aiding and abetting claim is implausible.  Crypto.com's motion to

21  dismiss this claim is GRANTED.  As I have already granted Lee leave to amend her claim twice,

22  to no avail, it is now dismissed with prejudice.

23      **B.**    **UCL**

24      The UCL prohibits unfair competition, which includes any "unlawful, unfair, or fraudulent

25

26  ───────────────

27  [6] Lee has also failed to show the "substantial assistance" element of aiding and abetting.  She
    argues that a financial institution's "ordinary business transactions" can satisfy this element, *see*
    SAC ¶ 262, but that is only true if the financial institution "actually knew those transactions were

28  assisting the customer in committing a specific tort." *Casey*, at 1145.

United States District Court
Northern District of California

business act or practice" that causes the person asserting a claim to have "suffered injury in fact" and "lost money or property." Cal. Bus. & Prof. Code §§ 17200, 17204. "Unlawful," "unfair," and "fraudulent" are recognized as three separate and distinct theories of liability under the UCL. *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 885 (1999).

I dismissed with prejudice Lee's unfair and fraudulent UCL claims because she lacked the standing to assert them. *See* Dkt. No. 79. I dismissed Lee's unlawful UCL claim with leave to amend, explaining that if she could plausibly allege her aiding and abetting claim, I would reevaluate its plausibility. As laid out above, *supra* Section I(B), Lee has not plausibly alleged aiding and abetting, so that tort cannot serve as the basis for her unlawful UCL claim. That fact does not end up mattering because Lee no longer asserts a UCL claim based on aiding and abetting (but states in a footnote that she does assert that Crypto.com is liable under the UCL for common law violations "including aiding and abetting."). Oppo. to Crypto.com Mot. 16, n.34. Instead, she offers several new statutes that she says serve as the basis for an unlawful UCL claim. Defendants encourage me to ignore these newly added potential bases for UCL liability as impermissibly added or otherwise find that they are implausible as alleged.[7]

"The unlawful prong of the UCL borrows violations from other statutes or common-law causes of action and means anything that can properly be called a business practice and that at the same time is forbidden by law." *Anderson v. PHH Mortg.*, No. SACV 12-01192-CJC-(RNBx), 2012 WL 4496341, at *4 (C.D. Cal. Sept. 28, 2012) (internal quotation marks and citations omitted). To assert a claim under the unlawful prong of the UCL, a plaintiff must sufficiently plead some separate unlawful offense. *See Smith v. Intel Corp.*, 745 F. Supp. 3d 853, 868 (N.D. Cal. 2024) (dismissing UCL claim under the unlawful prong and noting that such claim can only

---

[7] Crypto.com argues that Lee's unlawful UCL claim exceeds the scope of allowable amendment under my last order. "[W]here 'leave to amend is given to cure deficiencies in certain specified claims, courts have agreed that new claims alleged for the first time in the amended pleading should be dismissed or stricken.'" *Cover v. Windsor Surry Co.*, No. 14-cv-05262, 2016 WL 3421361 at * 3 (N.D. Cal. June 22, 2016) (granting motion to dismiss where plaintiff "failed to secure [defendant's] consent or seek leave of court to amend his pleadings"). I gave Lee leave to amend her unlawful UCL claim with a particular purpose in mind but did not bar her from trying other theories of liability for that claim. I address them on their merits.

survive a motion to dismiss if the complaint "plead[s] sufficient facts to support another cause of action").  The California Supreme Court has held that "where the alleged unlawful conduct is that the defendant engaged in misrepresentations and consumer deception," a plaintiff must show that she actually relied upon those misrepresentations. *See Figy v. Amy's Kitchen, Inc*., 2013 WL 6169503, at *3 (N.D. Cal. Nov. 25, 2013) (citing *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 326 n.9 (2011)).

Lee's new potential bases for liability under the unlawful prong of the UCL are: "a) Assisting Financial Elder Abuse against Mr. Patz (Cal. Welf. & Inst. Code § 15610.30) b) Receiving Stolen Property (Cal. Pen. Code § 496(a)) c) Violations of False Advertising Law (FAL) (Bus. & Prof. Code §17500) d) Violations of the Consumers Legal Remedies Act (CLRA) (Cal. Civ. Code §§ 1750, *et seq*.) e) Funds Transfers Involving the Proceeds of Wire Fraud (18 U.S.C. §1957) f) Violations of Bank Secrecy Act (BSA) and implementing anti-money laundering (AML) rules and regulations (31 U.S.C. § 5318(h), 31 C.F.R. § 1022.210(a)). i. Willful Violations of the BSA (31 U.S.C. §§ 5321(a), 5322(a)(b) & (c)). ii. Negligent Violations of the BSA (31 U.S.C. § 5321(a)(6)(A), and iii. Patterns of Negligent Activity (31 U.S.C. § 5321(a)(6)(B)). g) Violations of the FTC Act, Section 5, Unfair or Deceptive Acts or Practices (15 U.S.C. § 45(a)). h) Violations of the Consumer Financial Protection Act, Unfair, Deceptive, or Abusive Acts or Practices (12 U.S.C. §5336(a))." SAC ¶ 289.  Only one those theories is asserted as an independent claim in her complaint: Receiving Stolen Property (Cal. Pen. Code §496(a)) (which Crypto.com argues I should dismiss independently because it too was added without the court or the defendants' permission).  That is unusual, but does not by itself render Lee's unlawful UCL claim implausible.

As a preliminary matter, the reliance requirement articulated by the California Supreme Court in *Kwikset* knocks out several of Lee's proposed theories of liability that involve "misrepresentations and consumer deception" for the unlawful UCL claim.  She cannot make a showing of reliance regarding Crypto.com.  She never had an account and never used her husband's, so she never relied on any representations by Crypto.com, misleading or otherwise. *See* Dkt. No. 79 at 13-14.  Subsequently, the unlawful UCL claim *cannot* proceed under a theory

1    of liability where any of the following are the predicate violations: Violations of False Advertising

2    Law (FAL) (Bus. & Prof. Code § 17500); Violations of the Consumers Legal Remedies Act

3    (CLRA) (Cal. Civ. Code §§ 1750, *et seq*.); Funds Transfers Involving the Proceeds of Wire Fraud

4    (18 U.S.C. § 1957)[8]; Violations of the FTC Act, Section 5, Unfair or Deceptive Acts or Practices

5    (15 U.S.C. § 45(a)); or Violations of the Consumer Financial Protection Act, Unfair, Deceptive, or

6    Abusive Acts or Practices (12 U.S.C. §5336(a)).  Each of these statutes relate to misrepresentation,

7    fraud, and/or consumer deception, and accordingly would require Lee to show she relied upon

8    Crypto.com's false statements to prove liability.

9         With respect to the Elder Abuse Act, putting aside the standing issues, and assuming,

10   *arguendo*, that Lee could assert a claim under the unlawful prong of the UCL for alleged Elder

11   Abuse Act violations committed against her husband, after three complaints it is clear to me that

12   any Elder Abuse Act claim against Crypto.com would not succeed for the same reason that Lee's

13   aiding and abetting fraud claim cannot succeed: The facts alleged do not show that Crypto.com

14   had "actual knowledge" of the alleged elder abuse.  *See* discussion *supra*, Section I(B)(3); *see also*

15   *Das v. Bank of America*, 186 Cal. App. 4th 727, 744 (2010) (holding that assister liability for elder

16   abuse uses the same knowledge standard as common law aiding and abetting, and both require a

17   showing that the defendant had "actual knowledge" of the underlying crime/tort).

18        As for Lee's claim for violation of Cal. Pen. Code § 496 (receiving stolen property)—

19   which is the only claim that she asserts both as a standalone cause of action and a predicate for the

20   unlawful UCL claim—it is also implausible.  To state a claim for a violation of § 496, Lee must

21   plead that (1) the property was stolen or obtained in a manner constituting theft, (2) Crypto.com

22   knew the property was stolen or so obtained, and (3) Crypto.com received or had possession of the

23   stolen property.  *Switzer v. Wood*, 35 Cal. App. 5th 116, 126 (2019).  "[F]or property to be 'stolen'

24   under § 496(a), the property 'must already have the character of having been stolen' when it

---

[8] Lee's 18 U.S.C. § 1957 also requires that she show knowledge of fraud, which she cannot do.  A person is liable for money laundering under 18 U.S.C. §1957 if they (i) knowingly engage or attempt to engage in a monetary transaction, (ii) knowing the transaction involves criminally derived property, (iii) the property having a value of $10,000 or greater, (iv) the property being, in fact, derived from specified unlawful activity, and (v) the transaction having occurred in the United States.

comes into a defendant's possession." *Hueso v. Select Portfolio Servicing, Inc.*, 527 F. Supp. 3d 1210, 1229-1332 (S.D. Cal. 2021) (dismissing § 496 claim with prejudice and without leave to amend because property was "not 'stolen' at the time of the alleged misappropriation") (internal citations omitted).

*Barrett v. Apple Inc.*, is on point. No. 20-cv-04812, 2022 WL 2119131, at *5 (N.D. Cal. June 13, 2022). There, plaintiffs alleged that Apple was liable for receipt of stolen property where scammers misled victims into purchasing gift cards. The Hon. Edward J. Davila held that the plaintiffs failed to plead that the property was stolen before defendant Apple received the funds because the theft was "not complete until the scammers obtain[ed] the redemption codes and redeem[ed] the funds for their own purposes." *Barrett*, at *5. Moreover, the actual knowledge requirement plagues this claim as did the others—the SAC does not set forth facts from which I can infer Crypto.com "knew the property was stolen or so obtained." *Switzer*, 35 Cal. App. at 126; *see People v. Tessman*, 223 Cal. App. 4th 1293, 1302 (2014) ("A necessary element of [§ 496] is actual knowledge that the property received or sold was stolen").

That leaves one possible predicate for the unlawful UCL claim: violations of the Bank Secrecy Act ("BSA") and related anti-money laundering provisions. *See* SAC ¶¶ 372-411. Lee says that "[u]nder 31 U.S.C. § 5318(h) and implementing rules and regulations, named Defendants were required to implement and maintain effective anti-money laundering (AML) programs reasonably designed to prevent their financial systems from being used to facilitate money laundering." SAC ¶ 373. She alleges that Crypto.com both willfully and negligently failed to comply with this mandate in violation of 31 U.S.C. §§ 5321(a), 5322(a)(b) & (c).

Lee argues that "[u]nder the BSA, Defendant Crypto.com was required as a 'money services business' under 31 C.F.R. § 1022, … to include: a) The development of internal policies, procedures, and controls to ensure AML compliance, b) The designation of a compliance officer to ensure day-to-day AML compliance, c) An ongoing employee training program for AML compliance, d) An independent audit function to test programs and ensure AML compliance, and e) Risk based procedures for conducting ongoing customer due diligence (CDD)." SAC ¶ 376. She claims that Crypto.com, *inter alia*, "failed to detect and/or prevent the transfer of close to $1

United States District Court
Northern District of California

1   million from an elderly person to a recipient known to be associated with criminal activity,"

2   "failed to perform the necessary recordkeeping under the Travel Rule"[9], that it's "whitelisting"

3   process is conducted in lieu of due diligence and/or proper recordkeeping, and "especially under

4   circumstances of high risk, represents a critical AML failure," and that it "failed to integrate AML

5   compliance procedures with its automated data processing systems as required under 31 C.F.R. §

6   1022(d)(1)(ii)." SAC ¶ 386.

7       Crypto.com's arguments in favor of dismissal of the unlawful UCL claim center on the

8   issue of reliance, but the BSA theory does not rest on misrepresentations or consumer deception,

9   so reliance is not necessarily required.  Crypto.com also points to *Kenney v. Bank of Am., N.A.* to

10  argue that BSA violations cannot serve as the predicate for an unlawful UCL claim.  No. 25-cv-

11  02726, 2025 WL 1489549 (C.D. Cal. May 23, 2025).  *Kenney* is largely inapposite.  There, the

12  court dismissed a free-standing BSA claim because the BSA lacks a private right of action.  *See*

13  *Kenney*, at *3.  It later dismissed without discussion the plaintiff's unlawful UCL claim because

14  plaintiff had failed to plausibly allege any predicate unlawful act.  *See id.*, at *8-9.

15      Here, unlike in *Kenney*, Lee is not trying to assert a free-standing BSA claim and there is

16  no requirement that the statute that serves as the predicate for an unlawful UCL claim also confers

17  a private right of action.  California courts have held that where a statute "absolutely bar[s]" a

18  private right of action, a litigant "may not rely on the proscriptions of [that] law as the basis of a

19  UCL claim." *Newton v. American Debt Serv.*, 75 F. Supp. 3d 1048, 1058 (N.D. Cal. Dec. 16,

20  2014); *see Zhang v. Superior Ct.*, 57 Cal. 4th 364, 379–80 (2013) ("[i]n *Stop Youth Addiction* and

21  *Cel–Tech*, we explained that to bar a UCL action, another statute must absolutely preclude private

22  causes of action or clearly permit the defendant's conduct."); *see also Cel–Tech Communications,*

23  *Inc. v. L.A. Cellular Telephone Co*., 20 Cal.4th 163, 182 (1999)).  The BSA does not explicitly bar

24  a private right of action.

---

[9] A Bank Secrecy Act (BSA) rule [31 CFR 103.33(g)]—often called the "Travel" rule—requires all financial institutions to pass on certain information to the next financial institution, in certain funds transmittals involving more than one financial institution. *See* Jan. 1997 FinCEN Advisory (https://www.fincen.gov/sites/default/files/advisory/advissu7.pdf) (last accessed Aug. 29, 2025).

Crypto.com offers no authority that suggests Lee cannot use purported violations of the BSA as the predicate for her unlawful UCL claim.  And it offers no argument that Lee cannot plausibly allege that Crypto.com did violate the provisions of the BSA that she has identified.  *See generally* Crypto.com Mot. and Reply.  At the same time, Lee offers no case where a cryptocurrency exchange has been held liable for violations of the BSA.  *See generally* Oppo. to Crypto.com Motion.  At the hearing, counsel for both parties admitted that this case has entered uncharted waters with respect to the unlawful UCL claim based on Crypto.com's alleged violations of the BSA.

The SAC alleges that Crypto.com violated 31 U.S.C. §5318(h) and 31 C.F.R. §1022.210(a) by failing to implement an effective AML program, reasonably designed to prevent its financial system from being used to facilitate money laundering. The only case Lee offers where an alleged BSA violation formed the foundation for an unlawful UCL claim involved a bank defendant. *See* Oppo. to Crypto.com Mot. 21-22 (citing *S&S Worldwide, Inc. v. Wells Fargo Bank*, 509 F. Supp. 3d 1154, 1167 (N.D. Cal. 2020)).  Lee contends that Crypto.com, as a money transmitter and registered Money Services Business (MSB), "was required to comply with the Travel Rule under 31 CFR § 1010.410(f) to retain available beneficiary information and to implement automated, risk-based transaction monitoring as part of its anti-money laundering (AML) program under 31 CFR § 1022.210(d)(1)(ii)." Oppo. to Crypto.com Mot. 22.

In the absence of any authority precluding Lee from advancing under this theory of liability, I conclude that her unlawful UCL claim predicated on violations of the BSA by Crypto.com. is plausible.  Crypto.com's motion to dismiss that claim is DENIED.

## II.    FDIC-R AND EVANS' MOTIONS TO DISMISS

Defendant FDIC-R has moved to dismiss Lee's complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  It argues that I lack subject matter jurisdiction over her claims because Lee failed to timely file a proof of claim as required by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") and has not shown a reason why that failure should be excused.  FDIC-R Motion to Dismiss ("FDIC-R Mot.") [Dkt. No. 92].

United States District Court
Northern District of California

18

### A.  Rule 12(b)(1)

On a motion to dismiss under Rule 12(b)(1), "the plaintiff bears the burden of establishing the factual predicates of jurisdiction by a preponderance of the evidence." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).  A court evaluating a Rule 12(b)(1) motion may consider any evidence outside the pleadings to resolve factual disputes regarding jurisdiction.  *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988) ("the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction.").  "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cou*nty, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).

### B.  Discussion

#### 1.   The FIRREA claims process is jurisdictional

" 'Federal courts are courts of limited jurisdiction;' " we have subject matter jurisdiction only to the extent that it is conferred by statute or the Constitution.  *See Gunn v. Minton*, 568 U.S. 251, 133 S.Ct. 1059, 185 L.Ed.2d 72 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994)).  Here, Lee sues the FDIC pursuant to 12 U.S.C. § 1821(d)(6)(A)(ii), a provision of FIRREA, because the FDIC is acting as receiver for First Republic Bank under that statute.

When liquidating a failed bank's assets, the FDIC must "promptly publish a notice to the depository institution's creditors to present their claims ... [to the FDIC] by a date specified in the notice"—*i.e.* the "Claims Bar Date." 12 U.S.C. § 1821(d)(3)(B).  At the same time, the FDIC must also mail a similar notice to (1) "any creditor shown on the institution's books," and (2) "claimant[s] not appearing on the institution's books" but whose names and addresses the FDIC later discovers. 12 U.S.C. § 1821(d)(3)(C).  Once a claim is filed, the FDIC has 180 days to allow or disallow it. 12 U.S.C. § 1821(d)(5)(A).  Claims that are filed late, i.e. after the Claims Bar Date,

1   "shall be disallowed and such disallowance shall be final." 12 U.S.C. § 1821(d)(5)(C)(i). There is

2   one statutory exception to this rule: late-filed claims "may be considered by the receiver if ... the

3   claimant did not receive notice of the appointment of the receiver in time to file such claim before

4   [the Claims Bar Date]," and "such claim is filed in time to permit payment of such claim." 12

5   U.S.C. § 1821(d)(5)(C)(ii).

6       FIRREA provides for *de novo* judicial review of the FDIC's determinations of

7   administrative claims. 12 U.S.C. § 1821(d)(6). Section 1821(d)(6) provides that the United States

8   district court for the district where the failed bank has its principal place of business shall have

9   jurisdiction over claims that are disallowed by the FDIC, so long as the claimant files suit within

10  60 days of the disallowance. *See* 12 U.S.C. § 1821(d)(6)(A). But FIRREA also contains a broad

11  limitation on judicial review. In § 1821(d)(13)(D), it provides:

> Except as otherwise provided in this subsection, no court shall have jurisdiction over—
> (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or
> (ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

16  12 U.S.C. § 1821(d)(13)(D).

17      Courts across different circuits have interpreted FIRREA as making the administrative

18  claims process jurisdictional. *See e.g.*, *Intercontinental Travel Mktg., Inc. v. F.D.I.C.*, 45 F.3d

19  1278, 1282 (9th Cir. 1994); *Westberg v. FDIC*, 741 F.3d 1301, 1303 (D.C. Cir. 2014). Put another

20  way, the FDIC's administrative claims review process is mandatory, and judicial review in this

21  court is unavailable unless Lee first routed her claim through that process.

22      It is undisputed that Lee has now filed an administrative claim with the FDIC. But it is

23  also undisputed that she filed it late—over a year after the Claims Bar Date. At the start of this

24  case, I determined that Lee had filed her complaint prematurely; she came to court before she

25  exhausted her administrative remedies under FIRREA. When she moved to remand, she did not

26  contest that she had failed to exhaust administrative remedies but instead argued that she did not

27

28

United States District Court
Northern District of California

20

have to because she was never given proper notice under 12 U.S.C. § 1821.  *See* Dkt. No. 34.[10]

On September 6, 2024, FDIC-R filed a Motion to Dismiss for lack of subject matter jurisdiction

because the plaintiff had not completed FIRREA's mandatory administrative claims process.  Dkt.

No. 7.  Despite her insistence that she did not have to exhaust her administrative remedies, Lee

filed an administrative claim with the FDIC on September 18, 2024, two days before she filed her

opposition to the FDIC-R's first Motion to Dismiss.  *See* Dkt. No. 39-1.

I dismissed Lee's claims against FDIC-R and Evans without prejudice and stayed those

claims for either 180 days or until the FDIC-R issued a formal determination with respect to her

claims, whichever happened first.  The latter did.  On February 28, 2025, FDIC-R issued a notice

to Lee disallowing her claim because under 12 U.S.C. § 1821(d)(5)(C)(1), it was untimely filed.

*See* Dkt. No. 81 at pp. 4-5 (Disallowance Notice).  As the notice explained, the Claims Bar Date

was September 5, 2023, but FDIC-R received Lee's proof of claim "after the specified Bar Date."

*Id.*  FDIC-R's notice also explained that this determination is "final." *Id.*  Lee provided the court

with notice of this disallowance on April 25, 2025. *Id.* at pp. 1-2.

Then, Lee filed the Second Amended Complaint ("SAC") on May 23, 2025, which is

within the 60-day time limit allowed by statute to seek judicial review.  *See* SAC [Dkt. No. 84];

*see also* 12 U.S.C. § 1821(d)(6)(A).  The SAC contains allegations that Lee and her husband

banked with First Republic for many years before its closure.  *See e.g.*, SAC ¶¶ 145, 146, 155.  It

also names Catherine Evans as a defendant, a former First Republic Bank employee who was the

financial planner and investment manager for Lee and her husband, Patz.  *Id.* ¶ 147.  The SAC

does not address the FDIC-R's disallowance of her claim.

FIRREA provides that late claims "shall be disallowed and such disallowance shall be

final." 12 U.S.C. § 1821(d)(5)(C)(i).  There is a narrow exception to that rule.  As discussed

below, it does not apply.

### 2.    The late-filed claims exception does not apply in Lee's case

The FDIC-R contends that Lee has failed to show that she qualifies for the late-filed claims

---

[10] Lee was very vague about what it was that she lacked notice of.  That theme has persisted, as I
discuss below.

United States District Court
Northern District of California

1   exception, 12 U.S.C. § 1821(d)(5)(C)(ii).  Lee asserts that she "never received any notice—via

2   formal mailing notice or otherwise—prior to the purported 'Claims Bar Date'". Oppo. to FDIC-

3   R's Mot. 2.  She states that she never received any notice of any kind from the FDIC.  Declaration

4   of J. Lee [Dkt. No. 101].  While she is not clear what she never received notice of—the Claims

5   Bar Date itself or the FDIC-R's appointment as Receiver—I will assume for the sake of argument

6   that she claims not to have received proper notice of either.

7        With respect to the Claims Bar Date, that argument is immaterial.  As the Ninth Circuit

8   and its sister appellate courts have held, any failure by the FDIC to mail the notice required under

9   12 U.S.C. § 1821(d)(3)(C) does not relieve claimant of her obligation to exhaust administrative

10   remedies, because FIRREA does not provide for a waiver or exception in that circumstance.  *See*

11   *Intercontinental Travel Mktg., Inc. v. FDIC*, 45 F.3d 1278, 1285 (9th Cir. 1994).

12        Regarding the FDIC's appointment as Receiver, that argument would be legally material if

13   it were credible, but Lee's declarations and arguments do not support her position.  Nowhere in the

14   SAC does Lee allege when she first learned of the FDIC's appointment as receiver for First

15   Republic Bank.  *See generally* SAC.  This information is conspicuously missing from her

16   opposition to FDIC-R's Motion to Dismiss.  *See generally* Oppo. to FDIC-R Mot.  She states in

17   her Opposition that "Plaintiff's sworn declarations state she never received *any* notice of any kind

18   from FDIC prior to this litigation and thus had no idea about the receivership." Oppo. to FDIC-R

19   Mot. 4.  She presumably references her declaration at Dkt. No. 101, where she states that "I have

20   never received any notice from the [FDIC] regarding the matters at issue in this case," and "I only

21   learned about the FDIC notice and referenced exhibits during the course of this case, after the

22   litigation had commenced." Declaration of J. Lee ("Lee Decl.") [Dkt. No. 101].  But she

23   acknowledges (as the FDIC-R points out) that allegations in the SAC (and the original complaint

24   in this action) refer to the appointment of the FDIC-R as receiver, meaning that at least as early as

25   August 30, 2024, Lee knew that the FDIC was the Receiver for First Republic Bank.  *See* Initial

26   Complaint [Dkt. No. 1-1] ¶ 24 (On May 1, 2023, the [FDIC] seized control of First Republic

27   following a collapse of the bank"); SAC ¶ 24 (same).

28        The court in *Alkasabi v. Washington Mutual Bank, F.A.* considered a very similar situation,

1    where plaintiffs tried to invoke the late-filed claims exception after filing an administrative claim

2    with the FDIC that was disallowed as being late-filed.  31 F. Supp. 3d 101 (D.D.C. 2014).  There,

3    as here, there were no allegations in the complaint or in the plaintiffs' response to the FDIC-R's

4    Rule 12(b)(1) motion to dismiss when the plaintiffs became aware of the FDIC's appointment as

5    receiver for the defendant bank.  The court concluded that "[a]ccordingly, [plaintiffs] had failed to

6    meet their burden to show lack of notice of the FDIC's appointment 'in time to file [an

7    administrative] claim before [the Claims Bar Date]'." *Alkasabi*, 31 F. Supp. 3d at 108 (quoting 12

8    U.S.C. § 1821(d)(5)(C)(ii)); *see also Savage v. Glendale Union High Sch., Dist. No. 205,

9    Maricopa Cou*nty, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003) (the party asserting subject matter

10   jurisdiction has the burden to demonstrate it exists).

11          Dispositively, Lee received adequate notice of the FDIC as receiver through publication

12   notice.  The FDIC published notice of its appointment in various newspapers of general circulation

13   in May, June, and July 2023.  Stamelman Decl. ¶ 5 (stating that on May 8, 2023, June 9, 2023, and

14   July 7, 2023, the FDIC-R published a notice in the San Francisco Chronicle, the Los Angeles

15   Times, the New York Times, the Wall Street Journal and the Boston Globe stating that First

16   Republic Bank was closed and that claims against First Republic, if any existed, were to be

17   administratively filed on or before the Bar Date); *see also id.* Ex. D (example of notice published

18   on May 8, 2023, by the FDIC-R in the San Francisco Chronicle).  The Fourth Circuit has held that

19   publication in local newspapers precludes a claimant's defense of lack of notice of the

20   receivership, *Tillman v. Resolution Trust Corp.*, 37 F.3d 1032, 1036 (4th Cir. 1994), as have

21   district courts across the country, *see e.g. Alkasabi*, 31 F. Supp. 3d 101.

22          The failure of First Republic Bank and its receivership did not fly under the radar in

23   2023—the FDIC-R's takeover of First Republic Bank was widely reported across mainstream

24   media.  *See* Stamelman Decl. Exs. E-I.  This suggests that at the very least, Lee was on inquiry

25   notice of the FDIC-R's status as Receiver and the administrative claims process.  *See Elmco

26   Props., Inc. v. Second Nat'l Fed. Sav. Assoc.*, 94 F.3d 914, 921–22 (4th Cir. 1996) (a claimant

27   "may not complain of its lack of formal notice if it actually knew enough about the situation to

28   place it on 'inquiry notice' as to the details of the administrative process," and "a claimant's

knowledge that a bank has entered receivership triggers such inquiry notice"). Lee offers no reason, credible or otherwise, how she was able to remain completely ignorant of one of the largest bank failures in United States history, which involved her bank of "many years," *see* SAC ¶¶ 145, 146, 155, and the receivership that resulted. She does not satisfy the late-filed claims exception under Section 1821(d)(5)(C)(ii). The FDIC-R's motion is granted in full.

For that reason, the motion of individual defendant Catherine Evans is also granted. According to the SAC, Evans "was a Senior Managing Director and Wealth Manager and employee at First Republic." SAC ¶ 26. Evans "was the financial planner and investment manager of [Lee] and Mr. Patz," and was "acutely aware that [Lee's] family investment strategy was conservative." *Id.* ¶ 147. At various points, Lee alleges that Patz told Evans that "he needed her to sweep his investment account and checking account, and to wire … money to Crypto.com, because he was 'investing' in cryptocurrency." SAC ¶¶ 88, 132. She alleges that Evans "failed to act on this red flag." *Id.* ¶ 132. California courts have held that the "FIRREA jurisdictional bar applied to claims against employees of the failed institution where plaintiffs' claims are based on the wrongdoing alleged to have been committed by the individual as an employee of the failed institution." *Saffer v. JP Morgan Chase Bank, N.A.*, 225 Cal. App. 4th 1239, 1262 (2014); *see also Dixon v. JPMorgan Chase Bank*, No. 222CV01726JLSJEM, 2022 WL 16859661, at *2 (C.D. Cal. Sept. 7, 2022) (citing *Saffer*). For these reasons, Lee's claims against Evans are also barred.

### CONCLUSION

For the foregoing reasons, the FDIC-R and Evans' motions to dismiss are GRANTED, and Lee's claims against those defendants are dismissed, with prejudice. Crypto.com's motion to dismiss is GRANTED for all of Lee's claims except the unlawful UCL claim based on violations of the BSA. The Case Management Conference remains set for September 30, 2025 at 1:30 p.m.

**IT IS SO ORDERED.**

Dated: September 5, 2025

William H. Orrick
United States District Judge

United States District Court
Northern District of California