**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger (Bar No. 226112)
Galen K. Cheney (admitted *pro hac vice*)
Leah Rosa Vulić (Bar No. 343520)
548 Market St. #85399
San Francisco, CA 94104-5401
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
karl@kr.law
galen@kr.law
leah@kr.law

Attorneys for Plaintiff Jung Min Lee

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JUNG MIN LEE**, an individual,<br><br>Plaintiff,<br><br>v.<br><br>**FORIS DAX, INC. D/B/A CRYPTO.COM**, a Delaware corporation; **FIRST REPUBLIC BANK**, a California corporation; **CATHERINE EVANS**, an individual; and **DOES 1 through 25**,<br><br>Defendants. | Case No. 3:24-cv-06194-WHO<br><br>**PLAINTIFF JUNG MIN LEE'S OPPOSITION TO DEFENDANT FORIS DAX, INC. d/b/a CRYPTO.COM'S MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Date:      May 20, 2026<br>Time:      2:00 p.m.<br>Ctrm:      2<br>Before:    Hon. William H. Orrick<br><br>Complaint filed: July 1, 2024<br>Removal filed: August 30, 2024<br>Second Amended Complaint filed: May 23, 2025<br>Pretrial Conference: March 29, 2027<br>Trial Date: April 26, 2027 |

**PLAINTIFF'S OPP TO CRYPTO.COM'S MJOP**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ........................................................................................... 2

    A.    *Crypto.com Is a Federally Regulated Money Transmitter.* ............................ 3

    B.    *The Criminal Wallets Were Flagged Before the First Transaction.* .............. 3

    C.    *Crypto.com Took Custody of, Converted, and Transmitted the Funds Thirteen Times.* . 3

    D.    *Crypto.com Whitelisted the Criminal Wallets and Bypassed Due Diligence.* ............... 4

    E.    *The Compliance Questionnaire Confirmed the Fraud; Crypto.com Re-Enabled the Account Anyway.* .................................................................................. 4

LEGAL STANDARD ....................................................................................................... 5

ARGUMENT ..................................................................................................................... 6

    I.    THE COURT HAS ALREADY REJECTED CRYPTO.COM'S CAUSATION THEORY; LAW OF THE CASE BARS ITS REASSERTION. .................................. 6

        A. *This Court Rejected Crypto.com's Causation Theory on the Merits.* ....................... 7

        B. *This Court Reaffirmed its Prior Order by Express Reference.* ................................ 7

        C. *Crypto.com's Three Arguments Are the Same Three Arguments Already Rejected.* 8

    II.    THE UCL'S CAUSATION STANDARD IS A SUBSTANTIAL FACTOR ANALYSIS, NOT FEDERAL-RICO'S DIRECT CAUSE ........................................... 9

    III.    THE BSA IS A PREVENTION STATUTE, AND EVEN NEGLIGENT VIOLATIONS SUFFICE. ....................................................................................... 13

    IV.    THE SAC ALLEGES A DIRECT CAUSAL MECHANISM, NOT SPECULATION. ................................................................................................... 18

        A. Crypto.com's Strawman Causation Theory. ......................................................... 18

        B. At Multiple Decision Points, BSA Compliance Would Have Halted the Transfers. ............................................................................................................... 18

        C. The Either/Or Dilemma: Crypto.com Violated the BSA Whether Ignorant or Informed. ............................................................................................................... 19

    V.    THERE IS NO SUPERSEDING CAUSE. ......................................................... 20

KRONENBERGER ROSENFELD

A.  *The Scammers' Conduct Is the Foreseeable Harm the BSA Addresses.* ................ 20

B.  *Patz's Conduct Was the Product of the Fraud, Not an Independent Act.* .............. 21

VI.    AMENDMENT WOULD CURE ANY DEFICIENCY ................................................ 21

CONCLUSION ................................................................................................................. 25

**TABLE OF AUTHORITIES**

Page(s)

**<u>Cases</u>**

*Anza v. Ideal Steel Supply Corp.*,

547 U.S. 451 (2006) ........................................................................................................... 11

*Arizona v. California*,

460 U.S. 605 (1983) ............................................................................................................. 6

*Askins v. U.S. Dep't of Homeland Sec.*,

899 F.3d 1035 (9th Cir. 2018) ............................................................................................. 6

*Bhatia v. Silvergate Bank*,

725 F. Supp. 3d 1079 (S.D. Cal. 2024) ............................................................................. 12

*Bigbee v. Pacific Tel. & Tel. Co.*,

34 Cal. 3d 49 (1983) .......................................................................................................... 20

*Cal. Pac. Bank v. Fed. Deposit Ins. Corp.*,

885 F.3d 560 (9th Cir. 2018) ............................................................................................. 14

*Canyon Cty. v. Syngenta Seeds, Inc.*,

519 F.3d 969 (9th Cir. 2008) ............................................................................................. 11

*City & Cnty. of San Francisco v. Purdue Pharma L.P.*,

491 F. Supp. 3d 610 (N.D. Cal. 2020) ............................................................................... 11

*Cousins v. Lockyer*,

568 F.3d 1063 (9th Cir. 2009) ............................................................................................. 6

*Daro v. Superior Court*,

151 Cal. App. 4th 1079 (2007) .......................................................................................... 10

*Dworkin v. Hustler Magazine, Inc.*,

867 F.2d 1188 (9th Cir. 1989) ............................................................................................. 9

*Eminence Capital, LLC v. Aspeon, Inc.*,

316 F.3d 1048 (9th Cir. 2003) ........................................................................................... 22

*//*

*Empire Merchants, LLC v. Reliable Churchill LLLP,*

No. 16-CV-5226, 2017 WL 5559030 (E.D.N.Y. Mar. 16, 2017) ................................................. 10

*Exxon Co., U.S.A. v. Sofec, Inc.,*

517 U.S. 830 (1996) ................................................................................................................ 20

*Foman v. Davis,*

371 U.S. 178 (1962) ................................................................................................................ 22

*Global-Tech Appliances, Inc. v. SEB S.A.,*

563 U.S. 754 (2011) ................................................................................................................ 15

*Gonzalez v. Arizona,*

677 F.3d 383 (9th Cir. 2012) .................................................................................................... 6

*Holmes v. Securities Investor Protection Corp.,*

503 U.S. 258 (1992) ................................................................................................................ 11

*Kidd v. Mayorkas,*

645 F. Supp. 3d 961 (C.D. Cal. 2022) ................................................................................... 6, 9

*Kumaraperu v. Feldsted,*

237 Cal. App. 4th 60, 187 Cal. Rptr.3d 583 (2015) ................................................................. 10

*Kwikset Corp. v. Superior Court,*

51 Cal. 4th 310, 322-23 P.3d 877 (2011) ............................................................................... 8, 9

*Liberty Mut. Ins. Co. v. EEOC,*

691 F.2d 438 (9th Cir. 1982) .................................................................................................. 6, 7

*Licht v. Binance Holdings Ltd.,*

No. 24-10447-NMG, 2025 WL 625303 (D. Mass. Feb. 5, 2025) ................................................. 10

*Lusk v. Kellogg,*

No. SACV 11-00087 JVS, 2011 WL 13225140 (C.D. Cal. Aug. 10, 2011) ............................... 17

*Manzarek v. St. Paul Fire & Marine Ins. Co.,*

519 F.3d 1025 (9th Cir. 2008) .................................................................................................. 5

*Marlin v. Moody Nat'l Bank, N.A.,*

No. H-04-4443, 2006 WL 2382325 (S.D. Tex. Aug. 16, 2006) ................................................. 17

KRONENBERGER ROSENFELD

*Martinez-Colon v. Santander Nat'l Bank*,

    4 F. Supp. 2d 53 (D.P.R. 1998) ........................................................................................... 17

*McGlinchy v. Shell Chem. Co.*,

    845 F.2d 802 (9th Cir. 1988) ................................................................................................ 6

*Oki Semiconductor Co. v. Wells Fargo Bank*,

    298 F.3d 768 (9th Cir. 2002) .............................................................................................. 10

*Pacific Int'l Vegetable Mktg., Inc. v. Nationwide Agribusiness Ins. Co.*,

    694 F. Supp. 3d 1185 (N.D. Cal. 2023) ............................................................................... 5

*Reca v. Flashdot Ltd.*,

    No. 1:24-cv-6316-GHW, 2026 WL 82702 (S.D.N.Y. Jan. 12, 2026) .................................. 10

*Saelzler v. Advanced Group 400*,

    25 Cal. 4th 763 (2001) ........................................................................................................ 11

*SEB Investment Management AB v. Align Technology, Inc.*,

    485 F.Supp. 3d 1113 (N.D. Cal. 2020) ................................................................................. 9

*Shulman v. Kaplan*,

    58 F.4th 404 (9th Cir. 2023) ................................................................................................. 7

*Thomas v. Bible*,

    983 F.2d 152 (9th Cir. 1993) ................................................................................................ 6

*Troyk v. Farmers Grp., Inc.*,

    171 Cal. App. 4th 1305 (2009) ........................................................................................... 10

*United States v. Cuddy*,

    147 F.3d 1111 (9th Cir. 1998) ........................................................................................... 6, 9

*United States v. Iossifov*,

    45 F.4th 899 (6th Cir. 2022) ............................................................................................... 15

*Venture Gen. Agency, LLC v. Wells Fargo Bank, N.A.*,

    No. 19-cv-02778-TSH, 2019 WL 3503109 (N.D. Cal. Aug. 1, 2019) ................................. 17

*Vicon Fiber Optics Corp. v. Scrivo*,

    201 F. Supp. 2d 216 (S.D.N.Y. 2002) ................................................................................ 11

KRONENBERGER ROSENFELD

*Watt v. OKCoin USA Inc.*,

   2026 WL 880154 (N.D. Cal. Mar. 31, 2026) ............................................................................... 13

**Statutes**

18 U.S.C. §1957 ............................................................................................................................. 14

18 U.S.C. §1960 ............................................................................................................................. 14

18 U.S.C. §1960(b)(1)(C) .................................................................................................. 14, 19, 25

31 U.S.C. §5311(2), (4)(A) ............................................................................................................ 14

31 U.S.C. §5311(3) ........................................................................................................................ 14

31 U.S.C. §5318(h) ........................................................................................................................ 15

31 U.S.C. §5321(a)(6) .............................................................................................................. 17, 19

31 U.S.C. §5321(a)(6)(A) .............................................................................................................. 17

Cal. Bus. & Prof. Code §17204 ................................................................................................... 7, 8

**Rules**

Fed. R. Civ. P. 15(a)(2) .................................................................................................................. 22

**Regulations**

21 C.F.R. §1301.74(b) .................................................................................................................... 11

31 C.F.R. §1010.410(f) ...................................................................................................... 14, 19, 21

31 C.F.R. §1022.210 .......................................................................................................... 15, 16, 17, 24

31 C.F.R. §1022.210(d)(1) ....................................................................................................... 22, 25

31 C.F.R. §1022.210(d)(1)(ii) ................................................................................................... 5, 14

31 C.F.R. §1022.320(a)(2)(iv) ....................................................................................................... 14

31 C.F.R. §§1022.210(a), 1022.320(a)(2)(iv) ............................................................... 3, 13, 14, 17

KRONENBERGER ROSENFELD

Plaintiff Jung Min Lee ("Plaintiff") hereby responds to and opposes Defendant Foris DAX, Inc. d/b/a Crypto.com' ("Defendant" or "Crypto.com")'s Motion for Judgment on the Pleadings (the "MJOP") as follows:

**INTRODUCTION**

Defendant Foris DAX, Inc. d/b/a Crypto.com moves to dismiss the sole surviving claim in this case: a UCL unlawful-prong claim predicated on Crypto.com's violations of the Bank Secrecy Act ("BSA"). Crypto.com is a federally registered money transmitter and money services business ("MSB") that took custody of and transmitted over a million dollars of Plaintiff's community property into wallets that were publicly flagged as scam-associated. Criminals had been using Crypto.com to facilitate that scam, freely, for weeks. Crypto.com does not dispute that it processed the transfers, that the destination wallets were flagged as scam-associated, █████████████ ███████████ or that it whitelisted those criminal wallets before each transmission. According to Crypto.com, none of that matters. Stripped to its essentials, the Motion asks this Court to hold that a federally regulated money transmitter may lawfully function as the financial pipeline for a fraud operation by receiving millions of dollars from elderly victims, ignoring flagged wallet addresses, bypassing its own controls, and transmitting the funds to known criminal wallets, so long as it later memorializes the crime afterwards in a report.

Crypto.com's theory of the BSA would legalize willful blindness. But the statute is not a paperwork regime; its goal is prevention. It charges MSBs with operational duties to identify, investigate, and stop transactions known to be tied to criminal activity, and it punishes the failure to do so severely. The governing philosophy revealed by Crypto.com's Motion is to ignore fraud, facilitate fraud, collect fees, and maybe file a form. Crypto.com believes it can discharge its BSA duties without lifting a finger to prevent the fraud on its platform. That philosophy is not theoretical; it is written into the facts of this case. Crypto.com did not build a compliance system to prevent crime on its platform; it built one that it could ignore.

The Motion's timing is also revealing. Crypto.com filed on April 8, 2026, while the operational records bearing on causation remain in its sole possession and the parties are in a contested discovery battle. On April 23, 2026, the Court provided guidance to the parties about that

1

**PLAINTIFF'S OPP TO CRYPTO.COM'S MJOP**

dispute that was in Plaintiff's favor, stating that Plaintiff is entitled "to know about the scam enterprise's documented activity on Crypto.com in order to prove its case," including "records concerning Crypto.com customers whose funds flowed to the same destination wallets and clusters that were vendor-flagged as scam-related" and that "I also think documents related to Crypto.com's BSA compliance record would be discoverable." (Order on Letter Brief re Discovery Dispute (Dkt. 146 at p. 1).) Supplemental responses were due May 5, 2026, and fact discovery closes August 28, 2026. As of the date of this filing, May 6, 2026, Crypto.com has continued to refuse to produce *anything* regarding the other Crypto.com customer victims, and any BSA compliance record documents.

The public blockchain fills in what Crypto.com refuses to disclose. Open-source analysis establishes that the destination wallets in this case sit inside a broad and sprawling scam enterprise responsible for tens of millions of dollars in vendor-flagged transfers from Crypto.com to more than a thousand known scams across tens of thousands of transactions. Data shows Crypto.com has been feeding innocent consumers into the same network in the months leading up to Patz's (Plaintiff's husband) transfers and has kept whitelisting of scam wallets in place for years. The blockchain cannot be suppressed and does not lie, and what it shows is not consistent with a money transmitter operating any meaningful BSA compliance program. Yet Crypto.com asks this Court to hold, as a matter of law, that Plaintiff cannot prove that BSA compliance would have prevented Crypto.com from sending her property to criminals, while the company has refused to produce the very records that bear on that question.

The Court need not address the issues in this Motion at all because it has already rejected Crypto.com's causation theory twice, and law of this case bars its reassertion. On the merits, the Motion rests on three fundamental errors: it applies the wrong causation standard, it misreads the Bank Secrecy Act, and it builds on strawman counterfactuals untethered from the allegations actually pleaded. Each is independently fatal. Any one requires denial.

## FACTUAL BACKGROUND

The following facts are drawn from the Second Amended Complaint ("SAC") (Dkt. 84) and are accepted as true for purposes of this Motion.

### A. Crypto.com Is a Federally Regulated Money Transmitter.

Crypto.com operates a cryptocurrency exchange, is a registered MSB under the BSA, and holds money transmitter licenses in multiple states. (SAC ¶37.) As a money transmitter, Crypto.com takes custody of customer funds, converts them from fiat into cryptocurrency the company holds on behalf of customers, and transmits the cryptocurrency to external wallet addresses. That custody-and-transmission function is the mechanism of the harm in this case. Every dollar Plaintiff lost reached the criminals through Crypto.com's hands. (SAC ¶¶160-166, 226.) As a registered MSB, Crypto.com is required to "develop, implement, and maintain an effective [AML] program … reasonably designed to prevent the money services business from being used to facilitate money laundering … commensurate with the risks posed by the location and size of, and the nature and volume of the financial services provided," which expressly includes "use of the money services business to facilitate criminal activity." 31 C.F.R. §§1022.210(a), 1022.320(a)(2)(iv). (SAC ¶¶37-40, 376.)

### B. The Criminal Wallets Were Flagged Before the First Transaction.

This is not a hindsight case. The downstream criminal wallet was confirmed as associated with criminal activity on December 5, 2022, over six weeks before the first transaction. (SAC ¶217.) That wallet first interacted with the initial destination wallet Crypto.com would later whitelist on January 14, 2023, the day Patz opened his account. (SAC ¶218.) On January 25, 2023, scam tags were published on the destination wallet during the period of active transactions.[1] (SAC ¶216.) Crypto.com advertises real-time blockchain analytics as a core security feature. (SAC ¶¶47-52.) However, Crypto.com ignored the criminal association and scam tags, and made the transfers anyway.

### C. Crypto.com Took Custody of, Converted, and Transmitted the Funds Thirteen Times.

Crypto.com was the delivery mechanism. Each of the thirteen transactions Crypto.com made followed the same sequence: (1) Crypto.com received lawful custody of fiat currency wired from First Republic Bank; (2) Crypto.com converted the fiat into Tether (USDT); (3) Crypto.com executed outbound transmissions to destination wallets. (SAC ¶¶160-166, 226.) Between January

---

[1] In other words, the scam wallets were tagged or otherwise noted as being associated with fraud.

19 and February 20, 2023, Crypto.com transmitted approximately $1 million across thirteen transfers to wallets associated with criminal activity. (SAC ¶226.) Every one of these transmissions was an affirmative act by Crypto.com as a money transmitter. Every one occurred after data existed, accessible to Crypto.com's own blockchain analytics systems, that must have identified the destination wallet's criminal association under a BSA-compliant screening protocol. Crypto.com ignored it all, overriding its own system.

### D. Crypto.com Crypto.com Whitelisted the Criminal Wallets and Bypassed Due Diligence.

Whitelisting is not a default state. Just as a "blacklist" prevents any transactions from occurring, a "whitelist" removes the compliance obstacles by clearing the recipient once for all time. This is a deliberate operational decision that bypasses the standard due diligence review that would otherwise normally occur in a BSA-compliant environment to determine if the transaction was facilitating crime. (SAC ¶¶83-86, 225, 240-242.) Crypto.com at one time required a 24-hour hold between whitelisting and first withdrawal. However, it eliminated that safeguard, making it possible for criminals to route funds to a new address with zero delay or review. (SAC ¶¶84-85.) By whitelisting the criminal wallets, Crypto.com intentionally skipped any compliance review and made any subsequent compliance review structurally impossible. (SAC ¶¶92-93.)

### E. The Compliance Questionnaire Confirmed the Fraud; Crypto.com Re-Enabled the Account Anyway.

Crypto.com paused Patz's account and questioned him about his identity and purposes, not the recipient's identity (the Travel Rule requirement). (SAC ¶318.) Patz's answers matched the indicia of elder-fraud-induced cryptocurrency transfers FinCEN had identified in its June 2022 Elder Financial Exploitation Advisory and its September 2023 Pig-Butchering Alert (FIN-2023-Alert005). (SAC ¶¶72-78, 188.) The pause itself confirms Crypto.com's ability to halt or refuse fraud-induced transactions; what followed confirms its choice not to. Under any BSA-compliant protocol, Patz's answers would have required the pending transfers to be frozen and review escalated, because the transactions did not appear to have a lawful purpose, and because the customer was refusing to answer questions.

Crypto.com did the opposite. It lifted the pause, whitelisted the offending recipient

KRONENBERGER ROSENFELD

accounts, and processed additional outbound transfers to those accounts. (SAC ¶¶190, 191-193, 317.) Two of those transfers occurred within minutes of the whitelisting itself. (SAC ¶193.) Crypto.com did not freeze the pending transfers, did not escalate the matter, and never returned to perform ongoing due diligence. (SAC ¶¶190, 196, 315-319.) The same regulations that imposed the duties also required Crypto.com to integrate AML compliance procedures with its automated data processing systems, 31 C.F.R. §1022.210(d)(1)(ii); (SAC ¶386), so that knowledge surfaced through the questionnaire would feed back into the controls governing the transfers. Crypto.com's process ran the opposite way: information that would have triggered escalation in any compliant program was used to whitelist the criminal wallets and clear the path for the next tranche.

When Patz discovered it was all a fraud, he immediately reported it to Crypto.com.

11:12 PM | from Crypto.com: Our responsible team took the needed steps on our side to prevent more people falling victim to this fraud scheme.

MTD FAC, Neff. Decl. Ex. A. at 20-21 (Dkt. 67-2)

Plaintiff brought her UCL claim to recover her lost property and to vindicate an important public interest in protecting the public from Crypto.com's unlawful business practices. Plaintiff "claims that Crypto.com, *inter alia*, 'failed to detect and/or prevent the transfer of close to $1 million from an elderly person to a recipient known to be associated with criminal activity,' 'failed to perform necessary recordkeeping under the Travel Rule,' that it's 'whitelisting' process is conducted in lieu of due diligence and/or proper recordkeeping, and 'especially under circumstances of high risk, represents a critical AML failure, and that 'it failed to integrate AML compliance procedures with its automated data processing systems as required under 31 C.F.R. 1022(d)(1)(ii)." Order Denying MTD SAC (Dkt. 115 at 16-17.)

### LEGAL STANDARD

A Rule 12(c) motion is evaluated under the same standard as a Rule 12(b)(6) motion. *Pacific Int'l Vegetable Mktg., Inc. v. Nationwide Agribusiness Ins. Co.*, 694 F. Supp. 3d 1185, 1189 (N.D. Cal. 2023). The Court accepts all well-pleaded facts as true and construes them in the light most favorable to the non-moving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The movant must clearly establish that no material issue of fact remains to be

resolved. *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 810 (9th Cir. 1988). A claim survives if the plaintiff has pleaded sufficient facts to make it plausible on its face. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).

## ARGUMENT

### I.   THE COURT HAS ALREADY REJECTED CRYPTO.COM'S CAUSATION THEORY; LAW OF THE CASE BARS ITS REASSERTION.

This is the third time Crypto.com has challenged Plaintiff's causation at the pleading stage, on the same facts and using the same legal theories. Twice the Court has rejected it: first in the Order at Dkt. 79 rejecting a causation challenge against the FAC, then in the Order at Dkt. 115 denying the motion to dismiss the UCL claim in the SAC on the same grounds. The Motion identifies no intervening change in controlling law making reconsideration appropriate, no substantially different evidence, and no clear error whose enforcement would work a manifest injustice. Crypto.com, which must overcome a heighted burden, makes no attempt to do so. The law of the case bars Crypto.com's third attempt.

The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983). It applies to issues decided either expressly or "by necessary implication." *Liberty Mut. Ins. Co. v. EEOC*, 691 F.2d 438, 441 (9th Cir. 1982). A district court may depart from its prior ruling only in narrow circumstances when (1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial. *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc) (internal quotations omitted); *United States v. Cuddy*, 147 F.3d 1111, 1114 (9th Cir. 1998); *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993). A movant bears a "heightened burden" to demonstrate what exception applies. *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1043 (9th Cir. 2018) The movant "must present arguments demonstrating that dismissal is appropriate in spite of the law of the case." *Kidd v. Mayorkas*, 645 F. Supp. 3d 961, 966 (C.D. Cal. 2022).  Crypto.com makes no attempt to meet its burden and continues to contest the material facts. The Motion is barred.

### *A. This Court Rejected Crypto.com's Causation Theory on the Merits.*

In its Motion, Crypto.com side-steps the law of the case doctrine and claims the Court "did not address whether Plaintiff sufficiently demonstrated a causal connection between her injury in fact and the alleged unlawful conduct under the BSA." (MJOP at 4 (Dkt. 137)) Not so. In its Order at Dkt. 79, this Court specifically evaluated and rejected Crypto.com's argument that Plaintiff could not establish a causal link between Crypto.com's conduct and her loss, holding that "Lee has shown a plausible causal link between Crypto.com's actions and the alleged injury to her community property." Order on MTD FAC at 9-10 (Dkt. 79) It expressly rejected Crypto.com's theory on causation as a premature, disputed issue of material fact: "Crypto.com's factual attack may be successful at trial, but it is unpersuasive under Rule 12(b)(1)." (*Id.* at 10.) And it rejected Crypto.com's argument that Patz's communications with Crypto.com broke the causal chain: "Crypto.com enabled all of the transactions between Patz and the scammers … Patz's messages with Crypto.com representatives do not constitute a waiver of liability and do not foreclose the theory that Crypto.com (among other parties) caused Lee's injury." (*Id.* at 10 (citing and quoting the Article III standing holding in *Shulman v. Kaplan*, 58 F.4th 404, 408 (9th Cir. 2023).) Those holdings were not dicta. They were the Court's reasoned resolution of Crypto.com's causation challenge, and they bind the Court's subsequent rulings on the same legal question.[2]

### *B. This Court Reaffirmed its Prior Order by Express Reference.*

When Crypto.com renewed the same standing and causation theory in its Motion to Dismiss the UCL claim in the SAC, the Court framed its response as one already given: "Crypto.com's first argument in favor of dismissal is that Lee lacks constitutional and prudential standing to bring her claims; I rejected that argument in the last Order." Order Denying MTD SAC (Dkt. 115 at 5.) That Order then sustained the UCL unlawful-prong claim against Crypto.com's identical causation objections, which necessarily required the Court to find that Plaintiff had pleaded she "lost money

---

[2] The Court's "assume[d] without deciding" language in its Orders on the FAC and SAC (Dkts. 79 and 115) addressed the presumption of Article III standing at the pleading stage based on the alleged facts; it did not displace the substantive UCL causation analysis under Cal. Bus. & Prof. Code §17204 that those orders necessarily resolved. The Court's denial of Crypto.com's motions to dismiss the UCL claim, on Crypto.com's identical broken-causal-chain theory, necessarily required a finding that Plaintiff pleaded §17204 causation, and that ruling is law of the case. *Liberty Mut.*, 691 F.2d at 441.

or property as a result of" Crypto.com's BSA violations within the meaning of Cal. Bus. & Prof. Code §17204. *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322-23 P.3d 877 (2011). Plaintiff's response in its opposition then still applies today:

> The connection between Crypto.com's misconduct and Plaintiff's injury is not just fairly traceable – it is direct . . . . Crypto.com (a licensed money transmitter) took direct custody of and handled the money, and knowingly transmitted the money to criminals . . . . The connection between Defendant's misconduct and the injury is airtight. There was no intermediary linkage between Defendant and [the criminals], hypothetical or otherwise. There is nothing remotely complex, tenuous, or disputable in terms of causality about how Crypto.com regularly transmits customer money to third parties, just as Crypto.com transmitted Plaintiff's money to [the criminals] here … Crypto.com still makes the incredible claim the chain of causation was a "mile long and filled with gaps," despite transmitting money directly to criminals. According to the allegations, Crypto.com took Plaintiff's property and gave it to criminals, causing a direct monetary loss to Plaintiff. This could not be more straightforward and direct.

Pl.'s Opp. to MTD FAC at 3-4 [Dkt. 68].

### C. Crypto.com's Three Arguments Are the Same Three Arguments Already Rejected.

The Motion is a relabeling exercise. Of the thirty-seven cases Crypto.com cites in the Motion, exactly one was decided after this Court's last Order at Dkt. 115: *Reca*, on January 12, 2026. Crypto.com makes no attempt to explain how *Reca* is an "intervening change in the law" of this case, and it could not: *Reca* is a RICO decision applying federal proximate cause doctrine that does not govern UCL unlawful prong claims under California law. Strip away the new caption and what remains are the three causation theories this Court already considered and rejected when it sustained the UCL/BSA claim's causation element through two rounds of motion practice on the same operative facts.

The Motion repeats three theories already rejected. First, the broken-causal-chain theory: Crypto.com pressed it on the FAC (Dkt. 67 at 11) and again on the SAC (Dkt. 89 at 16); the Court rejected it both times. Order Denying MTD SAC (Dkt. 115 at 9-11). Second, the not-a-substantial-factor theory: same FAC posture (Dkt. 67 at 21-22), same SAC posture (Dkt. 89 at 16-17), same rejection. The Motion now relabels the substantial-factor argument with two unpublished RICO cases, *Reca* and *Licht*, attached to the same previously rejected legal theory. Third, the superseding-

KRONENBERGER ROSENFELD

cause theory grounded in Patz's authorization and the scammers' off-platform conduct: pressed on the FAC (Dkt. 67 at 26) and again on the SAC (Dkt. 89 at 19-20); the Court rejected each time (Order 115 at 8-9, 11). Each is the same argument under a new label, and each is barred by law of the case.

The labels on the MJOP are new. The arguments are not. The Ninth Circuit treats Rule 12(b)(6) and Rule 12(c) standards as functionally identical, *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989), and a defendant who lost a Rule 12(b)(6) motion cannot relitigate the same issue by relabeling the motion under Rule 12(c). Crypto.com "must present arguments demonstrating that dismissal is appropriate in spite of the law of the case." *Kidd*, 645 F. Supp. 3d at 966. Crypto.com fails to meet its burden. Indeed, its "moving papers are devoid of any reference whatsoever to the Court's prior Order or the law of the case doctrine." *Kidd*, 645 F. Supp. 3d at 966.[3] That absence was not simply a critical strategic error. There is no intervening authority, no new evidence, no clear error, and no manifest injustice here to justify reopening settled law of the case. *See Cuddy*, 147 F.3d at 1114. The law of the case bars the Motion.

## II. THE UCL'S CAUSATION STANDARD IS A SUBSTANTIAL FACTOR ANALYSIS, NOT FEDERAL-RICO'S DIRECT CAUSE.

Crypto.com's causation argument fails because it applies the wrong legal standard across the board. The Motion borrows wholesale from federal RICO doctrine, a body of law foreign to §17200, to manufacture a heightened proximate-cause requirement that California has never imposed on UCL plaintiffs. The Motion should be denied on this threshold ground alone.

The California UCL's Proposition 64 amendment requires that a private plaintiff have "lost money or property as a result of" the unfair competition, a standard that California's Supreme Court has construed as imposing simple "but for" causation. *See Kwikset*, 51 Cal. 4th 310, 322-27.

The operative analysis for an unlawful-prong claim is the 'if only they complied' test under

---

[3] Crypto.com may make a late attempt in its Reply to articulate an argument against the law of the case doctrine, but that argument is waived, because Crypto.com made no effort to do so in its moving papers. *See SEB Investment Management AB v. Align Technology, Inc.*, 485 F.Supp.3d 1113, 1135 (N.D. Cal. 2020) (denying motion to dismiss because "arguments raised for the first time in reply briefs are waived").

*Daro v. Superior Court*, 151 Cal. App. 4th 1079 (2007), which asks whether the plaintiff would have suffered the same harm absent non-compliance. Under that test, the unlawful conduct "does not have to be the only cause of the harm," just a "substantial factor . . . that a reasonable person would consider to have contributed to the harm." *Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1349-50 & n.33 (2009) (noting "no legislative intent . . . that would require a standard of causation more stringent than the 'a substantial factor' standard"). "An event will be considered a substantial factor in bringing about harm if it is recognizable as having an appreciable effect in bringing it about." *Kumaraperu v. Feldsted*, 237 Cal. App. 4th 60, 68, 187 Cal. Rptr.3d 583 (2015) (internal citations and quotation marks omitted).

Here, Plaintiff would not have suffered her loss had Crypto.com complied with the BSA, because a BSA-compliant Crypto.com would not have transmitted Plaintiff's property to criminals in the first place. Crypto.com's AML program failed at every operational decision point. BSA compliance would have required, for example, Crypto.com to screen the destination wallet against industry-standard blockchain-analytics data, surface the criminal-association that existed before the first transfer, and then to decline the transmission rather than override its own controls. A BSA-compliant Crypto.com would never have engaged in the transmission of funds to an ongoing fraud. That transmission was not merely an "appreciable effect" on Plaintiff's loss; it was the entire mechanism of the loss. Plaintiff has pleaded substantial-factor causation under California law.

Every case Crypto.com relies on was decided under RICO's strenuous direct-causation standard, citing various cases having nothing to do with the UCL: *Reca v. Flashdot Ltd.*, No. 1:24-cv-6316-GHW, 2026 WL 82702 (S.D.N.Y. Jan. 12, 2026)(dismissing RICO case alleging concealment-type injury from the laundering of already-stolen funds, not a direct transfer case); *Licht v. Binance Holdings Ltd.*, No. 24-10447-NMG, 2025 WL 625303 (D. Mass. Feb. 5, 2025)( dismissing RICO case alleging that scammers laundered plaintiffs' already-stolen funds in part through Binance, not a direct transfer case); *Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768 (9th Cir. 2002)(dismissing RICO aiding-and-abetting case where bank's alleged failure to detect laundering of already-stolen-property lacked direct relation to the underlying theft); *Empire Merchants, LLC v. Reliable Churchill LLLP*, No. 16-CV-5226, 2017 WL 5559030 (E.D.N.Y. Mar.

16, 2017)(dismissing RICO case where distributor's lost sales were derivative of harm to retailers and required counterfactual market speculation), *aff'd*, 902 F.3d 112 (2d Cir. 2018); *Vicon Fiber Optics Corp. v. Scrivo*, 201 F. Supp. 2d 216 (S.D.N.Y. 2002)(holding RICO predicate act cannot proximately cause an injury that "merely furthers, facilitates, permits or conceals an injury that happened or could have happened independently of the act"). Each case asked whether under RICO's direct-cause standard, a downstream defendant's conduct would have changed a loss already caused by someone else. The proximate-cause inquiry was speculative for that reason: it required the court to ask whether the defendant's compliance might have helped law enforcement recover property that was already long gone. None of these cases help Crypto.com here.

A RICO plaintiff must "show[] that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well," meaning "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992); *see Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006); *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 981 (9th Cir. 2008). No California court has ever applied that standard to a UCL claim.

The standards are not just different in theory; they yield divergent outcomes in practice. *See City & Cnty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 654-58, 684-86 (N.D. Cal. 2020) (Breyer, J.) (dismissing the City's RICO claim for failure to satisfy *Holmes*'s direct-causation requirement, while sustaining the UCL unlawful-prong claim predicated on opioid distributors' violations of preventative CSA regulations requiring them to "design and operate a system to disclose to the registrant suspicious orders" and to "inform the DEA of suspicious orders," 21 C.F.R. §1301.74(b)). The doctrinal point from *Purdue Pharma* is fatal to Crypto.com's Motion: a federal regulatory regime designed to *prevent* harm before it occurs may serve as a UCL predicate even where the same conduct might fail RICO's narrower direct-causation requirement.

*Saelzler v. Advanced Group 400*, 25 Cal. 4th 763 (2001), on which Crypto.com heavily relies, is inapposite. *Saelzler* involved an apartment complex's failure to hire additional security guards, a classic omission case requiring speculation about whether more deterrence would have prevented an off-camera assault by a third party. Here, no such speculation is required. Crypto.com

did not fail to deter unknown criminals from entering its premises; it took Plaintiff's community property into its own custody and affirmatively transmitted it to criminals. The causal mechanism is Crypto.com's money transmission. A third party did not transmit Plaintiff's property.

*Oki Semiconductor* is also inapposite. Crypto.com invokes *Oki* for the proposition that a money launderer's role in a criminal conspiracy is not a substantial factor in the causal chain. But *Oki* addressed post-theft laundering of already-stolen proceeds through a bank account, a scenario where the theft had already been completed independently of the bank's conduct. Here, the theft was Crypto.com's money transmission itself. Plaintiff's funds arrived at Crypto.com as lawful deposits from lawful bank accounts and became the property of criminals only when Crypto.com moved it there. There is no analytically separable "prior theft" and "subsequent laundering." This is the difference between a getaway driver who arrives after the robbery and one who drives the robber to the vault and hands him the stolen cash. Under California's substantial-factor test, a party whose affirmative act completes the harm is necessarily a substantial factor in causing it. The SAC easily meets that test.

Crypto.com was not downstream of any prior loss because there was no prior loss. Crypto.com was the exclusive on-ramp and off-ramp of the fraud itself: it took lawful custody of Plaintiff's community-property funds from the Patz and Lee family's bank account, converted to cryptocurrency, held those funds on its platform in its custody, and then transmitted the property in a single step to the criminals. The instant Crypto.com made each transfer off its platform—and only at that instant—the funds were lost forever. There was no intervening custodian, no antecedent theft, no need to allege downstream concealment. The act and the harm are one and the same; the fraud scheme culminated in Crypto.com's money transmission itself. The causal chain is one link long, and Crypto.com is at both ends of it. Under California's substantial-factor test, that is more than necessary to show causation, and it defeats Crypto.com's speculative causal mechanism. *See Bhatia v. Silvergate Bank*, 725 F. Supp. 3d 1079, 1112-13 (S.D. Cal. 2024) (rejecting bank's argument that "Plaintiffs would have found another bank to process transfers that diverted []customer funds" as "highly speculative"; bank was "substantial factor" where it "processed transfers and accepted

12

**PLAINTIFF'S OPP TO CRYPTO.COM'S MJOP**

deposits that sent []customer money" to fraudsters).[4]

## III.    THE BSA IS A PREVENTION STATUTE, AND EVEN NEGLIGENT VIOLATIONS SUFFICE.

Crypto.com's causation theory relies on rewriting the BSA and ignoring decades of AML regulatory activity. According to Crypto.com, the BSA is a passive reporting statute. Crypto.com says it can legally transmit customer funds from its own custody to wallets controlled by criminals in furtherance of a fraud scheme so long as it files paperwork after the loss. Crypto.com is wrong. The BSA is, by design and by regulatory history, a prevention statute. Crypto.com's affirmative obligation is to stop its platform from being used to commit crime. Crypto.com's radical and bizarre compliance philosophy portends that a money transmitter could lawfully execute criminal transactions so long as paperwork follows, criminals would gravitate to the platform with the loosest compliance posture, and the BSA would become the charter for the conduct it was enacted to prevent. That theory is foreclosed by the statute's text, by FinCEN's implementing regulations, by this Court's prior orders, common sense, and by the broader AML framework build around U.S. Code, Title 31.

Crypto.com tells the Court that "[n]owhere in the BSA's statutory declaration of purpose or regulations requiring effective AML programs is it indicated that the BSA and its ensuing regulations are designed to prevent theft of any kind." (Mot. at 7.) That statement is false, and it runs headlong into the way the statute is written, administered, applied, and enforced. FinCEN, the agency Congress charged with implementing the BSA, treats fraud detection as a central BSA function. Its September 2023 Alert on pig-butchering scams directs MSBs to identify, detect, and flag cryptocurrency transfers bearing the indicia of investment-fraud schemes, FIN-2023-Alert005 (Sept. 8, 2023), and its June 2022 Advisory does the same for elder financial exploitation. EFE

---

[4] Crypto.com may rely on *Watt v. OKCoin USA Inc.*, 2026 WL 880154 (N.D. Cal. Mar. 31, 2026), but *Watt* is no different than *Reca*, an irrelevant RICO case. There, OKCoin received plaintiffs' already-stolen cryptocurrency after the theft was complete. Quoting *Reca*, the Court reasoned: had "cryptocurrency not been stolen, they would have had no reason to try and recover it," making the downstream laundering not the direct RICO proximate cause of the loss. That is the opposite of this UCL case. The SAC alleges Crypto.com would not have transmitted at all because the BSA imposed specific pre-transfer duties on Crypto.com. (SAC ¶¶ 216-218, 386); 31 C.F.R. §§1022.210(a), 1022.320(a)(2), 1010.410(f).

Advisory (June 2022). The Ninth Circuit gives deference to federal regulatory guidance to analyze whether the BSA has been violated. *See e.g., Cal. Pac. Bank v. Fed. Deposit Ins. Corp.*, 885 F.3d 560, 574 (9th Cir. 2018). This Court has also endorsed that view: in sustaining the BSA-predicated UCL claim, it held that the Travel Rule, 31 C.F.R. §1010.410(f), the AML-program requirement, 31 C.F.R. §1022.210(a), and the risk-based monitoring rule, 31 C.F.R. §1022.210(d)(1)(ii), can support a UCL claim arising from a consumer fraud loss. (Order 115 at 9-11.)

The text of the statute and code is no different. Congress declared the purpose of the BSA to include "prevent[ing] the laundering of money and the financing of terrorism through the establishment by financial institutions of reasonably designed risk-based programs to combat money laundering and the financing of terrorism," addressing "fraud risks" specifically, and "protect[ing] the financial system of the United States from criminal abuse." 31 U.S.C. §5311(2), (4)(A). Separate from 'preventing,' 'combating', and 'protecting' from financial crime, the BSA identifies reporting via "tracking of money" as its own standalone, separate purpose. *See* §5311(3). Title 31's implementing regulation requires every MSB to maintain an AML program "reasonably designed to **prevent** the money services business from being used to facilitate money laundering and the financing of terrorist activities." 31 C.F.R. §1022.210(a) (emphasis added). The BSA states expressly that MSBs are to detect "use of the money services business to facilitate criminal activity," without limitation. 31 C.F.R. §1022.320(a)(2)(iv).

Crypto.com has an affirmative duty to identify, investigate, and stop every transaction being used to "promote or support unlawful activity." That requirement is not abstract. An MSB that consciously ignores red flags and continues to transmit funds anyway is not merely a regulatory delinquent; it exposes itself to criminal liability under the BSA framework as an unlicensed money transmitter under 18 U.S.C. §1960(b)(1)(C), which reaches the "transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity," and as a money launderer under 18 U.S.C. §1957, which criminalizes monetary transactions of $10,000 or more involving criminal proceeds.[5]

---

[5] Recent enforcement actions against cryptocurrency exchanges confirm that DOJ treats §1960 as integral to the BSA regime. *See, e.g., United States v. Binance Holdings Ltd.*, No. 2:23-cr-00178 (W.D. Wash. 2023) ($4.3 billion resolution); *United States v. Peken Global Ltd. (KuCoin)*, No. 23-

Willful ignorance is no defense; under the BSA framework, the duty applies whether Crypto.com saw the criminal activity or chose not to look. *See United States v. Iossifov*, 45 F.4th 899, 922 (6th Cir. 2022) (affirming money-laundering conviction of cryptocurrency exchange operator based in part on his "failure to follow anti-money laundering procedures, and his 'no questions asked' operation"); *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) (willful blindness satisfies a knowledge requirement).

Crypto.com's "reporting-only" theory of the BSA is not just legally wrong; it is dangerous and perverse. Under that view, willful blindness is a cost-saving choice. The BSA's preventative mandate becomes an operational disadvantage no rational business would opt for. For the public it means the more an MSB looks the other way the more attractive it becomes to criminals; victim funds flow most freely through the platforms least willing or able to stop them. The SAC alleges that the scammers specifically chose Crypto.com because its compliance posture made it the path of least resistance. (SAC ¶¶199-202.) That is not statutory interpretation; it is the regulatory race-to-the-bottom that put Crypto.com before this Court in the first place. This is the very kind of conduct the aptly named Unfair Competition Law was enacted to address.

The federal government's BSA enforcement record confirms the point. In January 2017, Western Union, the country's largest money transmitter MSB, entered a deferred prosecution agreement ("DPA") and forfeited $586 million to resolve charges that it violated 31 U.S.C. §5318(h) and 31 C.F.R. §1022.210, among other charges. *United States v. The Western Union Co.*, No. 1:17-cr-00011-CCC (M.D. Pa. Jan. 19, 2017). The DPA's Statement of Facts is unequivocal: "Fraudsters relied on Western Union's money transfer system to receive fraud and other criminal proceeds worldwide from victims in the United States. Western Union's conduct, including its failure to take effective corrective actions in a timely fashion, contributed to the success of the fraudsters' schemes." DPA, Statement of Facts ¶3 (Dkt. 3-1) [Request for Judicial Notice in Support of Plaintiff's Opposition to Defendant's Motion for Judgment on the Pleadings "RJN" Ex. B]. The government did not charge Western Union for filing the wrong reports after the fact. It charged Western Union for "willfully failing to implement and maintain an effective anti-money laundering

CR-196 (S.D.N.Y.) (§1960 charges alongside BSA charges).

KRONENBERGER ROSENFELD

('AML') program that was designed to detect, report, and prevent criminals from using Western Union to facilitate their fraud, money laundering, and structuring schemes." *Id.* ¶1. The conduct the government targeted in Western Union is the conduct the SAC alleges here. Western Union's own systems flagged consumer-fraud schemes being run through its payment system, including lottery and prize scams, fictitious-loan scams, high-ticket internet purchase scams, secret-shopper employment scams, and impersonation-of-relative ("grandparent") scams. DPA, Statement of Facts ('SoF') ¶21 (Dkt. 3-1). [RJN Ex. B.] Like Crypto.com, Western Union operated under a compliance philosophy that it was not required to do anything about the fraud it was observing, despite "transaction monitoring and regular reports generated by [] analysts reviewing transactions that highlighted [] exhibiting transaction patterns or behavior that were indicative of fraud-complicity." DPA, SoF ¶28 (Dkt. 3-1). [RJN Ex. B.]

The same §1022.210 Crypto.com tells this Court has nothing to do with consumer fraud was the centerpiece of the BSA enforcement effort in *Western Union*. For remedies, Western Union was ordered to submit to an "Enhanced Compliance Undertaking" involving major BSA/AML program changes and independent monitoring designed to stop fraud induced payments. DPA, Attachment C (Dkt. 3-3). [RJN Ex. D.] *MoneyGram* is the same story, told earlier: a $100 million DPA in 2012 admitting that MoneyGram had willfully failed to maintain an effective AML program, among other charges. *United States v. MoneyGram Int'l, Inc.*, No. 1:12-cr-00291-CCC (M.D. Pa. Nov. 9, 2012). Both BSA enforcement efforts were directed at the precise compliance failure at issue here: an MSB that ignores evidence that its payment system is being used to defraud consumers, under the same misguided belief Crypto.com espouses that it is not required to do anything preventative. Like Crypto.com, Western Union and MoneyGram took custody of victim funds and transmitted those funds to fraudsters through its agent network. The technology is different (in-person remittance agents versus blockchain), but the scheme was the same, and the basic legal mechanics were the same: custodial money transmission used to deliver consumer funds to criminals.

The cases Crypto.com cites (*Marlin*, *Lusk*, *Venture General Agency*, *Martinez-Colon*) addressed whether the BSA *creates* a direct private right of action, a strawman the SAC does not

KRONENBERGER ROSENFELD

raise.[6] The relevant issue is whether the BSA explicitly *bars* a private right of action, which it does not. To the extent Crypto.com's Motion re-raises the argument that the BSA cannot serve as a UCL predicate, that argument is foreclosed by the law of the case. *See supra* Section I. This Court has already decided the question. (Order, Dkt. 115 at 17-18 ("The BSA does not explicitly bar a private right of action … In the absence of any authority precluding Lee from advancing under this theory of liability, I conclude that her unlawful UCL claim predicated on violations of the BSA by Crypto.com is plausible.").)

The BSA's negligence regime is the final nail in the coffin that closes Crypto.com's attempt to rewrite the BSA. The BSA imposes civil penalties on MSBs for negligent failures to perform BSA duties, 31 U.S.C. §5321(a)(6)(A), and treats a "pattern of negligent activity" as a separate, independently actionable violation, *id.* §5321(a)(6)(B). Plaintiff need not show Crypto.com is just like *Western Union* or *MoneyGram*, which are the pinnacles of BSA enforcement.[7] Plaintiff is not required to prove willful misconduct or actual knowledge to establish that Crypto.com violated the BSA, either. She need only show that Crypto.com's AML program was not "reasonably designed to prevent the money services business from being used to facilitate money laundering and the financing of terrorist activities," for want of meeting a reasonable standard of care. 31 C.F.R.

---

[6] *Marlin v. Moody Nat'l Bank, N.A.*, No. H-04-4443, 2006 WL 2382325 (S.D. Tex. Aug. 16, 2006), *aff'd*, 248 Fed. Appx. 534 (5th Cir. 2007); *Lusk v. Kellogg*, No. SACV 11-00087 JVS, 2011 WL 13225140 (C.D. Cal. Aug. 10, 2011); *Venture Gen. Agency, LLC v. Wells Fargo Bank, N.A.*, No. 19-cv-02778-TSH, 2019 WL 3503109 (N.D. Cal. Aug. 1, 2019); *Martinez-Colon v. Santander Nat'l Bank*, 4 F. Supp. 2d 53, 57 (D.P.R. 1998). Each held only that the BSA does not create a private right of action; none addressed whether BSA violations may serve as a predicate for an "unlawful" UCL claim, which is the question this Court has already resolved in the affirmative.

[7] *Western Union* and *MoneyGram* are the criminal-prosecution end of the BSA enforcement spectrum. The civil end is the daily reality of MSB life. Crypto.com is licensed in over 40 states and is examined for BSA compliance at least annually by competent state and federal regulators in every jurisdiction in which it operates. Each of those regulators has authority to make findings of AML-program deficiency under the negligence standard set out in 31 U.S.C. §5321(a)(6) and 31 C.F.R. §1022.210(a), and such examinations routinely produce such findings. *See, e.g., In re Block, Inc.*, Multi-State Settlement Agreement & Consent Order (Jan. 15, 2025) (RJN Ex. G) ($80 million coordinated state penalty against the money-transmitter MSB that operates Cash App, based on Multi-State Examination findings of AML-Program deficiencies measured against the effectiveness standard in 31 C.F.R. §1022.210); *In re Wise US, Inc.*, Multi-State Consent Order (July 9, 2025) (RJN Ex. H) ($4.2 million penalty against money-transmitter MSB for AML Program deficiencies including transaction-monitoring data integrity issues, and inadequate independent review). On information and belief, similar findings have been made as to Crypto.com. Plaintiff cannot say more because Crypto.com has refused to produce any of its BSA compliance record in discovery. *See* Dkt. 146.

KRONENBERGER ROSENFELD

§1022.210(a). Had Crypto.com met its standard of care, it never would have sent Plaintiff's property to criminals. The SAC pleads that, in detail. In short, Crypto.com's "passive reporting" theory of the BSA collides with the statute, the regulations, and this Court's prior rulings. That argument should be rejected.

## IV. THE SAC ALLEGES A DIRECT CAUSAL MECHANISM, NOT SPECULATION.

Crypto.com argues that even if it had complied with the BSA, Plaintiff would have suffered the same harm. (Mot. at 11-12, 19-22.) This argument fails because it misidentifies the applicable causation hypothetical.

### A. Crypto.com's Strawman Causation Theory.

Crypto.com argues that Plaintiff's theory requires this sequence: (1) Crypto.com flags the transaction; (2) freezes the assets; (3) reports to law enforcement; (4) law enforcement seizes and returns the assets. (Mot. at 15.) Crypto.com then dismisses this as "too speculative." But this four-step sequence is Crypto.com's own construction, not Plaintiff's theory. It appears nowhere in the SAC and was invented whole cloth in Crypto.com's Motion. Plaintiff's theory is simpler: a BSA-compliant Crypto.com would not have transmitted the funds in the first place, because the destination wallet would have been flagged before the transmission was authorized. The alternative to Crypto.com transmitting the funds to criminals is simply non-transmission, not law-enforcement recovery.

### B. At Multiple Decision Points, BSA Compliance Would Have Halted the Transfers.

The SAC identifies specific, pre-transmission decision points at which BSA compliance would have broken the causal chain.

*Pre-Deposit Wallet Screening.* By January 14, 2023, the destination wallet had already interacted with a confirmed-criminal downstream wallet; that downstream wallet had been confirmed criminal since December 2022. (SAC ¶¶217-218.) ████████████████████ ████████████████████████████ A BSA-compliant transaction-monitoring system that cross-referenced destination wallets against commercially available blockchain-analytics data and available sanctions lists would have flagged the association before any funds ever left Crypto.com's custody. (SAC ¶386.)

KRONENBERGER ROSENFELD

*Travel Rule.* The January 23, 2023 transfer crossed the Travel Rule's $3,000 threshold. 31 C.F.R. §1010.410(f). The destination was unhosted; no counterparty existed to provide beneficiary information. A BSA-compliant Crypto.com would have attempted to comply with the Travel Rule, escalated to enhanced due diligence and halted all transfers. (SAC ¶¶90, 220-224, 233.)

*Post-Scam-Tag Screening.* On January 25, 2023, while Crypto.com was actively transmitting Plaintiff's funds, public scam tags were published on the destination wallet. (SAC ¶216.) A BSA-compliant AML program integrating blockchain analytics with transaction monitoring would have triggered an alert on the first transaction after January 25, and every subsequent transfer would have been flagged, held, and not executed. (SAC ¶226.)

*The February 20 Whitelisting Dialogue.* On February 20, 2023, Patz attempted to register a new wallet as a whitelisted address. During Crypto.com's purported compliance questionnaire, Patz's answers exhibited the indicia of elder financial exploitation and investment-fraud schemes that FinCEN had identified in its June 2022 EFE Advisory and that FinCEN later memorialized in its September 2023 Pig-Butchering Alert. (SAC ¶¶72-78, 184-189.) Under Crypto.com's own prior protocol (the 24-hour hold it had eliminated) the whitelist registration process alone would have triggered an automatic hold and compliance review. (SAC ¶83.) Instead, Crypto.com ignored FinCEN guidance, failed to perform enhanced due diligence, and proceeded with the transfers. (SAC ¶¶184, 191.)

### C. The Either/Or Dilemma: Crypto.com Violated the BSA Whether Ignorant or Informed.

Crypto.com's causation defense ultimately reduces to a claim that it did not know. Either side of that proposition is a violation. If Crypto.com did not know, its ignorance is the negligent failure to implement an effective AML program that the BSA itself penalizes. 31 U.S.C. §5321(a)(6); supra Section III. If Crypto.com did know or was willfully blind, the transmissions independently violated 18 U.S.C. §1960(b)(1)(C), which categorically prohibits the transmission of funds "known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity." In both scenarios, a BSA-compliant Crypto.com would not have made a single transfer, and Crypto.com cannot escape causation by choosing between ignorance and knowledge. In both scenarios, a BSA-compliant Crypto.com would never

have made a single transfer. The causal mechanism's outcome is identical regardless. Crypto.com cannot escape causation by choosing between negligent ignorance or willful blindness.

## V. THERE IS NO SUPERSEDING CAUSE.

Crypto.com's superseding-cause theory fails as a matter of law because neither argument it offers, the criminals' conduct or Patz's so-called "evasiveness," is unforeseeable. A superseding cause must be "highly unusual or extraordinary, not reasonably likely to happen." *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996). Crypto.com only offers the reasonably expected conduct of criminals and their fraud victims as breaking the causal chain. Those arguments fail.

### A. The Scammers' Conduct Is the Foreseeable Harm the BSA Addresses.

Pig-butchering scams targeting elderly individuals via social media are not extraordinary. They are the documented, foreseeable harm that the BSA's prevention mandate and FinCEN's elder-fraud guidance were specifically designed to address. (SAC ¶¶60-66.) An institution that had been observing these scams on its platform for over a year cannot claim the recurrence of that exact scenario was unforeseeable. (SAC ¶¶61-65 (alleging prior Crypto.com victims defrauded through the same scam typology, and that pig-butchering schemes have drained "over $75 billion from victims around the world . . . exploiting exchanges like Crypto.com for money laundering").)

California law has long answered Crypto.com's superseding-cause argument. In *Bigbee v. Pacific Tel. & Tel. Co.*, 34 Cal. 3d 49 (1983), the California Supreme Court reversed a defense summary judgment based on the same superseding-cause theory Crypto.com presses here. In *Bigbee*, a telephone company placed a phone booth too close to the boulevard and was struck by a drunk driver, severely injuring the plaintiff. The Court rejected defendant's attempt to deflect blame from its negligently installed and designed phone book to the superseding act of the drunk driver, holding that "what is required to be foreseeable is the general character of the event or harm . . . not its precise nature or manner of occurrence," *id.* at 57-58, and that "[i]t is of no consequence that the harm to plaintiff came about through the negligent or reckless acts of [a third party]" so long as the kind of third-party conduct that produced the harm was among "the hazards which makes the actor negligent." *Id.* at 58 (quoting Rest. (Second) of Torts §449). The rule applies whether the third party's act is "innocent, negligent, intentionally tortious, or criminal." *Id.* The same rule controls

here. Plaintiff is not required to plead that Crypto.com foresaw the specific scammers, the specific transfers, or the specific moments of victimization. The general character of the harm, which here is fraud-induced cryptocurrency transfers from an elderly retail customer to a known criminal-wallet typology, was the documented, recurring harm Crypto.com had been observing on its platform for well over a year or more. (SAC ¶¶204, 271.)

### B. Patz's Conduct Was the Product of the Fraud, Not an Independent Act.

A fraud victim's sincere belief in the fraud is the definition of victimhood, not an intervening, unforeseeable act. Patz told Crypto.com he was making a "legitimate investment" because the fraud had convinced him he was. Treating his victimization as a superseding cause would immunize every financial institution that processes a fraud-induced transfer so long as the fraud is effective enough that the victim cannot recognize it. That result finds no support in California law and would effectively confer total immunity on financial institutions that handle the proceeds of consumer fraud.

Crypto.com's characterization of Patz as "evasive" inverts the facts. The SAC alleges that Patz answered Crypto.com's questions, and that his answers were themselves the red flag. He told Crypto.com he was investing with an online contact who "was not a professional advisor" and that "these are my funds and I don't feel an obligation to divulge my personal goals." (SAC ¶¶188-189; Neff Decl. Ex. A (Dkt. 67-2).) Under FinCEN guidance in effect at the time, including the June 2022 EFE Advisory, those answers were classic indicia of an elder-fraud-induced transfer. (SAC ¶¶72-78.) A BSA-compliant MSB is never supposed to just ignore when a customer refuses to answer due diligence questions. A BSA-compliant institution would have escalated review upon receiving those answers, not released the account. Crypto.com did the opposite.

Patz's responses are also irrelevant under the Travel Rule, which required Crypto.com to ascertain the beneficiary, not the sender's state of mind. *See supra* Section III; 31 C.F.R. §1010.410(f); SAC ¶318. A rule that permits a fraud victim's misplaced confidence to discharge BSA compliance would render the BSA's AML program requirement a dead letter.

## VII.   AMENDMENT WOULD CURE ANY DEFICIENCY.

If the Court identifies any deficiency in the SAC, Plaintiff requests leave to file a Third

Amended Complaint. Courts "freely give leave when justice so requires," Fed. R. Civ. P. 15(a)(2), with "extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051-52 (9th Cir. 2003). None of the *Foman* factors counsels otherwise. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Discovery since the SAC has produced new evidence that decisively closes the causation theory Crypto.com now attacks. On information and belief based on Crypto.com's discovery production, an amended complaint will plead the following:

███████████████████████████████████████████████████

████████████████████████████████████████████████████

Crypto.com cannot now tell this Court that the BSA imposes no such duty when its own AML program dictates so. ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████. None was applied to the Patz account. Plaintiff cannot yet say more about why because Crypto.com has refused to produce relevant internal communications and reporting. *See* Order on Discovery Dispute, Dkt. 146.

These proffered facts demolish Crypto.com's primary causation argument. Under 31 C.F.R. §1022.210(d)(1), the failure to implement and follow an MSB's own policies, procedures, and internal controls is itself a BSA violation. That is one direct violation the amended complaint will allege, and it is one Crypto.com's own program documents establish on their face. Crypto.com's argument that the BSA imposes no prevention duty is rendered moot by its own contemporaneous

22

program documents acknowledging that prevention is exactly what its program was supposed to do. Had Crypto.com followed its own written policies and procedures, Crypto.com would not have sent Plaintiff's community-property funds to criminals.

As alleged in the SAC, public blockchain data, independently verifiable from the open ledger and corroborated by independent investigation, establishes that the scam network into which Patz's funds were ultimately transmitted was identified as a scam in Crypto.com's vendor database on November 10, 2022, more than two months before Patz's first transfer in January 2023. The wallet that received Patz's first transmissions was itself receiving funds from nodes affiliated with that attributed scam beginning on January 14, 2023, five days before Patz's first transfer, and each subsequent destination wallet was pre-funded through that same chain before Patz transmitted to it.

Crypto.com itself sent more than $140,000 in USDT directly to the vendor-attributed scam wallet between November 3 and November 25, 2022, and was acted upon by vendor in attributing the scam, all before Patz opened his Crypto.com account on January 15, 2023.

The timing of those alerts is itself probative of compliance failure.

That asserted limitation is itself the violation.

has not implemented an effective AML program under 31 C.F.R. §1022.210. The choices that produced the gap,

Neither occurred.

Third, Crypto.com's own case files document its failure to apply its own scam-alert procedure to the Patz account, both during the period of his transfers and after they ended.

████████████████████████████████████████████████████

████████████████████████████ From his first transactions in January 2023, Patz fit each of those indicators on the face of his own account, and each is documented in Crypto.com's records.

████████████████████████████████████████████████████

████ Crypto.com did neither. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ The contemporaneous failure to apply Crypto.com's own program to a customer file its own analysts had flagged is itself a violation of 31 C.F.R. §1022.210(d)(1).

The *Foman* factors all favor amendment. The new facts emerged only through document productions Crypto.com itself controlled, eliminating undue delay and prejudice. Plaintiff has cured every prior deficiency the Court may have identified. The proffered allegations are not futile; they remedy the causation theory the Motion attacks. Leave should be granted.

## CONCLUSION

Crypto.com's Motion should be denied. The Court has twice rejected the causation theory it presses, and law of the case forecloses its reassertion under a Rule 12(c) label. Crypto.com's arguments fail because they have no legal support, instead relying on irrelevant RICO causation cases. On the merits, the SAC pleads with specificity the BSA-grounded mechanism by which Crypto.com's misconduct caused Plaintiff's loss. That loss occurred because Crypto.com took lawful custody of and transmitted Plaintiff's property directly to criminals. In the alternative, the Court should grant leave to file an amended complaint, which would plead 18 U.S.C. §1960(b)(1)(C) as an independent UCL predicate and would supplement the record with new evidence from Crypto.com's own admissions that decisively closes any remaining causation gap. Dismissal with prejudice is not the appropriate remedy where the defendant is actively obstructing the discovery that would confirm the very causation it claims is speculative.

Respectfully Submitted,

KRONENBERGER ROSENFELD

DATED: May 6, 2026

**KRONENBERGER ROSENFELD, LLP**

By:  s/ Karl S. Kronenberger
       Karl S. Kronenberger

Attorneys for Plaintiff Jung Min Lee